UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEVERLY HILLS TEDDY BEAR COMPANY

        Plaintiff,

v.

BEST BRANDS CONSUMER PRODUCTS, INC.,
and BEST BRANDS SALES COMPANY, LLC

        Defendants.

Civil Action No.:

1:19-cv-3766 (GHW)

**DEFENDANT BEST BRANDS' MOTION FOR A REFERRAL
TO THE U.S. COPYRIGHT OFFICE**

Morris E. Cohen
Lee A. Goldberg
Limor Wigder
GOLDBERG COHEN LLP
1350 Avenue of the Americas, 3rd Floor
New York, New York 10019
(646) 380-2087 (phone – main)
(646) 380-2084 (phone – direct)
(646) 514-2123 (fax)
LGoldberg@GoldbergCohen.com
MCohen@GoldbergCohen.com
LWigder@GoldbergCohen.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

TABLE OF EXHIBITS ..................................................................................................... iv

I.    INTRODUCTION ................................................................................................. 1

II.   APPLICABLE LAW AND PROCEDURE UNDER §411 ................................. 2

III.  BEVERLY HILLS KNOWINGLY AND REPEATEDLY INCLUDED
      INACCURATE INFORMATION IN ITS COPYRIGHT APPLICATIONS ................... 5

      A.    Beverly Hills Submitted Knowingly Inaccurate Information as to
            the Nature of the Authorship of the Works .......................................... 7

      C.    Beverly Hills Knowingly Submitted Inaccurate Publication Information ............ 12

      D.    Beverly Hills Also Knowingly Submitted Inaccurate Information
            Regarding Pre-Existing Works ............................................................. 17

IV.   A REFERRAL SHOULD BE MADE AS TO WHETHER THE REGISTER OF
      COPYRIGHTS WOULD HAVE REFUSED REGISTRATION IF IT KNEW
      OF THE INACCURACIES .................................................................................. 22

CONCLUSION .................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Bruhn NewTech, Inc. v. United States*, 144 Fed. Cl. 755, 802 (2019)................................ 4

*DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013) ....................... 3

*Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, Ltd. Liab. Co.*, 925 F.3d 1140, 1147
    (9th Cir. 2019)................................................................................. 4

*Palmer/Kane LLC v. Gareth Stevens Publ'g,* No. 1:15-cv-7404-GHW, 2016 U.S. Dist. LEXIS
    147336 (S.D.N.Y. Oct. 24, 2016) ......................................................... 4

*Ronaldo Designer Jewelry, Inc. v. Cox*, 2019 U.S. Dist. LEXIS 69187 (N.D. Miss. Apr. 24,
    2019) ....................................................................................... 3

*Russ Berrie & Co. v. Jerry Elsner Co.,* 482 F. Supp. 980 (S.D.N.Y. 1980)............................. 21

**Rules**

17 U.S.C. § 101 ............................................................................... 16, 17

17 U.S.C. §103(a) .............................................................................. 21

17 U.S.C. §411(b)(2) ........................................................................... 22

17 U.S.C. §411(b)(1)(B) ........................................................................ 22

**Treatises**

*U.S. Copyright Office, Compendium of U.S. Copyright Office Practices* §1501 (3d ed. 2017)..... 9

**TABLE OF EXHIBITS**

Exhibit 1     Example of Beverly Hills Copyright Registration (U.S. Copyright Reg. No. VA 2-111-231 for the Series 1 White Cat)

Exhibit 2     U.S. Copyright Application Form VA (blank copy) with instructions

Exhibit 3     Beverly Hills' Responses to Best Brands' Second Set of Interrogatories (excerpted)

Exhibit 4     Two-Dimensional Artwork submission received from Benson Tjio as part of the 99designs contest

Exhibit 5     Chart Summarizing information in Beverly Hills Series 1 Registrations

Exhibit 6     Chain of emails between David Socha and Neil Kohler dated September 21, 2017 (Exhibit 7 from 30(b)(6) Deposition of David Socha) (BHTBC 1588-1592)

Exhibit 7     Communication of Beverly Hills to Benson Tjio (BHTBC 1356)

Exhibit 8     Communication of Benson Tjio to Beverly Hills (BHTBC1358)

Exhibit 9     Communication of Beverly Hills to Benson Tjio (BHTBC 1360)

Exhibit 10    Email of David Socha dated Nov. 20, 2017 to Kana Clausen

Exhibit 11    Email of David Socha dated October 15, 2017 (BHTBC1625)

Exhibit 12    30(b)(6) Deposition of David Socha dated February 25, 2020 (excerpted)

Exhibit 13    Deposition of Luke Solomon dated January 22, 2020 (excerpted)

Exhibit 14    30(b)(6) Deposition of Randy Clark dated February 21, 2020 (excerpted)

Exhibit 15    Deposition of Becker Cheng of BC Mini dated February 26, 2020

Exhibit 16    Images of BC Mini Products obtained from the Tokyo Show and beforehand (Exhibit 2 from the Deposition of Becker Cheng)

Exhibit 17    Declaration of Robert C. Turner, Managing Attorney at Hasbro, Inc.

Exhibit 18    Spreadsheet of sales data provided by Beverly Hills (BHTBC 1760 sorted by date and excerpted)

Exhibit 19    Transcript of Pre-Motion Conference of March 12, 2020 (excepted)

Exhibit 20    Artwork from late October 2017, shown to Target on November 2nd

Exhibit 21    Shipping Document from overseas manufacturer BHTBC1761

Exhibit 22    Email of February 24, 2020 from Best Brands' Counsel to Beverly Hills' Counsel

Exhibit 23    Email of February 28, 2020 from Beverly Hills' Counsel to Best Brands' Counsel

Exhibit 24    Beverly Hill's email chain re: Target meeting (Socha Dep. Ex. 29)

Exhibit 25    Beverly Hill's email chain re: artwork (Socha Dep. Ex. 30)

Exhibit 26    Copies of all of the asserted Series 1 Copyright Registrations

Defendants Best Brands Consumer Products, Inc. and Best Brands Sales Company, LLC (collectively "Best Brands") hereby file this motion for a referral to the United States Copyright Office pursuant to 17 U.S.C. §411(b), with respect to the copyright registrations-in-suit of Plaintiff Beverly Hills Teddy Bear Company ("Beverly Hills").

## I.    INTRODUCTION

On March 12, 2020, the Court held a pre-motion conference in response to the parties' letters (Dkts. 47, 48, 50, 51) outlining their anticipated contentions on summary judgment. Pursuant to the Court's instructions during the conference (Dkt. 52), Best Brands is filing this motion setting forth the grounds for a referral to the Copyright Office under 17 U.S.C. §411(b).

As detailed in Section III below, Beverly Hills filed a series of copyright applications to artwork of Mr. Benson Tjio, all of which included inaccurate information therein. It supplied the Copyright Office with inaccurate information regarding the nature of the authorship by Mr. Tjio, inaccurate deposit copies that did not reflect what Mr. Tjio solely authored, and inaccurate information as to the first date of publication and the first nation of publication of his works. These are all grounds for the Copyright Office to have refused registration of the copyright applications in this lawsuit. However, the most egregious and blatant example of inaccurate information supplied to the Copyright Office stems from Beverly Hills' misrepresentations as to the pre-existing works. Beverly Hills wanted Mr. Tjio to provide designs for the Squeezamals that were similar to existing products, but then concealed that information from the Copyright Office. Beverly Hills misrepresented to the Copyright Office that the Squeezamals designs were wholly original when it knew they were based on existing products.

Beverly Hills' own discovery indisputably establishes that it provided knowingly inaccurate information on its copyright applications. For example, emails and testimony

1

expressly prove that Beverly Hills directed Mr. Tjio to third party websites, such as the website

of BC Mini, to create similar designs to preexisting works.  This was done before Mr. Tjio even

"put pen to paper."  BC Mini testified that these preexisting works were publicly displayed at,

and obtained from, the 2017 Tokyo Gift Show, prior to the design contest that led to Mr. Tjio

"designing" the line of Squeezamals.  Simply put, Beverly Hills knew that the information it

provided to the Copyright Office was inaccurate, aside from being misleading.  Its own records

in discovery and the testimony of its own witnesses bear this out.

Following Section III on the inaccuracies, in Section IV Best Brands has included a

proposed list of questions for the Court to submit to the Register of Copyrights further to the

provisions of 17 U.S.C. §411(b)(2).

## II.    APPLICABLE LAW AND PROCEDURE UNDER §411

The applicable copyright statute, 17 U.S.C. §411(b), states as follows:

(1)    A certificate of registration satisfies the requirements of this
section and section 412, regardless of whether the certificate
contains any inaccurate information, unless—

(A)    the inaccurate information was included on the application
for copyright registration with knowledge that it was
inaccurate; and

(B)    the inaccuracy of the information, if known, would have
caused the Register of Copyrights to refuse registration.

(2)    In any case in which inaccurate information described under
paragraph (1) is alleged, the court shall request the Register of
Copyrights to advise the court whether the inaccurate information,
if known, would have caused the Register of Copyrights to refuse
registration.

17 U.S.C. §411(b).  The statute requires a referral to the Register of Copyrights "[i]n any case in

which inaccurate information described under paragraph (1) is alleged" (*id.* at §411(b)(2)), i.e.,

in which information was included on an application with knowledge that it was inaccurate.

2

The Seventh Circuit addressed this statutory provision in *Schaltenbrand*. *See,*

*DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013). It held that:

> "Although the statute appears to mandate that the Register get
> involved '[i]n any case in which inaccurate information [in an
> application for copyright registration] is alleged,' 17 U.S.C.
> §411(b)(2), input need not be sought immediately after a party
> makes such a claim. Instead, courts can demand that the party
> seeking invalidation first establish that the other preconditions
> to invalidity are satisfied before obtaining the Register's advice on
> materiality. In other words, a litigant should demonstrate that (1)
> the registration application included inaccurate information; and
> (2) the registrant knowingly included the inaccuracy in his
> submission to the Copyright Office. 17 U.S.C. §411(b)(1)(A).
> Once these requirements are met, a court may question the
> Register as to whether the inaccuracy would have resulted in the
> application's refusal.

*Id.* In a later case, the *Ronaldo* court surveyed the subsequent case law and observed that "[i]n

the years since *Schaltenbrand* was decided, numerous courts have utilized the Seventh Circuit's

two-pronged approach." *Ronaldo Designer Jewelry, Inc. v. Cox*, 2019 U.S. Dist. LEXIS 69187,

at *4 (N.D. Miss. Apr. 24, 2019) (collecting cases). However, at the same time, *Ronaldo* also

criticized the Seventh Circuit's decision, opining that "*Schaltenbrand's* approach cannot be

squared with the plain language of the statute." *Id.* at *5.

As the *Ronaldo* Court held, "Section 411(b)(2) unambiguously provides that a referral to

the Register is required '[i]n any case in which inaccurate information described under paragraph

(1) is *alleged*." *Id.* (emphasis added in *Ronaldo*). "The plain meaning of 'alleged,' of course,

contemplates no evidentiary burden …. Indeed, the United States Supreme Court has expressly

rejected imposing an evidentiary burden when a statute, like §411(b)(2), uses the phrase 'is

alleged.'" *Id.* After a detailed analysis, the *Ronaldo* Court concluded "that by using the word

'alleged' (rather than 'proved' or a similar variant), Congress has directly spoken on the precise

question of whether a factual showing is required to refer a question to the Register." *Id.* at *8-9.

3

Although it is submitted that the interpretation of the *Ronaldo* Court is most consistent with the express language of the statute, Defendant Best Brands meets the statutory requirement here whichever approach is taken.  Best Brands has alleged the requirements of §411(b), and has gathered overwhelming evidence to prove that the statutory requirements are present.  As detailed at length in Section III below, Plaintiff Beverly Hills' own evidence establishes that inaccurate information was included on its applications for copyright registration, with knowledge it was inaccurate, fulfilling the requirements of §411(b)(1)(A).  It is indisputable that there were knowing inaccuracies in Beverly Hills' applications, based on its own records and deposition testimony in discovery, and the undisputed evidence of third parties.

In the interest of precision, it is important to note that the statute only requires a showing that inaccurate information was included with knowledge that it is inaccurate.  As this Court has previously held, the statute does not set forth a requirement to show "fraudulent intent."  *See, Palmer/Kane LLC v. Gareth Stevens Publ'g,* No. 1:15-cv-7404-GHW, 2016 U.S. Dist. LEXIS 147336, at *11-12 (S.D.N.Y. Oct. 24, 2016) (Woods, J.) ("To the extent that Plaintiff argues that the statute requires a showing of 'fraudulent intent' separate and apart from a showing of knowing inaccuracy, the Court agrees with Judge Rakoff and declines to graft this additional requirement onto the plain statutory text."); *Bruhn NewTech, Inc. v. United States*, 144 Fed. Cl. 755, 802 (2019) ("this court concludes that 17 U.S.C. §411(b) does not require a showing of fraud or willfulness to invalidate a copyright registration"); *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, Ltd. Liab. Co.*, 925 F.3d 1140, 1147 (9th Cir. 2019) ("the plain language of §411(b) … does not require a showing of fraud, but only that the claimant included inaccurate information on the application 'with knowledge that it was inaccurate.'").

4

Fraudulent intent is not discussed herein,[1] since intent is often a factual issue.  However, intent is not necessary for this motion.  Even though there is evidence of fraud here, whether Beverly Hills was deliberately attempting to mislead the Copyright Office or was grossly negligent is immaterial under the statute.  As noted above, the statutory standard is simply whether Beverly Hills provided inaccurate information with knowledge that it was inaccurate.  As discussed in Section III, that is established by Beverly Hills' own evidence.

Once knowingly inaccurate information is alleged or proven, the statute sets forth a mandatory referral procedure to the Copyright Office.  Under the procedure of §411(b)(2), the Court shall request that the Register of Copyrights advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.  To facilitate the Court's submission to the Copyright Office, Section IV details several proposed questions to the Register of Copyrights, based on the knowingly inaccurate information that is discussed in Section III.

## III.     BEVERLY HILLS KNOWINGLY AND REPEATEDLY INCLUDED INACCURATE INFORMATION IN ITS COPYRIGHT APPLICATIONS

Attached to Beverly Hills' Second Amended Complaint ("SAC") is a series of registrations it obtained from applications filed with the U.S. Copyright Office for the asserted works of Mr. Benson Tjio of Indonesia.[2]  The registrations are listed in the SAC[3] and attached to

---

[1]   Defendants, of course, reserve the right to set forth their contentions as to Beverly Hills' fraudulent intent at trial, and the motivation for Beverly Hills' repeated inaccuracies, in the unlikely event that a trial is necessary.

[2] Mr. Tjio has never been employed by Beverly Hills.  He is a third-party designer.

[3]  As listed in the SAC (Dkt. 42 at ¶18), the following are Beverly Hill's registrations for its "Series 1" products which it is asserting:

Reg. No. VA 2-111-231, for the Series 1 White Cat;
Reg. No. VA 2-111-212, for the Series 1 Dog;
Reg. No. VA 2-111-208, for the Series 1 Monkey;

it as Exhibit C (Dkts. 42-3, 42-4, 42-5, and 42-6) (the "Copyright Registrations").  As set forth in

footnote 1, the Copyright Registrations are divided herein into "the Series 1 Registrations"

asserted by Beverly Hills (Exhibit 26), "the Series 2 Registrations" (registrations for a later series

of plush toys) and "the Packaging Registration" (for packaging for the plush toys).  Although the

present motion concerns the Series 1 Registrations only, the same types of problems exist

throughout all the Copyright Registrations.

---

Reg. No. VA 2-111-202, for the Series 1 Panda;
Reg. No. VA 2-111-230, for the Series 1 Penguin;
Reg. No. VA 2-112-188, for the Series 1 Unicorn;
Reg. No. VA 2-140-693, for the Series 1 Teal Cat;
Reg. No. VA 2-140-694, for the Series 1 Duck;
Reg. No. VA 2-140-678, for the Series 1 Ladybug;
Reg. No. VA 2-140-680, for the Series 1 Pink Owl;
Reg. No. VA 2-140-672, for the Series 1 Bunny;
Reg. No. VA 2-140-676, for the Series 1 Fox;
Reg. No. VA 2-140-679, for the Series 1 Pig;
Reg. No. VA 2-140-698, for the Series 1 Narwhal;

(collectively, the "Series 1 Registrations" or Exhibit 26).  The following are its registrations for
its "Series 2" or "Season 2" products (which are not being asserted):

Reg. No. VA 2-129-675, for the Season 2 Elephant;
Reg. No. VA 2-129-679, for the Season 2 Furball;
Reg. No. VA 2-129-672, for the Season 2 Giraffe; and
Reg. No. VA 2-129-669, for the Season 2 Zebra,

(collectively, the "Series 2 Registrations").  The following is its registration for packaging
(which is also not being asserted):

Reg. No. VA 2-112-164, for the Series 1 Packaging (the "Packaging Registration").

The Series 1 Registrations, the Series 2 Registrations, and the Packaging Registration are all
collectively referred to herein as "the Copyright Registrations."

For ease of reference, one of the Series 1 Registrations is attached as Exhibit 1, and a summary chart is attached as Exhibit 3,  In addition, a set of all the asserted Series 1 Registrations is attached as Exhibit 26.  As illustrated therein and explained below, in every one of its fourteen (14) applications which are the subject of this motion, Beverly Hills submitted information to the Copyright Office that Beverly Hills knew was inaccurate.

### A.     Beverly Hills Submitted Knowingly Inaccurate Information as to the Nature of the Authorship of the Works

As shown on the Series 1 Registrations, Beverly Hills filed applications to register the asserted works of a third-party designer, Mr. Benson Tjio of Indonesia.  *See e.g.*, Exhibit 1.

Mr. Tjio was one of the winners of a design competition that was conducted by Beverly Hills through the online website "99Design."  *See,* Exhibit 3, Beverly Hills' Responses to Interrogatories 12 and 14.  In discovery, Beverly Hill provided copies of the 2-dimensional (2D) artwork that Mr. Tjio is said to have provided in connection with the competition.  An example is attached as Exhibit 4.  *See also,* Exhibit 12, Socha Dep. at 82:22 - 84:21.  Beverly Hills also obtained 2D artwork from Ms. Francesca Ibba, another contest winner having no connection to Beverly Hills (*infra*, Section III.B).

Beverly Hills took the artwork, and then its production department worked with a manufacturer overseas to have the manufacturer create plush toys out of it.  *See,* Exhibit 14, Clark Dep. at 16:4 - 17:3, 18:16 - 21:9, 40:8-22.  Mr. Tjio did not create any plush toys.[4]

 Attached as Exhibit 2 is a blank copy of the Copyright Office's VA application form for registering a work of visual arts.  As part of the copyright application, Beverly Hills was

---

[4]  Moreover, as further discussed below (*infra* Section III.B), Mr. Tjio did not design the final Squeezamals shown in the deposit copies, either.  Rather, his artwork was combined with that of Ms. Ibba to produce the final designs.  *See,* Exhibit 13, Solomon Dep. at 33:3-34:10.

obligated to accurately identify the Nature of Authorship by Mr. Tjio.  *See*, Exhibit 2, Application Section 2a.  In each and every application, Beverly Hills represented to the Copyright Office that Mr. Tjio had created 3-Dimensional sculptures.  *See,* Exhibit 1 (example of the issued registrations), Exhibit 2 (copyright application); Exhibit 5 (summary chart); and, Exhibit 26 (all the Series 1 Registrations).  That information was knowingly inaccurate.  Beverly Hills knew that Mr. Tjio had only created 2D artwork:  he never created any sculptures. Furthermore, the applications had a specific box for 2D artwork.  *See*, Exhibit 2, Application Section 2a.  But instead of accurately informing the Copyright Office, Beverly Hills knowingly provided inaccurate information that Mr. Tjio had created sculptures.  *See,* Exhibit 1, Exhibit 5 (summary chart), and the set of Series 1 Registrations in Exhibit 26.

In discovery, Beverly Hills only provided copies of 2D artwork from Mr. Tjio; it did not provide images of any sculptures by him.  Limor Wigder Declaration at ¶27.  When Beverly Hills filed its applications, it fully knew that Mr. Tjio only created 2D artwork.  As noted above, it testified that the 3-dimensional sculptures, or plush toys, were created by its production department along with its manufacturer overseas.  *See e.g.,* Exhibit 14, Clark Dep. at 18:16 - 21:9.

Furthermore, Beverly Hills was well aware of the difference between registrations for 2D artwork and for 3-D sculptures.  For example, it submitted a copyright application which resulted in Reg. No. VA 2-112-164, and stated therein that it had created 2D artwork.  *See,* Dkt. 42-5, pgs. 41-43.

In summary, Beverly Hills knew that Mr. Tjio had only authored 2D artwork.  But it provided information to the Copyright Office that Mr. Tjio had authored 3-dimensional sculptures, knowing that the information was inaccurate.

**B.      Beverly Hills Knowingly Submitted Inaccurate Deposit Copies**

Each Series 1 Registration is directed to a work solely and wholly authored by Mr. Tjio. *See,* Exhibit 1 (authorship section, Section 2a), Exhibit 2 (blank copyright application with spaces for sole or multiple authors), Exhibit 5 (summary chart showing authorship that was listed); and Exhibit 26 (authorship section in all the registrations).  As a result, when Beverly Hills submitted those applications, it was obligated to submit accurate images of what Mr. Tjio solely and wholly authored.  Such images are known as "deposit copies."  *See e.g., U.S. Copyright Office, Compendium of U.S. Copyright Office Practices* §1501 (3d ed. 2017) ("*Compendium (Third)*") ("The term "deposit"… refers to the copy or copies of a work that are submitted to the U.S. Copyright Office").

An accurate deposit copy is very important because the Copyright Office examines it as part of the registration process.  It is also very important that it be accurate because it illustrates to the public what the scope of the application is.  "Upon request, any member of the public may inspect the deposit copy(ies) or identifying material for a work that has been registered or refused by the U.S. Copyright Office."  *Compendium (Third)* §1510.3.

As shown by the Series 1 Registrations themselves (Exhibits 1 and 26), each registration included images of a three-dimensional product attached thereto.  But  as noted above (Section III.A), Mr. Tjio did not author any 3-dimensional products – he only created 2D artwork.  Thus, the deposit copies were <u>not</u> copies of works that Mr. Tjio authored.  Since the Series 1 Registrations are all directed to works authored by Mr. Tjio, Beverly Hills should have included copies of the 2D artwork that he authored, but they did not.

Furthermore, the Series 1 Registrations are to works solely authored by Mr. Tjio, but the 3-D products in the deposit copies are not accurate depictions of designs that he solely created.

9

Rather, Beverly Hills has admitted that they included features which Mr. Tjio did not author. As Beverly Hills acknowledged in discovery, the Squeezamals Products reflect a combination of features from multiple parties. *See,* Exhibit 3, Response to Interrogatory No. 14; *see also,* Exhibit 13, Solomon Dep. at 33:3 - 34:10 (testifying that the artwork of Benson Tjio and Francesca Ibba were combined to produce the final designs). Beverly Hills took features from the submission of Francesca Ibba (another winner of the design competition), and had Mr. Tjio incorporate those features into his 2D artwork. *Id.*

For example, the eyes in the Squeezamals products were taken from Ms. Ibba's 2D art.[5] *See,* Dkt. 50 at 2 (admitting to the Court that Ms. Ibba submitted the eye design which was incorporated by Plaintiff into the final Squeezamals Works). As Beverly Hills has admitted, the eyes were not designed by Mr. Tjio. Yet, when it applied for copyrights, it listed Mr. Tjio as the source of all of the features. Beverly Hills knowingly provided inaccurate information that he was the sole author of all the features in the deposit copies.

Recognizing that this is a problem, Plaintiff alleged in its pre-motion response letter that the eyes are a "*de minimis*" part of the design. *See*, Dkt. 50 at 2. However, that is directly contradicted by Beverly Hills' own internal documents, which specifically focused on the importance of the eyes to the products. Indeed, the eyes were the most important feature to Beverly Hills. It was the one feature that Beverly Hills focused on, again and again.

---

[5]  Defendants contend that the eyes in Ms. Ibba's artwork were, in turn, taken from prior products sold by Hasbro. *See,* Exhibit 17, Hasbro Declaration of Robert Turner and accompanying exhibits (whose admissibility was stipulated to by Beverly Hill's counsel). Since Plaintiff may dispute that fact regarding the original source of the eyes provided by Ms. Ibba, Defendants do not rely on misappropriation from Hasbro in the discussion above. Nor do Defendants need to. As noted above, Plaintiff did not dispute in discovery that Mr. Tjio did not create the eyes. *See also*, Exhibit 7, Exhibit 9, and, Exhibit 11 (all directing Mr. Tjio to incorporate into this 2D artwork the eyes that were obtained from Ms. Ibba). As a result, it is clear that all the copyright applications, which said he did, were knowingly inaccurate.

At the very outset of the Squeezamals (a/k/a Squishamals) project David Socha wrote to his outside sales representative Neil Kohler on September 21, 2017 at 3:18 pm.  "In terms of Squishamals – you want these with the non-expressive Japanese eyes? right?  not the cartoony eye?"  Exhibit 6, BHTBC 1589.  Mr. Kohler wrote back at 439 pm, "Hi David, I will leave it to your designers to make the right "eyes" for Squishamals."  *Id.* at BHTBC 1588.

After Mr. Tjio provided his artwork, Beverly Hills wrote to him, indicating that they wanted him to incorporate Ms. Ibba's eyes in his designs.  They wrote "Any way you can keep doing your designs but just use the eyes that are attached.  We love these eyes but we love your designs as well."  *See,* Exhibit 7.[6]  Mr. Tjio wrote back "no problem, I will change the eyes." *See,* Exhibit 8.  Likewise, after he incorporated the eyes, they had him correct them, including their size.  *See,* Exhibit 9.  Similarly, when he forwarded additional illustrations at their request, CEO Socha wrote to his head of design Kana Claussen "can we put our eyes on there? can they do it?"  *See,* Exhibit 10.

No other design feature got this level of attention.  The company repeatedly went back to, and focused on, the eyes.  It is indisputable that Beverly Hills itself never considered the eyes to be "de minimis."

Indeed, Beverly Hills' 30(b)(6) witness and CEO Socha was asked in depositions what feature he allegedly owned of the asserted products.  The very first feature that he identified, and the one that he kept coming back to, was the eyes.  *See,* Exhibit 9, Socha 123:18-20 (Q: … What features do you think you own? … A:  The eyes …); *id.,* 124:1-2 (Q: … So which particular features?  A:  The eyes …); *id.,* 128:21-23 (Q:  Do you know what particular features, though,

---

[6]  Attached Exhibits 7, 8, and 9 are in very small print, but were produced that way to us by the Plaintiff.  We have quoted the relevant text above.

are yours or others?  A:  I'm repeating; the eyes …).  The eyes were not deemed "de minimis" – on the contrary, it was the most important feature to him.  As the 30(b)(6) witness for the company, it was the feature that he kept emphasizing as belonging to Beverly Hills.

When Beverly Hills submitted applications to Mr. Tjio's works, it was well aware that Mr. Tjio did not create the eyes.  As noted above, Beverly Hills directed that the eyes from Ms. Ibba's artwork be used in Mr. Tjio's designs, instead of the eyes that Mr. Tjio had provided. However, it listed Mr. Tjio as the author of all aspects of the designs, including the eyes.  That was knowingly inaccurate.

Moreover, as discussed below (Section III.D), Beverly Hills misinformed the Copyright Office that Mr. Tjio was the original author of all aspects of the works in the deposit copies, i.e. that the deposit copies were not based on any pre-existing works, when, in reality, it had directed the designers to base their designs on preexisting works.  That was also knowingly inaccurate.

In summary, Beverly Hills applied for works by Mr. Tjio, informing the Copyright Office that the deposit copies were wholly and solely authored by Mr. Tjio.  Yet, it knew that Mr. Tjio did not create any of 3-dimensional sculptures shown in the deposit copies.  It also knew that Mr. Tjio did not author the eyes in those sculptures.  It also knew that it had directed Mr. Tjio to create his designs based on pre-existing works.  Beverly Hills knowingly provided inaccurate deposit copies to the Copyright Office, deposit copies which allegedly reflected the sole authorship of Mr. Tjio, but which, in reality, did not.

C.    **Beverly Hills Knowingly Submitted Inaccurate Publication Information**

Beverly Hills also submitted knowingly inaccurate publication data to the Copyright Office.  The publication dates and nations of publication that Beverly Hills submitted to the Copyright Office in each of the Series 1 Copyright Registrations is included in Exhibit 5.

12

Under the Copyright Act, "publication" is defined as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership." 17 U.S.C. §101. Likewise, "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication." *Id.*

In the Series 1 Registrations, Beverly Hills represented that all of the works were first published on December 21, 2017 in the United States (other than the unicorn which it represented was first published on February 27, 2018 in the United States). All of those representations were knowingly inaccurate based on Beverly Hills' records. Not a single document was produced by Beverly Hills in discovery that corroborated the first publication dates listed in its applications.

Under the statute, offering to distribute copies for purposes of further distribution (i.e. an offer for sale) constitutes publication. 17 U.S.C. §101. Thus, offers for sale must be taken into account under the statutory definition to determine the date and nation of first publication. According to both of Beverly Hills 30(b)(6) witnesses, its CEO David Socha, and its President Randy Clark, the first offers for sale by Beverly Hills took place in October and November 2017.

Mr. Socha testified that Mr. Tjio's designs were first shown in Hong Kong in October 2017. Exhibit 12, Socha Dep. at 86:20 - 88:19, and Exhibit 11. In an email on October 15th (under the subject line "Squishamals") he stated that "We have a new line that is getting a lot of attention at the show in Hong Kong." Exhibit 11. ("Squishamals" was the original name given to their asserted products before they changed the name to "Squeezamals.") In Hong Kong, he showed the designs to "key partners," i.e., to overseas distributors. Exhibit 12, Socha Dep. at 87:9-89:22, and Exhibit 11. As Mr. Socha testified, they were shown to their Australian distributor, their UK distributor, and their Canadian distributor, to get them to buy it, i.e. they

13

were offered for sale.  Exhibit 12, Socha Dep. at 87:22-88:14.  The designs shown were the

artwork created by Mr. Tjio.  *See e.g*., Exhibit 4.[7]  Randy Clark, the company president, was

showing the designs at meetings, and Mr. Socha was at some of the meetings.  Exhibit 12, Socha

Dep. at 89:4-11.  *See also*, Exhibit 8, Randy Clark Dep. at 85:20-86:3 (testifying that the designs

were shown in Hong Kong in October).  Beverly Hills then received commitments for purchases

in October from their distributor in Australia (Exhibit 12, Socha Dep. 101:2-25), their distributor

in the UK (*id.,* Socha Dep. 99:7 - 100:12; 101:20 - 103:21), and so forth.  Thereafter, Mr.

Socha's company continued to offer the products for sale.  For example, its 30(b)(6) witness

believed that their representative approached Five Below with artwork showing the line.  *Id.,*

Socha Dep. 90:10 – 91:21.

  The artwork illustrating the intended designs was in final, or essentially final, form by the

end of October.  Exhibit 12, Socha Dep. 107:16-24, 109:10-23; Exhibit 14, Clark Dep. 35:20-

36:20.  Beverly Hills then offered the line for sale to Target at a sales meeting on November 2,

2017.  Exhibit 12, Socha Dep. 108:15 – 109:5; Exhibit 14, Clark Dep. at 32:9-33:13.  The

materials from late October 2017, shown to Target on November 2nd, are attached as Exhibit 20.

  Indeed, nothing at all was produced in discovery showing any basis for the December 21,

2017 first date of publication set forth on its registrations (or the February 27, 2018 date for the

---

[7]  Exhibit 4 (Socha Deposition Exhibit 9) and Clark Deposition Exhibit 3 (which are the same)
were the only artwork provided to Best Brands prior to Messrs. Socha and Clark's deposition.
Mr. Clark testified that, but for minor color modifications on the "chick" and "owl", this was the
final artwork provided to Target in November 2017.  *See*, Exhibit 14, Clark Dep. at 35:20-36:20.
After it was determined that art boards regarding the initial presentation to Target were not
produced, Best Brands requested those art boards.  As can be seen by Exhibit 20
(BHTBC001713-1715), the final artwork for the presentation was dated October 27, 2017, and
October 30, 2017.  After the presentation was completed, BHTBC also created artwork for a
"SideCap" for Target that would appear in their stores.  Exhibit 20 (BHTBC1716).  The date of
that artwork was November 8, 2017.  *Id.*

unicorn).  Realizing that it had produced no documents to support its December 21, 2017 date during discovery, and provided no deposition testimony to corroborate it, Beverly Hills has recently scrambled to try to justify that date.  About three weeks after fact discovery ended on February 29th, eleven days after Best Brands' pre-motion letter to the Court (Dkt. 47), in the week following the pre-motion conference with the Court conference, Beverly Hills suddenly and incredulously "uncovered an additional document" that it first produced to Best Brands on March 17, 2020.  It appears to be a shipping document from "Big Bonanza Industrial Ltd." to Beverly Hills dated December 20, 2017.  There is also an entry in this document that states "Plush Toys Squishamals for Target."  *See,* Exhibit 21.

Considering that documents of this type were sought in Best Brands' discovery requests served in July 2019, one has to wonder how and why this one document was suddenly "uncovered" weeks after the close of discovery.  Could it have something to do with the fact that Best Brands pressed the issue of Beverly Hills' erroneous first publication date in Best Brands' March 6, 2020 pre-motion letter, or that this issue was fully discussed on March 12th during the pre-motion conference before the Court?  Why would Beverly Hills further search for documents when discovery was over, after Beverly Hills' counsel explicitly confirmed in an email dated February 28th "that no additional documents are forthcoming"?  Exhibit 23, February 28, 2020 email from Dwana Dixon.  The answer to these questions is obvious:  Beverly Hills fully realized that its listed first publication date was unsupported in discovery.  As a result, it is now grasping for straws in a thinly-veiled and weak attempt to rectify the situation, irrespective if it means that it has flouted its discovery requirements under the Federal Rules.

Because of Beverly Hills' violation of its discovery obligations and late production of this document, Best Brands has no chance to test its veracity or authenticity, or probe its

contents. As such, Beverly Hill's use of the document is an attempt to prejudice Best Brands. Notwithstanding that prejudice, the document is of no moment. To the extent that Beverly Hills may believe it supports its listed first publication date, the document does the contrary. As found in the Copyright Act (17 U.S.C. § 101) "publication" includes an offer for sale, as discussed above. The documents and deposition testimony of Beverly Hills representatives show that at the very least, Beverly Hill's first "offer for sale" of final versions to Target was November 2, 2017. This late-produced document only confirms that fact. The December 20, 2017 document reflects a shipment of products that were going to Target. Thus, the product had <u>already</u> been offered for sale, and sold to, Target, confirming that the subsequent December 21, 2017 first publication date is incorrect.

Moreover, even though Best Brands requested copies of the sales data in document requests, and then repeated its request before Mr. Socha's 30(b)(6) deposition (*see e.g.*, Exhibit 22), Beverly Hills was never able to produce any invoices, or any other records in discovery, to corroborate the December 21st date.[8]

In summary, Beverly Hills provided inaccurate publication information to the Copyright Office, knowing it was inaccurate. The date of first publication that it provided were inaccurate. Each registration indicated that Mr. Tjio's designs were first published on December 21, 2017 in the U.S, other than the unicorn for which it stated a February 27, 2018 date. *See*, Exhibit 5

---

[8]  With respect to the distribution of copies by sale (17 U.S.C. §101), Beverly Hills did not produce any invoices corroborating a December 21, 2017 date, either. It produced a spreadsheet of its alleged sales dates in discovery (BHTBC001760). Attached as Exhibit 18 is an excerpt from the data provided. (Counsel took the spreadsheet produced by Beverly Hills, sorted it by invoice date, and excerpted the first several months of entries to create the attached Exhibit 18. *See,* Declaration of Limor Wigder at ¶18.) At the top is the information produced in discovery as to the earliest invoices for sales of Beverly Hills' asserted products. The first invoices were alleged to be from January 1, 2018. Exhibit 18. Thus, there were no records produced in discovery as to any invoices dated December 21, 2017.

(summary chart).  All those dates were wrong.  As set forth above, Beverly Hills fully knew that

it started offering Mr. Tjio's designs for sale (copyright "publication") in October 2017, and

offered the final designs (which incorporated other authors, and also included the unicorn) on

November 2nd.  That included offers of the unicorn.  *See,* Exhibit 14, Clark Dep. 35:12 – 38:20;

Exhibit 24 (Socha Dep. Ex. 29) Exhibit 25 (Socha Dep. Ex. 30); Exhibit 12, Socha Dep. at

108:12 109:23.  Thus, the dates of first publication on the applications were all knowingly

inaccurate.  *See also,* Exhibit 14, Clark Dep. 34:19 – 35:11 (in the earlier part of November

2017, Beverly Hills had a purchase commitment from Target).

Furthermore, the actual nation of first publication was Hong Kong.  Beverly Hills fully

knew this – it showed Mr. Tjio's original designs at a trade show there.  The nation of first

publication was not the United States, contrary to what Beverly Hills told the Copyright Office.

Beverly Hills was well aware of its own activities.  It certainly knew of its own extensive

efforts involving offers for sale at trade shows and to customers, and its sales to those customers.

The information it provided to the Copyright Office was knowingly inaccurate.

### D.    Beverly Hills Also Knowingly Submitted Inaccurate Information Regarding Pre-Existing Works

Under the Copyright Act, a "'derivative work' is a work based upon one or more

preexisting works, such as … art reproduction, abridgment, condensation, or any other form in

which a work may be recast, transformed, or adapted."  17 U.S.C. §101.  As part of its copyright

applications, Beverly Hills was legally obligated to inform the Copyright Office whether its

works were derivative works.  *See*, Exhibit 2, Copyright Application Section 6.  It was obligated

to identify any preexisting material (*id.*, Section 6a), and to provide a statement of the material

added thereto, in which copyright is claimed.  *Id.,* Section 6b.

Yet, again, Beverly Hills provided knowingly inaccurate information in its applications. In its design contest, Beverly Hills instructed outside designers as to what it wanted the designs based on, but then withheld that information from the Copyright Office.

As Mr. Socha himself testified, his strategy with the Squishamals/Squeezamals was to create plush toys based on the hot trends from Japan. Exhibit 12, Socha Dep. 94:1-10. His September 21, 2017 correspondence with his sales representative to Target, Neil Kohler, is illustrative. In it, Mr. Kohler directed Mr. Socha to the offerings on the website of third-party BC Mini. Exhibit 6 [Socha Ex. 7], email of 12:17 pm, and email of 1:24 pm. Mr. Kohler expressed his desire that Beverly Hills come out with a line like that. He stated that he had a meeting with the Target plush buyer in which he "showed her BC Mini (Japanese collectibles brand) and told her we were developing squishable mini-plush in animals and food … She loves the idea. … Check out BC Minis for inspiration … we can win big by doing the squishies trend in plush." *Id.* (12:17 pm email). In correspondence less than an hour later, Mr. Kohler again directs Mr. Socha to the BC Mini site. *Id.* (1:24 pm email). Beverly Hills then commenced its design contest at the end of September, directing the designers to those designs.

Best Brands deposed Beverly Hill's employee Luke Solomon on this issue. During the 2017 time frame in question, Mr. Solomon was Beverly Hills' Marketing Coordinator.[9] Mr. Solomon testified that the Squeezamals were developed though the a contest conducted on the website "99design." Exhibit 7, Solomon Deposition at 18:9-19:1. Freelance designers were given instructions as to what Beverly Hills wanted, and then Beverly Hills picked the winner or winners. *Id.* at 18:13-19.

---

[9] Mr. Solomon was in the Marketing Coordinator from approximately the start of 2016 until the beginning of 2018. Exhibit 7, Solomon Deposition 9:24-10:1. (From the beginning of 2018 on, he moved into a new position with the company.)

Mr. Solomon testified that, when Beverly Hills communicated with the designers, it "***gave them some examples of what we wanted the product to look like***." *Id.* at 18:20-22 (emphasis added). Mr. Solomon supplied the designers with references to the websites of third party BC Mini and third party Silly Squishies. *Id.* at 23:7-24:17. He was directed to do so by Beverly Hills' President David Socha. *Id.* at 23:21-24:5. Mr. Socha wanted the designers to use those websites as "inspiration." *Id.* at 24:6-13. More specifically, ***Mr. Socha wanted the designers to create products like the BC Mini and Silly Squishy ones***. *Id.* 24:14-17.

With respect to the Japanese "trends" and the offerings of BC Mini, Best Brands deposed BC Mini's corporate representative Becker Cheng, who appeared in response to a subpoena. Mr. Cheng testified that he attended the Tokyo, Japan International Gift Show that was held from September 6-8, 2017. Exhibit 15, Cheng Deposition at 6:9-13. He saw numerous plush products at the show which he then bought, then offered for sale, and sold in the U.S. Market. *Id.* at 9:4-12:11; and, Exhibit 16. His family also took pictures of what was available. Exhibit 15, Cheng Dep. 9:8-19; and, Exhibit 16 (page 1). Some examples of the materials obtained at the show (and beforehand), are attached. Exhibit 16.

Mr. Cheng testified that the product to the left below was manufactured by Yamani, Ltd. of Osaka, Japan. *See*, Exhibit 15, Cheng Dep. Page 9 ln. 8-10. Plaintiff's Squeezamals (below right) are based on the Japanese product to the left, with the "starry eyes" incorporated from Hasbro's "Littlest Pet Shop" products in the center. Pursuant to a subpoena on Hasbro, Best Brands confirmed that the Hasbro products were first offered for sale from 2008-2009. Exhibit 17 (Hasbro Declaration).



| Pre-existing Tokyo, Japan Gift Show work | Pre-existing Hasbro work | Squeezamals' Product |
|---|---|---|

The close similarity between the Yamani product sold by BC Mini (on the left) and

Beverly Hills' Squeezamals product (on the right) is unmistakable.  Nor is it any surprise.

Beverly Hills' own records and testimony was that it wanted products like the one to the left, and

so directed the designers.  Nor was the pre-existing Japanese product above the only plush toy

available for sale at the 2017 Tokyo Gift Show.  As Mr. Cheng testified, there were many others.

*See*, Exhibit 16, at pages 1-7; Exhibit 15, Cheng Dep. at 9:5 - 11:17.

When Beverly Hills applied for its copyrights, it was obligated to tell the Copyright

Office of the preexisting BC Mini works.  It was also obligated to tell it about the Silly Squishy

works.[10]  However, it did not.  It fully knew of all those pre-existing works – indeed, it

specifically wanted designs like them, and told the design contestants as much.  But it withheld

that information from the Copyright Office.

Although Beverly Hills' intent does not need to be shown for the purposes of this motion

(*supra,* Section II), it is apparent, and is briefly explained herein to provide context.  By law, the

copyright in a derivative work only extends to the new material added, not to the pre-existing

---

[10]  Best Brands subpoenaed Silly Squishies, the other third party website identified by Plaintiff in
the design contest.  However, Silly Squishies is out of business, and did not maintain its records.
Plaintiff's intentional lack of disclosure of Silly Squishies to the Copyright Office is thus
particularly egregious, and it should not benefit from that wrongful conduct either.

material which came before.  *See,* 17 U.S.C. §103(b) ("The copyright in a … derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.").  Here, Beverly Hills' products are very close to the pre-existing works. By misrepresenting that there were no preexisting works, Beverly Hills obtained a copyright to the preexisting material, not just its own contributions.  It fraudulently applied for a copyright in a very broad scope that it was not entitled to, and the Copyright Office issued it a copyright to others' preexisting material, not knowing that Beverly Hills was engaging in fraud.

Beverly Hills's motivation is similarly apparent from Section 103(a) of the statute.  The statute provides that "protection for a work employing preexisting material … ***does not extend to any part of the work in which such material has been used unlawfully***."  17 U.S.C. §103(a) (emphasis added).  Since Beverly Hills unlawfully and pervasively copied prior works, it concealed that information from the Copyright Office.  In doing so, it obtained unlawful protection to those works, rights it was not entitled to.

In a similar case in this circuit that is directly on point, a plush toy manufacturer based its product on a prior Japanese design, but knowingly failed to apprise the Copyright Office.  *See, Russ Berrie & Co. v. Jerry Elsner Co.,* 482 F. Supp. 980, 988-89 (S.D.N.Y. 1980).  The Court held that "[t]he knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute reason for holding the registration invalid and thus incapable of supporting an infringement action … or denying enforcement on the ground of unclean hands." *Id.* at 988.

Indeed, even Beverly Hills' own counsel grudgingly acknowledged what transpired here. In the telephonic conference of March 12, 2020, Ms. Brownlee tried to justify her client's

wrongdoing by saying that companies in the toy industry, like her client, commonly do this.  As she stated to the Court:  "The toy industry, generally, it builds on top of each other."  Exhibit 19 (excerpted), at 24:24-25.  Beverly Hills was obligated to tell the Copyright Office what it "built on top of," but it did not.

In summary, Beverly Hills provided knowingly inaccurate information to the Copyright Office that there were no preexisting works to its designs.  Its own records and testimony demonstrate that it commissioned the works based on the pre-existing designs of others.  It was well aware of the facts, but provided knowingly inaccurate information to the Copyright Office.

## IV.    A REFERRAL SHOULD BE MADE AS TO WHETHER THE REGISTER OF COPYRIGHTS WOULD HAVE REFUSED REGISTRATION IF IT KNEW OF THE INACCURACIES

As set forth above, Beverly Hill's registrations are rife with inaccuracies on every page. In view thereof, it is respectfully submitted that a referral should be made to the Copyright Office under §411(b)(2), to determine under 411(b)(1)(B) whether the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

The following is the text of a proposed request to the Copyright Office:

Definition:  The Asserted Registrations are defined as U.S Copyright Reg. No. VA 2-111-231 ("Series 1 White Cat"); Reg. No. VA 2-111-212, for the Series 1 Dog"); Reg. No. VA 2-111-208 ("Series 1 Monkey"); Reg. No. VA 2-111-202 ("Series 1 Panda"); Reg. No. VA 2-111-230 ("Series 1 Penguin"); Reg. No. VA 2-112-188 ("Series 1 Unicorn"); Reg. No. VA 2-140-693 ("Series 1 Teal Cat"); Reg. No. VA 2-140-694 ("Series 1 Duck"); Reg. No. VA 2-140-678 ("Series 1 Ladybug"); Reg. No. VA 2-140-680 ("Series 1 Pink Owl"); Reg. No. VA 2-140-672 ("Series 1 Bunny"); Reg. No. VA 2-140-676 ("Series 1 Fox"); Reg. No. VA 2-140-679 ("Series 1 Pig"); Reg. No. VA 2-140-698 ("Series 1 Narwhal"); (collectively, the "Asserted Registrations"), applied for by Beverly Hills Teddy Bear Company ("Beverly Hills") (copies attached) [Exhibit 26].

Question 1:  Would the Copyright Office have refused the Asserted Registrations if it had known that the nature of the authorship listed for Mr. Tjio was inaccurate?  In particular, Beverly

Hills characterized the nature of the authorship in Section 2 as "sculpture."  However, the nature of authorship of all of Mr. Tjio's works was 2-dimensional artwork only.

Question 2:  Would the Copyright Office have refused the Asserted Registrations if it had known that the deposit copies did not reflect what Mr. Tjio had solely authored?  In particular, the deposit copies were for three dimensional sculptures.  However, Mr. Tjio only authored 2-dimensional artwork, not sculptures.  In addition, the deposit copies included features which Mr. Tjio did not create.  For example, the eyes in all of the deposit copies were obtained from the work of a different author.

Question 3:  Would the Copyright Office have refused the Asserted Registrations, if it had known that the deposit copies did not include an accurate first date and nation of publication of Mr. Tjio's works?  In particular, the first date of publication of Mr. Tjio's works was in October-November 2017, well before the date of first publication that was listed.  In addition, the works solely authored by Mr. Tjio were first published overseas, starting with publication in Hong Kong.  The nation of first publication was not the U.S., despite the listing to that effect on the Asserted Registrations.

Question 4:  Would the Copyright Office have refused the Asserted Registrations if it had known that they were derivative works, but their derivative work status was not listed on the applications?  In particular, the designs were based on pre-existing works, including those of Japanese third parties, but the pre-existing works were not disclosed by Beverly Hills in the copyright applications.


It is also respectfully requested that the Copyright Office be given a reasonable time period, such as a month or two, to respond, which is within the Court's discretion.

**CONCLUSION**

Beverly Hills' own discovery establishes that it provided knowingly inaccurate information to the Copyright Office in connection with copyright applications to Mr. Benson Tjio's asserted works.  It supplied the Copyright Office with inaccurate information regarding the nature of the authorship by Mr. Tjio; inaccurate deposit copies that did not reflect what Mr. Tjio solely authored; and inaccurate information as to the first date of publication and the first nation of publication of his works.  It also blatantly misrepresented to the Copyright Office that the designs were wholly original, despite the fact that it had commissioned them to be based on pre-existing works.

In view of the foregoing, a referral is respectfully requested to the Copyright Office, seeking its response to a series of questions whether it would have refused registration had it known of the knowingly inaccurate information supplied by Beverly Hills.

Dated: March 26, 2020                        Respectfully submitted,

*/s/ Morris E. Cohen*

Morris E. Cohen
Lee A. Goldberg
Limor Wigder
GOLDBERG COHEN LLP
1350 Avenue of the Americas, 3rd Floor
New York, New York 10019
(646) 380-2087 (phone – main)
(646) 380-2084 (phone – direct)
(646) 514-2123 (fax)
LGoldberg@GoldbergCohen.com
MCohen@GoldbergCohen.com
LWigder@GoldbergCohen.com

24

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2020, a true and correct copy of the foregoing was served on counsel of record via the Court's ECF system.

Dated: March 26, 2020                    */s/ Morris E. Cohen*

                                         _____

                                         Morris E. Cohen