*BEVERLY HILLS TEDDY BEAR COMPANY VS.*
*BEST BRANDS CONSUMER PRODUCTS, INC.*

*DAVID SOCHA*
*February 25, 2020*
*HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY*



*Original File 301478.txt*
*Min-U-Script® with Word Index*

Exhibit 12

| BEVERLY HILLS TEDDY BEAR COMPANY vs. HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY | DAVID SOCHA |
|---|---|
| BEST BRANDS CONSUMER PRODUCTS, INC. | February 25, 2020 |

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  SOUTHERN DISTRICT OF NEW YORK
    ---------------------------------------x
 3  BEVERLY HILLS TEDDY BEAR COMPANY,
 4              Plaintiff,
         vs.
 5
    BEST BRANDS CONSUMER PRODUCTS, INC.,
 6  and BEST BRANDS SALES COMPANY, LLC,
 7              Defendants.
    ---------------------------------------x
 8
        *** HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY ***
 9
10              60 East 42nd Street
                  New York, New York
11
                  February 25, 2020
12                    8:30 a.m.
13
14
15  Reported by:
16  Eileen Mulvenna, CSR/RMR/CRR
17  Job No. 301478
18
19
20
21
22
            ELLEN GRAUER COURT REPORTING CO. LLC
23            A U.S. LEGAL SUPPORT COMPANY
           126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                REF:  301478
```

Page 2

```
 1            DEPOSITION of DAVID SOCHA,
 2  held at the offices of Epstein Drangel LLP, One
 3  Grand Central Place, 60 East 42nd Street, New
 4  York, New York, before Eileen Mulvenna,
 5  CSR/RMR/CRR,  Certified Shorthand Reporter,
 6  Registered Merit Reporter, Certified Realtime
 7  Reporter and Notary Public within and for the
 8  State of New York
```

Page 3

```
 1  A P P E A R A N C E S:
 2
 3  EPSTEIN DRANGEL, LLP
 4  Attorneys for Plaintiff
 5  One Grand Central Place
 6  60 East 42nd Street, Suite 2520
 7  New York, New York 1065
 8  BY: JASON DRANGEL, ESQ.
 9  DWANA DIXON, ESQ.
10  Jdrangel@ipcounsellors.com
11  ddixon@ipcounselors.com
12
13  GOLDBERG COHEN, LLP
14  Attorneys for Defendants
15  1350 Avenue of the Americas, 3rd Floor
16  New York, New York 10019
17  BY: MORRIS E. COHEN, ESQ.
18  LEE A. GOLDBERG, ESQ.
19  mcohen@goldbergcohen.com
20
21
22  ALSO PRESENT:
23  Cade Socha
```

Page 4

```
 1  ------------------ I N D E X ------------------
 2  WITNESS              EXAMINATION BY           PAGE
 3  DAVID SOCHA          MR. COHEN                  11
 4
 5
 6  -------- TRANSCRIPT INFORMATION/REQUESTS --------
 7  DOCUMENT/DATA REQUESTS:              Page/Line
 8                                         69    8
 9                                         79    4
10                                         88   22
11                                         97   25
12                                        109   20
13                                        111   12
14                                        154    1
15
16
17  --------------- E X H I B I T S ----------------
18  SOCHA         DESCRIPTION               FOR I.D.
19  Exhibit 1     No Bates numbers,               14
20                Defendants' Notice of FRCP
21                30(b)(6) Deposition of
22                Defendant Beverly Hills
23                Teddy Bear Co.
```

Exhibit 12

Case 1:19-cv-03766-AS   Document 72-12   Filed 06/11/20   Page 3 of 13

BEVERLY HILLS TEDDY BEAR COMPANY v. HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY          DAVID SOCHA
BEST BRANDS CONSUMER PRODUCTS, INC.                                                    February 25, 2020

Page 21

  1  general preparation for your deposition, did you
  2  review any documents?
  3      A.   Gosh, I've seen a lot of pictures --
  4  I've seen a lot of pictures of product on shelf of
  5  what we're alleging, so that would be probably the
  6  most preparation.
  7      Q.   Anything else?
  8           THE WITNESS: I met with you for ten
  9      minutes yesterday.
 10  BY MR. COHEN:
 11      Q.   That was my next question. Who did
 12  you meet with in preparation for the deposition?
 13      A.   Mr. Drangel.
 14      Q.   Anyone else at the meeting?
 15      A.   Ashley --
 16           MS. DIXON: Sands.
 17           MR. DRANGEL: -- Sands.
 18  BY MR. COHEN:
 19      Q.   Okay. Anyone else?
 20           THE WITNESS: No, right?
 21      A.   No.
 22      Q.   Have you had any other meetings in
 23  preparation for your deposition; for example,
 24  meetings with other members of your company?
 25      A.   No. I've just told people I'm having

Page 22

  1  it, but, no, not a meeting.
  2      Q.   Did you discuss your deposition with
  3  anyone other than your attorneys?
  4      A.   Briefly with Randy.
  5      Q.   When did you discuss it with Randy?
  6      A.   Just at the show in the course of the
  7  week.
  8      Q.   What did you discuss?
  9      A.   Really, just the nature of it, I mean,
 10  but nothing -- nothing too specific.
 11      Q.   Well, for example, what topics did
 12  you go over?
 13      A.   He just said that he got upset at one
 14  point. The main part of our conversation was that
 15  he got upset at one point talking about all the
 16  damage that we did. We're about to sue Walmart, so
 17  he was -- so yes.
 18      Q.   During his deposition?
 19      A.   Yes.
 20      Q.   Anything else you discussed?
 21      A.   Not that I recall.
 22      Q.   So Mr. Drangel indicated Ashley and
 23  also Dwana's here are your IP attorneys, I
 24  understand that.
 25      A.   Yes.

Page 23

  1      Q.   Do you have any other IP attorneys?
  2           THE WITNESS: Hal would be
  3      considered that?
  4           MR. DRANGEL: He would be.
  5      A.   Okay, Hal Kyle.
  6      Q.   Hal Kyle?
  7      A.   Yes.
  8      Q.   What firm is he with, if any?
  9      A.   Hal Kyle & Associates.
 10      Q.   Any other IP attorneys presently or
 11  in the past that your company's had?
 12      A.   I don't think so, no.
 13      Q.   Where is Hal Kyle & Associates
 14  located?
 15      A.   I think West Lake Village, California.
 16      Q.   And how long have they represented
 17  you?
 18      A.   I've known Hal for 30 years, but -- I
 19  mean, he does our trademark stuff, some of our
 20  trademark stuff.
 21      Q.   What other type of work does he do
 22  for you?
 23      A.   Consulting from time to time if we
 24  have a legal question.
 25      Q.   And how long has he done trademark

Page 24

  1  work, consulting or any other legal work for your
  2  company?
  3      A.   Off and on for probably 20 years when
  4  necessary, yeah.
  5      Q.   Does he do any copyright work for
  6  your company?
  7      A.   Well --
  8      Q.   -- more --
  9      A.   I don't think so.
 10           THE WITNESS: He hasn't done any
 11      copyright for us, right?
 12           MR. DRANGEL: I'm not sure.
 13           THE WITNESS: I don't think so. I
 14      don't think he has.
 15  BY MR. COHEN:
 16      Q.   Okay.
 17      A.   That's really...
 18      Q.   Any other intellectual property
 19  work; patents, trade secret?
 20      A.   Just consulting on those if we have a
 21  question about it once in a while, just because he's
 22  a friend. I've known him for -- like I said, I
 23  worked with him 30 years ago.
 24      Q.   So is that a no, he hasn't done any
 25  other --

BEVERLY HILLS TEDDY BEAR COMPANY vs.    HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY    DAVID SOCHA
BEST BRANDS CONSUMER PRODUCTS, INC.                                                           February 25, 2020

Page 81

1  Squishamals?
2  A.  I think so, yes.
3  Q.  Why did you go to the contest to do
4  it?
5  A.  Reasonable price.
6  Q.  Why didn't you do it in-house?
7  A.  Reasonable price.
8  Q.  Was it cheaper to do it through the
9  contest you're saying?
10 A.  I think so.
11 Q.  Okay.  And do you remember whether
12 at this point in time, whether you went to the
13 contest?
14 A.  If I looked at some of the designs?  I
15 looked at designs.  I don't know if I actually went
16 on the actual page, but I remember looking at
17 designs, yes.
18 Q.  So you don't remember ever going
19 into the system is what you're saying?
20 A.  For this I don't, not specific.
21 Q.  Not for Squeezamals?
22 A.  No.
23 Q.  But you remember that you may have
24 looked at designs that came from the contest?
25 A.  Yes.

Page 82

1  Q.  Okay, that's what I was asking.
2  A.  Good.
3  Q.  I'm going to mark as Socha 8, BHBTC
4  1593 to 1595.
5       (Socha Exhibit 8, Bates Nos.
6   BHTBC001593 through BHTBC001595, E-mail
7   Chain, marked for identification.)
8  Q.  So you see in the middle of the
9  first page, it says, "We don't have a design look
10 yet for Squishamals"?
11      And does that -- is it fair to say
12 that on September 25, 2017, you didn't have a
13 design yet for the Squishamals; is that -- based
14 upon this document, does that refresh your
15 recollection at all?
16 A.  I think so, yes.  That makes sense.
17 Q.  Then at the top you say, "I think
18 you have to leave squish off."
19 A.  Yeah, I don't know what that refers
20 to.
21 Q.  Okay.
22      MR. COHEN: I'm marking as Socha 9 a
23  copy of BHTBC 1095 to the next page.
24      (Socha Exhibit 9, Bates Nos.
25   BHTBC001095 through BHTBC0001096, E-mail

Page 83

1   dated 10/3/17 from Claussen to Chan, marked
2   for identification.)
3  A.  Okay.
4  Q.  You see this says, "Hi, Allen"?
5  Who's Allen?
6  A.  This is a factory.
7  Q.  Your factory?
8  A.  Yes.
9  Q.  And it states "attached artwork for
10 Squishamals."  And there's artwork on the other
11 side.  It's double-sided.
12      Do you see that?
13 A.  Yes.
14 Q.  Is this artwork that you got from
15 the contest?
16 A.  It looks -- I don't know.  I'm
17 assuming because you showed me the monkey and I
18 recognize the penguin and dog -- yeah, it looks like
19 some of ours, yeah.
20 Q.  So after Kana sent this artwork out,
21 I assume you looked at this; right?
22 A.  I remember these designs.  I don't --
23 I don't necessarily remember the eyes in it, but I
24 remember the -- I remember the animals just from
25 what we produced.  I'm assuming I remember seeing

Page 84

1  this, I just don't remember the eyes.
2  Q.  So you have a contest going on,
3  right, and you're looking for design look;
4  correct?
5  A.  Okay.
6  Q.  And the contest is sending you
7  designs; correct?
8  A.  Okay.
9  Q.  Who's making the decision as to
10 which designs you're going to go with?
11 A.  Led by Kana.  Kana probably makes the
12 recommendation of what to use and then we look at it
13 as a group.
14 Q.  Then who's making the decision?
15 A.  Probably Randy, myself, Kana.  Kana
16 has a big input.  Mimi had a big input at that
17 point.
18 Q.  So you or Randy are making the
19 ultimate decision but with Kana and Mimi's input?
20 A.  They're driving -- I mean Kana's
21 driving it.  She's the creative director, so yeah.
22      (Discussion off the record.)
23      (Socha Exhibit 10, Bates Nos.
24   BHTBC001621, E-mail dated 10/9/17 from
25   Socha to Clark, marked for identification.)

Exhibit 12

BEVERLY HILLS TEDDY BEAR COMPANY v. HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY  
BEST BRANDS CONSUMER PRODUCTS, INC.  
DAVID SOCHA  
February 25, 2020

Page 85

BY MR. COHEN:
Q. See this e-mail from you to Randy Monday, October 9?
A. Uh-huh.
Q. It says "Squishamals," that's the subject. And it says, "Please have Allen work on three large sizes, too. Neil's dream is to get the end cap."
    What does that mean, "Neil's dream is to get the end cap"?
A. Get the product on the end cap.
Q. What's an end cap, just for the record?
A. In a store when you walk up the aisles, the end of the aisles is called an end cap.
Q. Why is it, quote-unquote, Neil's dream to do that?
A. Better traffic on an end cap.
Q. I see.
    So certain parts of the store or certain types of displays are better in terms of sales than others?
A. Sure.
Q. Other than an end cap, can you think of anything else?

Page 86

A. Clip strips, side caps, end caps front of store, those are all great places.
Q. Just define those for the record because we want to make sure that everybody's on the same page.
    When you say a "side cap," what do you mean by it?
A. It's on the side of an end cap.
Q. And the end cap you defined.
    And the front of the store, you mean by the register?
A. If it was by the register.
Q. Got it.
    And you're saying sales are better for those type of displays?
A. And clip strips.
Q. And clip strips. Got it.
    I'd like to show you what I'm marking as Socha 11, which is BHTBC 1625.
    (Socha Exhibit 11, Bates Nos. BHTBC001625, E-mail dated 10/15/17 from Socha to Scher, marked for identification.)
Q. You see this is an e-mail from you to PK Scher?
A. Yes.

Page 87

Q. Who's PK Scher?
A. She's a rep that works for Licensed to Play.
Q. Oh, okay.
    Any relationship to David Scher?
A. It is.
Q. What's the relation?
A. Father, daughter.
Q. Okay. You're writing to her, and this is October 15, and you say, "We have a new line that is getting a lot of attention at the show in Hong Kong." And the subject is Squishamals.
    So are you showing the Squishamals at the show in Hong Kong at this time?
A. Privately.
Q. Who are you showing it to?
A. I think just a couple key partners.
Q. What do you mean by "key partners"?
A. People we would trust and -- people we trust with our life that wouldn't share with others.
Q. Who are you showing it to?
A. Gosh. Head Start. Vivid, I'm guessing. Imports Dragon. Those are probably the majors.

Page 88

Q. Who is Head Start?
A. Australian distributor.
Q. Who is Vivid?
A. UK distributor.
Q. And who is Imports Dragon?
A. Canadian distributor.
Q. So you're showing these to distributors?
A. Uh-huh.
Q. And you want them to sell it; is that what --
A. I want them to buy it.
Q. You want them to buy it?
A. Yes.
Q. And what are showing them?
A. Just a couple samples.
Q. Samples?
A. Uh-huh.
Q. And are you showing them that artwork that we had seen in Socha 9?
A. I think it's little different. I think this might be on older one, but probably something similar to this, yes.
Q. So you're showing them artwork and samples?

Exhibit 12

BEVERLY HILLS TEDDY BEAR COMPANY vs. HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY  DAVID SOCHA
BEST BRANDS CONSUMER PRODUCTS, INC.  February 25, 2020

Page 89

1  A.  I think so.
2  Q.  What samples were you showing them
3  if you recall -- strike that.
4      First, just to be clear, are you the
5  one showing it or someone else showing it?
6  A.  Probably Randy.
7  Q.  Okay. Randy.
8  A.  Yes.
9  Q.  Were you there at those meetings?
10 A.  Not all of them, but yes.
11 Q.  At some of them?
12 A.  Yes.
13 Q.  What samples are being shown?
14 A.  A couple samples underneath the food
15 service tray. They were hidden. So I'm going to
16 guess it was the dog and the panda are my guess, I
17 think, if I remember correctly.
18 Q.  Okay. So samples of a dog and a
19 panda and all that artwork that we had -- or
20 something similar to the artwork that we just
21 looked at in Socha 9?
22 A.  Probably, yes.
23 Q.  Do you still have those samples, the
24 dog and the panda?
25 A.  I don't know. I don't know if we have

Page 90

1  the originals.
2  Q.  If you have them, we'd request them
3  or images of them.
4  A.  Sure.
5  DOCUMENT/DATA REQUESTED:
6  Q.  Oh, and what did they say, by the
7  way? You said a lot of attention. What does that
8  mean?
9  A.  People liked it.
10 Q.  And it says, "This line is perfect
11 for Five Below."
12     Why do you say that?
13 A.  Because it's a trend item.
14 Q.  What makes Five Below in particular
15 suitable for this?
16 A.  It's a tween girl item. A lot of
17 tween girls shop at Five Below.
18 Q.  And what about the pricing, would
19 the pricing be in line with what was expected for
20 Five Below?
21 A.  Usually we try to make them a custom
22 size. It might be a smaller size.
23 Q.  To get within their pricing?
24 A.  Yes.
25 Q.  At this point in time, did you

Page 91

1  approach Five Below with this item?
2  A.  I'm assuming we did because Lindsey's
3  pretty aggressive, so I'm assuming she did.
4  Q.  Who was Lindsey?
5  A.  That was the rep -- I'm sorry,
6  PK Scher.
7  Q.  PK is Lindsey?
8  A.  PK is Lindsey, yes.
9  Q.  So she's the rep for Five Below?
10 A.  Correct.
11 Q.  And do you know what she showed
12 them?
13 A.  I don't.
14 Q.  It would have been artwork, samples,
15 typically?
16 A.  Usually we try to get her at least one
17 sample, so I'm assuming one sample. But I don't
18 know for sure.
19 Q.  But presumably she'd be showing them
20 pictures, artwork, something attached to that?
21 A.  Potentially, yes.
22 Q.  Okay. Any other companies or people
23 that you know or recall that Lindsey pitched this
24 to?
25 A.  That Lindsey did? In this time

Page 92

1  period --
2  Q.  Right.
3  A.  -- or now?
4  Q.  No, at this time period.
5  A.  At this time period. Prob- -- maybe
6  Dave & Busters. I don't know. I don't know.
7  Q.  Do you remember anyone else that the
8  company was pitching it to in this time period?
9  A.  Good question. When you say "anyone
10 else," anyone else in the US?
11 Q.  Anywhere, yes.
12 A.  I mean, I'm assuming once we got it
13 developed, we were showing some of our key partners.
14 Probably not everybody because we didn't have it
15 developed, you don't want something to go --
16 Q.  Then any key -- I'm sorry, I didn't
17 mean to cut you off.
18 A.  No, okay.
19 Q.  You can finish.
20 A.  No, I just said probably just our key
21 partners. Someone would go off and do what your
22 client did, but yeah.
23 Q.  Leaving aside that characterization,
24 which key partners other than the ones that you
25 mentioned?

Exhibit 12

Page 93

1   A.   Walmart we trust.  At least our buyer.
2   Target, as you know.  Maybe Walgreens.
3   Q.   Do you remember whether you showed
4   it to those parties at this time?
5   A.   I don't.  I don't remember
6   specifically.
7   Q.   That's fine.
8        MR. COHEN: I'm going to mark as
9   Socha 12, a document BHTBC 1622 to 1624.
10       (Socha Exhibit 12, Bates Nos.
11   BHTBC001622 through BHTBC0016254, E-mail
12   dated 10/15/17 from Socha to Anderson,
13   marked for identification.)
14  BY MR. COHEN:
15  Q.   This is an e-mail from -- below it,
16  it's an e-mail from Cristy to you and Randy.  The
17  subject is selling points.
18       Who's Cristy again?
19  A.   Cristy Collins.
20  Q.   And what's her role?
21  A.   Marketing.
22  Q.   Got it.
23       And see at the bottom talking about
24  Squishamals?
25  A.   Okay.

Page 94

1   Q.   It says, "Perfect blend of what
2   BHTBC does best; high quality plush with the hot
3   trends of super soft and squishy collectibles.  We
4   know that the trend starts in Japan and has
5   started -- has quickly started to spread in the
6   US."
7        Is that an accurate statement of
8   what the strategy was at this point, to do plush
9   with hot trends from Japan?
10  A.   Yeah.
11  Q.   Okay.  And why are you forwarding it
12  to Scott, if you recall?
13  A.   He probably just needed sales -- sales
14  information for his accounts because he handles
15  international sales.
16  Q.   Got it.
17       (Socha Exhibit 13, Bates Nos.
18  BHTBC001636, E-mail dated 10/16/17 from
19  Socha to Scher, marked for identification.)
20  Q.   I'd like to show you what I'm
21  marking as Socha 13, BHTBC 1636.  This is an
22  e-mail to David Scher.
23       You see it says -- David says to
24  you, "Hi.  Lindsey is very excited about
25  Squishamals.  What is the plan," et cetera.  And

Page 95

1   you write to him "Call me."
2        Who is David Scher again?  Who does
3   he service?
4   A.   He handles Walmart.
5   Q.   Does this refresh your recollection
6   whether he's showing it to Walmart yet?
7   A.   I don't know if he would have
8   because -- unless you're going to produce a document
9   that says that, he could have.  I'm assuming if he
10  was showing Lindsey, I'm sure he was going to show
11  Walmart.  Maybe they were a little further along.
12  Q.   I'm showing you Socha 14.
13       (Socha Exhibit 14, Bates Nos.
14  BHTBC001626, E-mail dated 10/16/17 from
15  Socha to Jon@intertoy.biz, marked for
16  identification.)
17  Q.   This is an e-mail BHTBC 1626, and
18  it's from you to Jon@intertoy.biz.
19       Who is Jon@intertoy.biz?
20  A.   Jon is a sales rep that works for
21  Scott, does our sales -- guy that handles some of
22  our international territories.
23  Q.   So who does he sell to?
24  A.   He sells to the distributors.
25  Q.   And at this point, is he showing

Page 96

1   Squeezamals to distributors?
2   A.   I'm assuming not because he's saying
3   "let's talk about it next time -- when we see you
4   tonight."
5   Q.   After that, after you met with him.
6   I'm sorry I wasn't clear.
7   A.   Yes, he would have brought Vivid in
8   for Scott and we would have brought these other guys
9   in, yes.
10  Q.   Got it.
11       (Socha Exhibit 15, Bates Nos.
12  BHTBC001637, E-mail dated 10/17/17 from
13  Socha to Kohler, marked for
14  identification.)
15  Q.   I'm showing you what I'm marking as
16  Socha 15.  It's BHTBC 1637.
17       You have it?
18  A.   Yes.
19  Q.   It says, "Neil in Hong Kong now.
20  We'd love to FaceTime and show you progress on
21  Squishamals."
22       What was the progress on Squishamals
23  at this point?
24  A.   Samples.
25  Q.   The samples that you're showing to

Exhibit 12

**Page 97**

1  your key partners?
2   A.   Correct.
3   Q.   Showing it to anyone else on the
4  17th during that time period?
5   A.   No, just key partners.
6   Q.   Do you remember you said Jon at
7  Intertoy?  Is that Jon Gregory?
8   A.   Yes.
9   Q.   Showing you Socha 16, BHTBC 1642,
10 one-page document.
11       (Socha Exhibit 16, Bates Nos.
12   BHTBC001642, E-mail dated 10/17/17 from
13   Socha to Clark, marked for identification.)
14  Q.   It says e-mail -- it's from you to
15 Randy.  "E-mail Jon Gregory for commitments on
16 Squeezamals."
17       Do you know what that refers to?
18  A.   Yes, who's going to take it
19 internationally for his territories.
20  Q.   Which distributor is going to buy?
21  A.   Right.
22  Q.   Okay.
23       Who is KayTyler@plush.com?
24  A.   That was our IT guy.  What year is
25 this?  '17 still.  Yes.

**Page 98**

1   Q.   I'll show it to you.
2   A.   Yes, he's probably still there.
3   Q.   Did you have an outside IT person or
4  in-house IT?
5   A.   He was a contractor.
6       (Socha Exhibit 17, Bates Nos.
7    BHTBC001647, E-mail dated 10/18/17 from
8    Socha to Ennis, marked for identification.)
9   Q.   Does this refresh your recollection
10 why you're e-mailing him?  Is he Kib or Perry
11 Anne -- I mean, not Perry Anne, is it Kib?
12  A.   Yes, Kib.
13  Q.   Kib Tyler?
14  A.   Yes.
15  Q.   What does he do, websites?
16  A.   He was doing the websites, yes.
17  Q.   Got it.
18       And do you remember what you wanted
19 him to do with the website at this time?
20  A.   He was helping us get the names, you
21 know, if we wanted to get squeezamals.com or
22 snapblock.com.
23  Q.   Do you remember when you first
24 started putting the Squeezamals on your website?
25  A.   I'm assuming in the beginning of --

**Page 99**

1  end of '17, beginning of '18.
2   Q.   Was it around this time, October
3  18th?
4   A.   Probably not.  Probably not yet.
5   Q.   Do you have any documents of that?
6   A.   I don't.  Not that I know of.
7   Q.   We would ask that you check your
8  records for when Squeezamals, if they were called
9  that, were first put on your website.
10  A.   Okay.
11 DOCUMENT/DATA REQUESTED:
12       MR. COHEN: I'm marking as 19 a
13   document BHTBC 0016 -- 18.  Sorry.  Strike
14   that.
15       I'm marking as Exhibit 18 BHTBC 1643
16   and the following pages up until 1645.
17       (Socha Exhibit 18, Bates Nos.
18   BHTBC001643 through BHTBC001645, E-mail
19   dated 10/18/17 from Anderson to Socha,
20   marked for identification.)
21 BY MR. COHEN:
22  Q.   Scott e-mails you, you see at the
23 bottom, "Do you have a Squishamal spec sheet?
24 Need to send out ASAP."
25  A.   Uh-huh.

**Page 100**

1   Q.   Why is he sending -- this is the
2  spec sheet; right?
3   A.   Yes.
4   Q.   What does he need it for and why he
5  is sending it out?
6   A.   To show his customers.
7   Q.   Who are his customers?
8   A.   The example were the three we just
9  gave you, Vivid, Head Start and Imports Dragon.
10  Q.   Okay.  Good.
11       Now we're at 19.  We would get there
12 eventually.
13       (Socha Exhibit 19, Bates Nos.
14   BHTBC001649 through BHTBC001650, E-mail
15   Chain, marked for identification.)
16  Q.   It's BHTBC 1649.
17       Do you see there's an e-mail there
18 in the middle of the page, Andrew and Randy.  It
19 says, "Hi, Randy.  Please lock us in for 30,000
20 pieces for pre CNY shipment."
21       What does that mean?
22  A.   Chinese New Year.
23  Q.   And what does it mean "please lock
24 in us," as far as understand it, "for 30,000
25 pieces"?  Is that his order or --

Exhibit 12

Page 101

1   A.   Yes, that's his opening order.
2   Q.   And below that Randy says, "Major
3   customer says it's a home run."
4        Do you see that? It doesn't matter;
5   but in any event so --
6   A.   Oh, it's covered by your sticker, yes,
7   but I see that.
8   Q.   I'm sorry about that.
9        So Andrew Hendy is putting in an
10  order.
11       And what is Head Start again?
12  A.   A distributor in Australia.
13  Q.   I thought you said that. I just
14  wanted to make sure.
15       Is this the first sale to Australia
16  as far as you recall?
17  A.   As far as our company or as far as
18  this product line?
19  Q.   No, this product line, Squishamals.
20  A.   I don't know. I don't know if it's
21  the first sale. I think we had a verbal from
22  Target, but I'm not sure.
23  Q.   You don't remember if it was before
24  or after this?
25  A.   I don't. I don't.

Page 102

1   Q.   Who would know about the verbal from
2   Target? Would that be Neil?
3   A.   He might know, yes.
4   Q.   Okay. That's on October 22nd.
5        So I'm going to show you Socha 20.
6   This may help refresh your recollection. BHTBC
7   1648.
8        (Socha Exhibit 20, Bates Nos.
9        BHTBC001648, E-mail dated 10/22/17 from
10       Socha to Collins, marked for
11       identification.)
12  Q.   Does this refresh your recollection
13  as to whether you had seen Target yet? Because it
14  says on the top, "Need to have ready for day after
15  Target."
16       Does that suggest maybe that you
17  hadn't shown it to Target yet or maybe you have
18  shown it to Target. I'm not sure. I'm asking
19  you.
20  A.   This might have been for the launch,
21  but I don't know for sure.
22  Q.   Who would know?
23  A.   Maybe Cristy.
24  Q.   Okay.
25  A.   Maybe.

Page 103

1   Q.   Okay.
2        (Socha Exhibit 21, Bates Nos.
3        BHTBC001651, E-mail dated 10/23/17 from
4        Socha to Hicks, marked for identification.)
5   Q.   I'm showing you Socha 21. And this
6   is another e-mail. It's BHTBC 1651.
7        You see it's from you to Tony Hicks
8   at Vivid?
9   A.   Okay.
10  Q.   And it says, "Looking forward to
11  building Squeezamals and potentially Squishamals
12  together."
13  A.   Okay.
14  Q.   Do you remember what that was about?
15  Was he interested in buying Squishamals?
16  A.   Yes.
17  Q.   And he did give you any commitment?
18  A.   Verbally, I think, potential.
19  Q.   And this is for sales in the UK?
20  A.   UK, yes.
21  Q.   Got it.
22       (Socha Exhibit 22, Bates Nos.
23       BHTBC001657, E-mail dated 10/23/17 from
24       Socha to Clark, marked for identification.)
25  A.   You don't mind if I stand up?

Page 104

1   Q.   No, please do.
2        (Discussion off the record.)
3   Q.   Look at Tony Hicks to you. "I know
4   we put in a proposal on Squishamals."
5        Does this refresh your recollection
6   that he had committed to buying them?
7   A.   Does now, yes.
8   Q.   Okay. Good.
9   A.   I knew they bought them. I just
10  didn't know the timing. They've been a partner for
11  three years now.
12       (Socha Exhibit 23, Bates Nos.
13       BHTBC001659, E-mail dated 10/23/17 from
14       Socha to Clark, marked for identification.)
15  Q.   Socha 23, see it says, "Patent
16  Squishamals"?
17  A.   Yeah.
18  Q.   Do you remember any discussions
19  about that?
20  A.   Had a dream.
21  Q.   What?
22  A.   Had a dream.
23  Q.   To what?
24  A.   To patent. It would be great to have
25  a patent.

Exhibit 12

Page 105

1  Q.  And did you do anything to do that?
2  A.  No.
3      (Socha Exhibit 24, Bates Nos.
4   BHTBC001660, E-mail dated 10/24/17 from
5   Socha to Clark, marked for identification.)
6  Q.  This is S24. It's an e-mail, BHTBC
7  1660. And it's from you to Randy about Squishamal
8  order with Allen. And it says, "Here's how I see
9  it."
10     Can you just tell me what this is
11 about?
12 A.  Sure. Just a forecast for opening
13 order.
14 Q.  These are the parties that are
15 interested and this is what you're forecasting
16 they're going to take?
17 A.  Yes.
18     (Socha Exhibit 25, Bates Nos.
19  BHTBC00167, E-mail dated 10/24/17 from
20  Socha to Clark, marked for identification.)
21 BY MR. COHEN:
22 Q.  And I'm now going to mark as S25
23 BHTBC 1671. This is from you to Randy. It says,
24 "Product development." You see it says, "Just
25 want to circle on the PD from HK."

Page 106

1     What's PD?
2  A.  Product development.
3  Q.  And HK is Hong Kong?
4  A.  Yes.
5  Q.  And it says, "4) Squishamals--need
6  to finalize look and get ordered ASAP."
7     What does that mean?
8  A.  Need to finalize the design and get it
9  ordered ASAP.
10 Q.  Ordered from the factory?
11 A.  Yes.
12 Q.  Got it.
13    (Socha Exhibit 26, Bates Nos.
14  BHTBC001662 through BHTBC001663, E-mail
15  Chain, marked for identification.)
16 BY MR. COHEN:
17 Q.  I'm going to show you 1662. It's
18 S -- Socha 26. And you can see that Neil Kohler
19 is writing.
20    Does this refresh your recollection
21 as to whether he's now pitching the Squishamals to
22 Target? Neil Kohler to Any Stassen. And on the
23 back of the page it says, "Squishamals, proposed
24 three new DPCIs."
25    What are DPCIs?

Page 107

1  A.  I think it's basically an item.
2  Q.  I figured that, but I wanted to make
3  sure.
4     So he's pitching this item to
5  Target?
6  A.  Uh-huh.
7  Q.  Okay. Oh, is that a yes?
8  A.  Yes.
9  Q.  Okay. Thank you. "Uh-huh" is
10 not -- you know, uh-huh --
11 A.  Yes, got it.
12 Q.  Thanks.
13    (Socha Exhibit 27, Bates Nos.
14  BHTBC001640, E-mail dated 10/27/17 from
15  Clark to Chan, marked for identification.)
16 Q.  I'm going to show you Socha 27.
17 This is an e-mail from Randy to Allen. It's
18 double-sided. "The 16 styles of the animals for
19 Squishamals."
20    Take a look at the back. Are these
21 the final designs for Squishamals, as far as you
22 can tell?
23 A.  They look close, yeah. They look
24 close.
25

Page 108

1  Q.  So how about this one, on
2  October 27th, a little bit later in the day,
3  7:06 p.m., Socha 28, which is BHTBC 1666.
4     (Socha Exhibit 28, Bates Nos.
5   BHTBC001666, E-mail Chain, marked for
6   identification.)
7  Q.  I'll show you that one. It says,
8  "Going with the big eye."
9     Do you know what that means?
10 A.  There's probably a couple of eyes and
11 go with the bigger one.
12    (Socha Exhibit 29, Bates Nos.
13  BHTBC001638 through BHTBC001839, E-mail
14  Chain, marked for identification.)
15 Q.  Socha 29 is Bates number BHTBC 1638.
16 It says, "We have a huge meeting with VP of toys
17 at Target."
18    You see that's from Randy?
19 A.  Okay.
20 Q.  "To get them to buy huge on
21 Squishamals. It must arrive Wednesday latest to
22 Neil Kohler."
23    Is Neil the one who's pitching this
24 meeting?
25 A.  Yes.

Exhibit 12

Page 109

1   Q.   And Randy had testified that that
2   meeting was I think Thursday -- it was the next
3   Thursday.  I think November 2nd was the Thursday
4   after that.
5   A.   Okay --
6   Q.   This is Socha 30 now.
7        (Socha Exhibit 30, Bates Nos.
8        BHTBC001672 through BHTBC001673, E-mail
9        Chain, marked for identification.)
10  Q.   "Hi, Randy.  Please find attached
11  Squishamals."  This is from Kana to Randy cc to
12  you on the first page.  And you -- I'm sorry --
13  Kana says, "Please find attached Squishamals with
14  big eyes artwork."
15       You see that attached?
16  A.   Yes.
17  Q.   Now, this is now the final design as
18  far as you recall?
19  A.   Looks pretty close, yes.  Other than
20  the one that's not round, Accordion the Cat, but --
21  Q.   Okay.  Do you know whether this is
22  what was shown to Target?
23  A.   I'm assuming.  I'm assuming.
24  Q.   S31 is BHTBC 1675.
25

Page 110

1        (Socha Exhibit 31, Bates Nos.
2        BHTBC001675 through BHTBC001676, E-mail
3        dated 10/28/17 from Socha to Anderson,
4        marked for identification.)
5   Q.   It's got an image on the other side,
6   as usually I try to do double-sided, what does
7   this mean, "Airport gift shop packaging for
8   Squishamals" on the back?
9   A.   I want to go like this to make it
10  bigger.  I'm not sure.
11  Q.   Okay.  I want to show you S32.
12       (Socha Exhibit 32, Bates Nos.
13       BHTBC001677 through BHTBC001678, E-mail
14       Chain, marked for identification.)
15  Q.   This is BHTBC -- I covered something
16  up -- BHTBC 1677.
17       And you see Scott Anderson is asking
18  for a Squishamal sample for Melanie for their
19  Wednesday WMT meeting.
20       So first who's Melanie?
21  A.   Import Dragon.
22  Q.   And that's Canada?
23  A.   Yes.
24  Q.   What is WMT meeting?  Is that --
25  A.   Walmart.

Page 111

1   Q.   -- Walmart meeting in Canada?
2   A.   Yes.
3   Q.   And do you know if the sample was
4   sent?  It says, "Randy, can we send one?"
5   A.   Potential -- they're one of our
6   number 1 partners, so probably.
7   Q.   Well, if you have that sample, we'd
8   like a picture or the sample.
9   DOCUMENT/DATA REQUESTED:
10  Q.   Just to close the loop on this,
11  Exhibit 33, which is BHTBC 1679.
12       (Socha Exhibit 33, Bates Nos.
13       BHTBC001679 through BHTBC00168, E-mail
14       Chain, marked for identification.)
15  BY MR. COHEN:
16  Q.   Socha 32, you see that six samples
17  are going to Neil to Hong Kong?  Do you remember
18  what happened with those samples?
19  A.   To Neil to Hong Kong?
20  Q.   Right.
21  A.   To Neil.
22  Q.   They went to Neil.  Okay.
23       (Socha Exhibit 33, Bates Nos.
24       BHTBC001364 through BHTBC001365, E-mail
25       dated 11/20/17 from Solomon to Clauseen,

Page 112

1        marked for identification.)
2   Q.   I'm marking as Socha 33 BHTBC 1364
3   and the following page, which is double-sided.
4   Socha 33 now.
5        It says, "There are 50 Squishamal
6   designs from 99 Design."
7        Again, are these final designs as
8   far as you can tell?
9   A.   I don't know.  Some might.  I don't
10  recognize some, so -- but some I do.  So could be.
11  Q.   Why 50?  We had before like 16, I
12  think.  Why 50 now?
13  A.   Now we're trying to get ahead of the
14  curve because we have obviously interest.
15  Q.   Do you know who you showed these
16  illustrations to?
17  A.   This, probably just internal.  Unless
18  we did a poster for a show.  But we wouldn't have
19  specifically said oh, hey, look.
20  Q.   Do you remember if you did a poster
21  for a show or who would know?
22  A.   Kana.
23  Q.   Okay.  If there's any e-mails
24  sending out or distributing those designs, that
25  50, we would ask for them.  Okay.

Exhibit 12

**Page 121**

1  that this is not accurate?
2   A.   The only thing I would say that from
3  time to time, we fine-tune our work. So, you know,
4  if we fine-tune something on the eye or on the body,
5  that's the only thing. But these were --
6   Q.   Do you know if -- go ahead, finish
7  your answer.
8   A.   No, go ahead.
9   Q.   Do you know if these were
10 fine-tuned?
11  A.   Most things are, so I'm assuming they
12 would have been fine-tuned.
13  Q.   Do you know what fine-tuning, if
14 any, was conducted?
15  A.   I don't know specifics, no.
16  Q.   So you don't know, you're just
17 assuming there might have been?
18  A.   Yes.
19  Q.   So leaving that assumption aside,
20 asking for your understanding, is it accurate --
21 you're the 30(b)(6), you're the person designated
22 so I have to ask you -- whether it's accurate that
23 Mr. Tijo and Ms. Ibba were the sources of the
24 features of the Squeezamal products?
25  A.   Probably the sources, yes.

**Page 122**

1   Q.   The two sources?
2   A.   Sources, yes.
3         I'll just add, I don't know what we
4  gave them for inspiration and I don't know what we
5  fine-tuned at the end.
6   Q.   Okay. Why would you give them
7  something for inspiration?
8   A.   We have some of the best artists, so I
9  would want their inspiration to start with them.
10  Q.   I didn't understand what you meant.
11 In other words, you're giving something for
12 inspiration, you want them to do something like
13 that; is that what you're saying?
14  A.   Yeah.
15  Q.   Were you satisfied with the work
16 that you got from the design contest? Were you
17 happy with it?
18  A.   I believe so.
19        (Discussion off the record.)
20  Q.   So let's take a look at one of them
21 that you just looked at. Let's look at 25. We
22 looked at this before.
23        Can you identify that for the
24 record?
25  A.   Squeezamal monkey.

**Page 123**

1   Q.   And you've seen that before I'm
2  sure?
3   A.   Yes.
4   Q.   And that's a Series 1 product;
5  right?
6   A.   I believe so.
7   Q.   How can you tell? I mean, you said
8  you believe so. So what makes you think?
9   A.   Just like when I look at the artwork,
10 it's all recognizable, pretty distinct look and
11 color.
12  Q.   So you understand that you're
13 asserting that you have rights in your products;
14 is that fair to say?
15  A.   Correct.
16  Q.   So looking at the monkey, for
17 example, which features of the product do you
18 consider to be yours? What features do you think
19 you own? By "you," I mean your company.
20  A.   The eyes and the style. The
21 configuration of it. I don't own a monkey, but I
22 own this look.
23        THE WITNESS: Is that safe to say?
24  Q.   You can't ask your counsel. He
25 can't testify for you.

**Page 124**

1         So which particular features?
2   A.   The eyes, where the colors are.
3   Q.   Anything else?
4   A.   Certain ones have the cheek things,
5  the cheek highlights.
6   Q.   Anything else?
7   A.   Small appendages.
8   Q.   Okay. What features do you think
9  you don't own, if any?
10  A.   I don't know.
11  Q.   As far as you know, you think you
12 own all the features; is that fair to say? Is
13 that your opinion?
14  A.   Are we talking -- can you reword that?
15 Maybe I'm missing it.
16  Q.   Sure.
17        So you have a product in front of
18 you. I want to know what aspects of the product
19 you don't own. I asked you what do you own. The
20 next question is, what aspects do you not own? Or
21 do you own everything? It's your answer, so I
22 don't want to put any words in your mouth.
23  A.   I don't know what -- I don't know what
24 I don't own. I mean, frankly, I don't know if I
25 could answer that. We talked about there was other

Exhibit 12

BEVERLY HILLS TEDDY BEAR COMPANY vs. HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
BEST BRANDS CONSUMER PRODUCTS, INC.

DAVID SOCHA
February 25, 2020

**Page 125**

1  balls. I don't own a ball. So I guess that's
2  probably --
3    Q.  What else don't you own, if you
4  know?
5    A.  On these, I don't -- if I'm comparing
6  the two, I don't know what I don't own other than
7  the ball.
8    Q.  So if I were to show you any other
9  products of yours, would your answer change, that
10 you don't know what you do and don't own?
11   A.  What do you mean "other products"?
12 Other products --
13   Q.  Other Series 1 products. For
14 example, this is your -- this is 23, your
15 Squeezamal -- what is this -- is this a pig?
16   A.  I think it's an owl.
17   Q.  Oh, an owl.
18       So would your answer be any
19 different for that product, that you don't know
20 what features you do and don't own?
21       MR. DRANGEL: And this is
22 Plaintiff's --
23       MR. COHEN: 23.
24       (Plaintiff's Socha Exhibit 23,
25 Previously marked.)

**Page 126**

1    A.  I don't think so. I think it would be
2  pretty similar.
3    Q.  Same answer?
4    A.  Yes.
5    Q.  And it would be probably the same
6  for all of these, correct, all of your products?
7  What about this one, for example, Plaintiff's 27?
8       (Plaintiff's Exhibit 27, Previously
9    marked.)
10   Q.  And I'm just going to put a bunch in
11 front of you and if you have a different answer --
12   A.  Sure.
13   Q.  That's Plaintiff's 27. I'll
14 identify it for the record.
15       What kind of an animal is it?
16   A.  Chick.
17   Q.  Plaintiff's 22.
18       (Plaintiff's Exhibit 22, Previously
19    marked.)
20   A.  Fox.
21   Q.  Plaintiff's 24.
22       (Plaintiff's Exhibit 24, Previously
23    marked.)
24   A.  Bunny.
25

**Page 127**

1    Q.  Plaintiff's 26.
2       (Plaintiff's Exhibit 26, Previously
3    marked.)
4    A.  Cat.
5    Q.  Plaintiff's 28.
6       (Plaintiff's Exhibit 28, Previously
7    marked.)
8    A.  Pig.
9    Q.  Plaintiff's 30.
10       (Plaintiff's Exhibit 30, Previously
11    marked.)
12   A.  See how confusing it is, he just
13 grabbed one of your products to show me, but yes.
14   Q.  That's not true, but --
15 Plaintiff's 29.
16       (Plaintiff's Exhibit 29, Previously
17    marked.)
18   A.  If I get confused by my own products
19 on shelves, for sure kids who collect and do it get
20 confused.
21   Q.  Let's stay on topic.
22       Can you identify --
23   A.  It's a lady bug.
24   Q.  Plaintiff's 29?
25   A.  That's a penguin.

**Page 128**

1    Q.  Plaintiff's --
2    A.  It's the second bunny.
3    Q.  It's a duplicate. Okay. Thank you.
4       Plaintiff's 21.
5       (Plaintiff's Exhibit 21, Previously
6    marked.)
7    A.  Unicorn.
8    Q.  Great. And that's -- great.
9       The same question, for any of these,
10 do you have an opinion or position as to what
11 features you do own and what features you don't
12 own or you don't know?
13   A.  Are we talking about the millions of
14 advertising we spent that has this specific look it
15 in and cartoons we've done and coloring books and
16 things, or are we just talking about these products?
17   Q.  I'm looking at these products,
18 right.
19   A.  So the overall look?
20   Q.  The overall look.
21       Do you know what particular
22 features, though, are yours or others?
23   A.  I'm repeating; the eyes, the cheek --
24 I mean can name is lot of features -- the way the
25 product is sewn, the patterns.

Exhibit 12