UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEVERLY HILLS TEDDY BEAR COMPANY<br><br>Plaintiff,<br><br>v.<br><br>BEST BRANDS CONSUMER PRODUCTS, INC.,<br>and BEST BRANDS SALES COMPANY, LLC<br><br>Defendants. | Civil Action No.:<br><br>1:19-cv-3766 (GHW) |

**DEFENDANT BEST BRANDS' MOTION FOR DISCOVERY SANCTIONS
AND MEMORANDUM OF LAW IN SUPPORT**

Morris E. Cohen
Lee A. Goldberg
Limor Wigder
GOLDBERG COHEN LLP
1350 Avenue of the Americas, 3rd Floor
New York, New York 10019
(646) 380-2087 (phone – main)
(646) 380-2084 (phone – direct)
(646) 514-2123 (fax)
LGoldberg@GoldbergCohen.com
MCohen@GoldbergCohen.com
LWigder@GoldbergCohen.com

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.    BEVERLY HILLS POSSESSED INFORMATION THAT WAS EXTREMELY
      RELEVANT TO THIS SUIT ........................................................................... 2

      A.    Beverly Hills Had An Agreement with GennComm Regarding Copyrights.......... 2

      B.    Beverly Hills' Litigations With GennComm Reveal Further Documents.............. 6

      C.    Beverly Hills Also Possessed Highly Probative Sales Records............................ 7

II.   BEVERLY HILLS CONCEALED THAT INFORMATION IN VIOLATION
      OF THE FEDERAL RULES ............................................................................ 8

      A.    Beverly Hills Omitted the Information from its Initial Disclosures ...................... 8

      B.    Beverly Hills Withheld It From Its Document Production .................................... 9

      C.    Beverly Hills Concealed it When it Responded to Interrogatories ...................... 10

      D.    Beverly Hills Then Committed Perjury to Cover Up its Misconduct .................. 11

III.  BEVERLY HILLS INTENTIONALLY CONCEALED THE INFORMATION
      TO HIDE THE FATAL FLAWS IN ITS MERITLESS CASE ....................................... 13

IV.   BEVERLY HILLS HAS COMMITTED A FRAUD ON THE COURT ........................ 14

V.    THIS COURT HAS THE POWER TO SANCTION BEVERLY HILLS FOR ITS
      ABUSIVE MISCONDUCT ............................................................................ 16

      A.    The Court Has Inherent Power to Protect the Administration of Justice.............. 16

      B.    The Court Also Has Power to Sanction Under Rule 37(c) ................................... 17

VI.   BEVERLY HILLS SHOULD BE SEVERELY SANCTIONED ................................... 18

      A.    Beverly Hills Should be Sanctioned For Its Fraud on the Court ......................... 18

      B.    Beverly Hills Should Likewise be Sanctioned For Its Perjury ............................ 20

      C.    No Lesser Sanction Than Dismissal is Appropriate ............................................ 21

      D.    Beverly Hills Should be Ordered to Pay Best Brands' Attorneys' Fees............... 24

CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Adelphia Supply USA*, 2020 U.S. Dist. LEXIS 50928, *18-19 (E.D.N.Y. Mar. 24, 2020), ................................................................................. 14, 16, 19

*Advanced Video Techs. LLC v. HTC Corp.*, 2015 U.S. Dist. LEXIS 122423 (S.D.N.Y. Aug. 28, 2015) ......................................................................................................... 18

*Anheuser-Busch, Inc. v. Natural Beverage Distributors,* 69 F.3d 337, 352 (9th Cir. 1995). . 20, 24

*Arnold v. Cnty. of El Dorado*, 2012 U.S. Dist. LEXIS 112398, at *13 (E.D. Cal. Aug. 8, 2012)20, 24

*Combs v. Rockwell Inter. Corp.*, 927 F.2d 486, 488 (9th Cir. 1991) ........................................... 20

*ComLab, Corp. v. Kal Tire & Kal Tire Mining Tire Grp.*, 2018 U.S. Dist. LEXIS 154983, at *24-25 (S.D.N.Y. Sep. 11, 2018). ....................................................................... 24

*Communispond, Inc. v. Kelley*, 96 Civ. 1487 (DC), 1998 U.S. Dist. LEXIS 12336, at *14-15 (S.D.N.Y. Aug. 10, 1998) .......................................................................... 23, 24

*Daval Steel Prods., Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991) ...................................................................................... 17, 22

*Hirsch v Qingdao Orien Commer. Equip. Co., Ltd.,* 2015 U.S. Dist. LEXIS 28112, at *19 (E.D.N.Y. Mar. 6, 2015) .................................................................... 13

*New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 Fed. App'x 25 (2d Cir. 2011) ............................................................................... 14

*Pannonia Farms, Inc. v USA Cable*, 2004 U.S. Dist LEXIS 23015, at *18, n 14 (S.D.N.Y. 2004) ................................................................................. 13

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 386 (2d Cir. 1981) ....................... 16

*R.B. Ventures, Ltd. v. Shane*, 91 Civ. 5678 (CSH), 2000 U.S. Dist. LEXIS 10170, at *14 (S.D.N.Y. July 19, 2000) (citation omitted). ................................................. 20

*Rammal v. Timberland Co.*, 1995 U.S. Dist. LEXIS 13605, at *6-7 (S.D.N.Y. Sep. 20, 1995) .. 18

*Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 270 (2d Cir. 1999)......................................... 22

*S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) ........................ 21

*Silberman v Innovation Luggage, Inc.,* 2003 U.S. Dist. LEXIS 5420, at *18 (S.D.N.Y. Mar. 31, 2003) ...................................................................................... 13

*Universal Oil Prods. Co. v. Root Ref. Co.*, 328 U.S. 575, 580, 66 S. Ct. 1176, 1179 (1946) ...... 25

*Update Art, Inc. v. Modiin Publishing, Ltd.,* 843 F.2d 67, 71 (2d Cir. 1988)............................... 18

*Valley Eng'rs v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057-58 (9th Cir. 1998) ................................ 20

**Statutes**

17 U.S.C. §101 ............................................................................................................................... 7

17 U.S.C. §102(b) ........................................................................................................................... 5

17 U.S.C. §501(b) ......................................................................................................................... 13

18 U.S.C. §1621 ........................................................................................................................... 20

18 U.S.C. §1622 ........................................................................................................................... 20

**Rules**

Fed. R. Civ. P. 11 ......................................................................................................................... 20

Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi). ............................................................................................. 17

Fed. R. Civ. P. 37(c)(1)(c) ........................................................................................................... 17

iii

# TABLE OF EXHIBITS

Exhibit 1    Non-Exclusive License Agreement, dated June 16, 2017, between GennComm LLC and Beverly Hills Teddy Bear Co.

Exhibit 2    Plaintiff Beverly Hills' Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1)

Exhibit 3    Defendants' First Set of Requests for Production to Plaintiff

Exhibit 4    Plaintiff's Responses to Defendants' First Set of Interrogatories

Exhibit 5    Plaintiff's Responses to Defendants' Second Set of Interrogatories

Exhibit 6    Email of Wednesday December 18, 2019 from Defendants' attorney Limor Wigder to Plaintiff's attorneys

Exhibit 7    Email of Tuesday December 31, 2019 from Defendants' attorney Limor Wigder to Plaintiff's attorneys.

Exhibit 8    Email of Wednesday January 15, 2020 from Defendants' attorney Limor Wigder to Plaintiff's attorneys

Exhibit 9    Email of Friday February 28, 2020 from Plaintiff's attorney Dwana Dixon to Defendants' attorneys

Exhibit 10   Transcript of the 30(b)(6) deposition of David Socha dated February 25, 2020 (excerpted)

Exhibit 11   GennComm LLC's ("GennComm's") Verified First Amended Complaint in the Superior Court of the State of California for the County of Los Angeles – Northwest District, Case No. 18VECV00045

Exhibit 12   Beverly Hills' Third Amended Cross-Complaint in the Superior Court of the State of California for the County of Los Angeles – Northwest District, Case No. 18VECV00045

Exhibit 13   Beverly Hill's Complaint against GennComm in the United States District Court for the Central District of California – Western District, Civil Action No. 2:20-cv-02849-CJC-JEM

Exhibit 14   GennComm's Memorandum of Points and Authorities, Dkt. 22-1, in the U.S. District Court for the Central District of California – Western District, Civil Action No. 2:20-cv-02849-CJC-JEM

Exhibit 15    Declaration of Genna Rosenberg, Dkt. 22-2, in the U.S. District Court for the Central District of California – Western District, Civil Action No. 2:20-cv-02849-CJC-JEM

Exhibit 16    GennComm Provisional Application filed in the U.S. Patent and Trademark Office

Exhibit 17    GennComm's U.S. Patent No. 10,427,061 B2

Exhibit 18    GennComm's U.S. Patent No. 10,596,475 B2

Exhibit 19    Beverly Hills' Answer to Plaintiff GennComm's Verified First Amended Complaint in the Superior Court of the State of California for the County of Los Angeles – Northwest District, Case No. 18VECV00045

Exhibit 20    Attorney Biography of Bret G. Anderson posted on the website of Ferguson Case Orr Paterson LLP (excerpt)

Exhibit 21    Profile of Tyler Train posted on Linked-In and attorney biography of Tyler Train posted on the website of Womble Bond Dickinson (both excerpted)

Exhibit 22    "Confidential Settlement Agreement and Release" between Plaintiff and Royal Deluxe Accessories LLC, obtained from Plaintiff during discovery in this matter

Exhibit 23    "Confidential Settlement Agreement and Release" between Plaintiff and Michael & Michelle Enterprise, Inc. obtained from Plaintiff during discovery in this matter

Exhibit 24    "Confidential Settlement Agreement and Release" between Plaintiff and Cloud Commerce Systems Limited, obtained from Plaintiff during discovery in this matter

Exhibit 25    Letter dated April 28, 2020 from GennComm LLC to David Socha of Beverly Hills Teddy Bear Co, obtained from GennComm's attorney

Exhibit 26    Response of the Register of Copyrights in *Design Tech Homes, Ltd. v. RVision Homes, Ltd., et al.,* Civil Action No. H-18-4268, Dkt. No. 115-1, United States District Court for the Southern District of Texas, Houston Division

Exhibit 27    Response of the Acting Register of Copyrights in *Urban Textile, Inc. v. Fashion Avenue Knits, Inc., et al.,* Civil Action No. CV-16-6786-MWF (KSx), Dkt. No. 71-1, United States District Court for the Central District of California

Exhibit 28    Transcript of the Court Conference of July 3, 2019 in this matter (excerpt)

Exhibit 29    Transcript of the Court Conference of July 17, 2020 in this matter

Exhibit 30     Transcript of the Court Conference of July 28, 2020 in this matter

Exhibit 31     Plaintiff's Responses to Defendants' First Set of Requests for Production to
               Plaintiff

Exhibit 32     Screenshots downloaded from the Internet on August 24, 2020, including images
               from various websites, showing examples of the Squeezamals sold in a box

Exhibit 33     Beverly Hills' First Amended and Supplemental Complaint filed against
               GennComm in the United States District Court for the Central District of
               California – Western District, Civil Action No. 2:20-cv-02849-CJC-JEM

Exhibit 34     Beverly Hills' Organizational Chart

Defendants (collectively, "Best Brands") hereby move for sanctions against Plaintiff Beverly Hills Teddy Bear Company ("Beverly Hills"), to redress Plaintiff's numerous discovery violations, including both its calculated cover-up of critical evidence, and its perjury.

## INTRODUCTION

This is a case of a Plaintiff who asserted copyrights it did not own, intentionally concealed the facts in discovery, and then lied multiple times under oath. It is the case of a Plaintiff who willfully perpetrated a fraud on this Court.

## BACKGROUND

Beverly Hills is a serial scam artist. Beginning in January 2019, it brought four lawsuits asserting infringement of copyrights to the Squeezamals. In each suit, it avowed that it owned the copyrights. *See,* Exhibits 22-24. Yet, Beverly Hills was concurrently knee-deep in litigation over an Agreement that had assigned those copyrights to GennComm LLC. The three prior defendants' suits all settled by paying significant sums to Beverly Hills.[1] Having successfully duped them out of money under the color of law,[2] Beverly Hills forged ahead with this lawsuit to extort Best Brands next. Then, throughout this case, Beverly Hills concealed its prior transfer of the copyrights, flouting the fact that it was suing over rights it did not own.

Its pattern of falsehoods is incessant. It misrepresented to the Copyright Office that it had ownership rights in the designs of the copyrights-in-suit, despite its prior assignment. It granted

---

[1] Interestingly, each of the settlement agreements requires each defendant to "recognize and acknowledge BHTBC's claim of sole ownership of exclusive rights in and to the Squeezamals IP worldwide." The agreements also forbid each defendant from challenging "ownership or registration of any of the Squeezamals IP." Ex. 22 at 5 ¶6; Ex. 23 at 6 ¶8; Ex. 24 at 5 ¶5.

[2] Counsel of record Epstein Drangel LLP has denied knowledge of the GennComm Agreement until recently, and represented Beverly Hills in the three other litigations. As a result, one would have to assume that they did not disclose the GennComm Agreement to the three prior defendants when those defendants settled the lawsuits brought against them by Beverly Hills.

that assignment to obtain patent rights in slow-rise technology which it needed to make the plush-toys-in-suit, but was unable to develop on its own. *Infra,* Section I.A.

Best Brands served extensive discovery requests seeking exactly this type of information. *Infra,* Section II.B-C. But Beverly Hills did not produce the Agreement, or related emails, or any of the pleadings from two lawsuits on this in California. It then submitted false or misleading interrogatory responses that were verified by its CEO Mr. Socha. Mr. Socha then committed perjury in his deposition, in machinations designed to hide the facts. Best Brands learned the facts from GennComm on July 14, 2020 – after the close of discovery here. Had GennComm not reached out to Best Brands, Best Brands would have been the fourth victim.

When Beverly Hills' attorneys were confronted with these egregious violations in recent hearings, they pled ignorance. They provided no facts to explain about how they had asserted false statements in three complaints, and again in motion papers, that Beverly Hills owns the copyrights in the Squeezamals. Instead, they averred that it was Beverly Hills' intentional decision to not disclose this information. Exhibit 30, Tx. at 11:4-15. They also begrudgingly conceded that their client's ownership of the copyrights is "ambiguous" (which is generous, considering it plainly does not own rights at all). Exhibit 30, Tx. at 30:21 - 31:2.

Beverly Hills' scheme, now on its latest victim, should not go unpunished. It warrants the most severe of sanctions – namely, dismissal of this meritless action.

## ARGUMENT

## I.   BEVERLY HILLS POSSESSED INFORMATION THAT WAS EXTREMELY RELEVANT TO THIS SUIT

### A.   Beverly Hills Had An Agreement with GennComm Regarding Copyrights

As we now know, Beverly Hills executed a Non-Exclusive License Agreement with GennComm on June 16, 2017 – two years before this lawsuit was filed. Ex. 1 ("Agreement") at

1.  In the Agreement, GennComm licensed to Beverly Hills rights in patent-pending technology for making the "ITEM," i.e. slow-rising foam plush toys.  *See*, Ex. 1, p. 22 (definition).[3]  Thus, the Agreement directly covers Beverly Hills' Squeezamal products-in-suit.  *See*, Complaint, Dkt. 1 at ¶9 (defining the Squeezamals as slow-rise foam toys); Dkt 1-1 (illustration).[4]

Beverly Hills knew about its Agreement – its CEO signed it.  Exhibit 1 at 21.  Though it fell directly within Best Brands' discovery requests (*infra,* Sections II.B-C), Beverly Hills intentionally concealed the Agreement, along with its litigations with GennComm, and all related information, in violation of the Federal Rules.  Its Vice President, who reports directly to the CEO, acknowledged that the Squishamal/Squeezamals fell within the Agreement.  *Infra*, Section I.B.  So, Beverly Hills also withheld those emails.  Shockingly, Mr. Socha then added criminal conduct to the mix.  He provided false interrogatory responses, verified the same, and engaged in perjury during his 30(b)(6) deposition, to effect a cover-up of his civil violations.  *Infra,* Sections II.C-D.  Best Brands first learned of the Agreement on July 14, 2020, well after discovery closed.  Cohen Dec. ¶34.  But for notice from GennComm, Beverly Hills would have gotten away with everything.  In other words, it flagrantly committed a fraud on this Court.  *Infra,* Section IV.

In Beverly Hills' federal suit, GennComm's CEO provided a sworn declaration

---

[3]  "Pop Up Plush: Plush figure comprising of slow rising, kid safe, latex, polyurethane or other memory foam filler that has been cut or molded (e.g., machine, injection, additive printed), into the shape of a plush toy or other character.  The exterior will be covered with a general plush material synthetic or natural that is sewn or wrapped around the sculpted memory foam."

[4]  Beverly Hill's counsel Mr. Drangel has since engaged in a baseless attempt to argue that the Agreement requires a box (Exhibit 30 at 10:16-11:22).  However, Beverly Hills' own judicial admissions directly contradict that.  Beverly Hills admitted that "the Agreement only generally described the Pop Up Plush as "slow rising, kid safe, latex, polyurethane or other memory foam filler that has been cut or molded . . . into the shape of a plush toy or other character . .  [the] exterior will be covered with a general plush material.  **No reference to the limitation of the box or packaging element was referenced in Exhibit A's description of what the Provisional Patent Application covered.**"  Exhibit 12, ¶10 (emphasis added).  Moreover, <u>Mr. Drangel falsely stated to this Court that Beverly Hills does not sell its products in a box</u>.  In fact, it does.  *Compare*, Exhibit 30 Tx. 11:15-21, *with* Exhibit 32, Cohen Dec. ¶¶32, 42.

explaining the background.  Slow-rise foam "squishy" toys were very popular in 2016, but the market was missing "plush-covered slow-rise foam squishy toys."  Ex. 15 at ¶3.  GennComm succeeded in developing a means of making such products, which Beverly Hills jumped at, since Beverly Hills had spent years failing to make that work.  Ex. 15 at ¶¶3-4; Ex. 11 at ¶19.

As a result, the parties entered into a Non-Exclusive License Agreement so that Beverly Hills could use GennComm's toy concept.  *Id.* at ¶5.  The Agreement provided Beverly Hills with a non-exclusive license (*see,* Exhibit 1, Section I.1.a) to GennComm's pending patent applications and any issued patents on the ITEM, i.e., plush slow-rise toys (*id.* at 22).  Since then, two patents have issued.  Exs. 16-17 (patents); Ex. 15, Dec. at ¶13.

In exchange for that patent license, Beverly Hills agreed that "All right, title, and interest in and to all copyrights … embodying the ITEM, and all copyright … registrations based thereon … shall be owned exclusively by LICENSOR [GennComm] ... and LICENSEE [Beverly Hills] shall have no interest in or claim to the ITEM or any copyrights."  Exhibit 1, Section IV, p.6.  In short, Beverly Hills agreed that all copyrights in that ITEM would be owned by GennComm.[5] Seizing the chance to sell a product it was unable to develop on its own, and that was anticipated to be "wildly successful" (Ex. 15 at ¶4), Beverly Hills took a patent license and all the profit, and gave up a small royalty and the copyrights in return.

Beverly Hills also waived all right to sue on the products-in-suit without GennComm's prior written consent, which consent Beverly Hills never obtained here.  As set forth in Section

---

[5] To that effect, the Agreement also included an assignment clause expressly assigning all these copyrights to GennComm:  "LICENSEE [Beverly Hills] hereby assigns to the LICENSOR [GennComm] all copyrights ... in ITEM …"  Exhibit 1, Section IV.1, p.6.  "[N]othing contained in this Agreement shall be construed as an assignment or grant to LICENSEE [Beverly Hills] of any right, title or interest in or to the ITEM, or any registration or application therefore."  *Id.* at Section IV.2, p.7.  Beverly Hills thereby expressly assigned to GennComm all copyrights in any soft-rise plush products that Beverly Hills was to make and sell, and disavowed all rights therein.

XIV.2, "[GennComm] shall have the sole right to determine what, if any, action shall be taken to address such unauthorized uses [e.g., infringements]. … [BHTBC] agrees not to … bring suit, effect any settlements, or take any other action without the express prior written consent of [GennComm]."  *Id.*, at p. 17, §XIV.2.  To wit, Beverly Hills waived all right to sue on the slow-rise plush ITEMs in suit – **irrespective of copyright issues**.

Beverly Hills further agreed that all designs and improvements with respect to the ITEM shall belong to GennComm.  Exhibit 1 at 12, §XI.2.c.  That also covers the designs of the plush-toys-in-suit.

In the recent hearing, Mr. Drangel strove to rely on Section V.1 as providing Beverly Hills with copyright rights.  Firstly, his "*post-hoc*" rationale (Exhibit 30 Tx. at 14:9-11) does not excuse his client's utter failure to produce the Agreement in violation of the rules.  The only fair inference is that Beverly Hills withheld it because it showed the transfer of the copyright rights, and wanted to continue to pressure unsuspecting defendants for payments nonetheless.

Secondly, Mr. Drangel deliberately misread the clauses.  Section IV addresses rights in the ITEM itself, i.e., the plush toys which have been copyrighted.  Section V.1, that he relies on, addresses collateral rights.  Exhibit 1 at 8, §V.1.  Yet, this case is not about collateral rights.  It is not about methods of manufacturing the ITEM – such methods are not even copyrightable.  *See,* 17 U.S.C. §102(b).[6]  Nor does this case concern copyrights under Section V.1 in sale of the item (e.g., boxes that the Squeezamals are placed in), or in advertising materials.  This case concerns copyright rights in the ITEMs themselves – which were assigned to GennComm under Sections IV.1-2.  All rights to the ITEM and copyright registrations thereof were reserved by GennComm,

---

[6] "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery."

except for Beverly Hills' right to <u>use</u> the ITEM; any registrations "which may be obtained by" Beverly Hills <u>were to be owned by GennComm</u>. *Id.* Section IV.2.  Indeed, after straining to misread the contract (Exhibit 30 at 28:21-29:13), and pigeonhole his client's rights into §V.1, even Mr. Drangel conceded his client's alleged rights have "ambiguity" (*id.* at 30:20 - 31:2).

Moreover, the GennComm Agreement was terminated due to Beverly Hills' failure to pay royalties.  *See,* Exhibit 25.  Under Section V.2 (Exhibit 1 at 8), even if Beverly Hills had any copyright rights under the Agreement, they went to GennComm upon that termination.

It is undeniable that this document is highly probative.  It is critically relevant to whether Beverly Hills had the right to file and maintain this lawsuit.  But it was never produced.

### B.      Beverly Hills' Litigations With GennComm Reveal Further Documents

Beverly Hills and GennComm are embroiled in two litigations over the Agreement – disputes also falling within Best Brands' discovery requests.  *Infra,* Section II.B.  Beverly Hills concealed the existence of those litigations.  Cohen Dec. ¶36.  Moreover, the pleadings in those litigations cite yet further documents that Beverly Hills also concealed.

For example, the pleadings refer to emails (Ex. 11 at 8, ¶¶41-42) sent by Vice President Cristy Collins (Ex. 34) in October 2017, which were never produced (Cohen Dec. ¶37).  The emails indicate that the ITEM in the Agreement was being called "Squishamals," and was being presented to Target.  *Id.*  (The name was later changed to "Squeezamals.")  These documents were from an officer of the company that reports directly to Mr. Socha.  Ex. 34.  <u>They refer to the products-in-suit, and confirm Beverly Hill's understanding that the Agreement covers them.</u> <u>Yet, no explanation has been provided why those emails were never produced.</u>  Numerous other relevant emails were cited in the pleadings,[7] but were not produced either.  Cohen Dec. ¶38.  A

---

[7] For example, Beverly Hills' President Randy Clark emailed on Nov. 27, 2017 to show GennComm Beverly Hill's use of GennComm's innovation in the Squishamals. Ex. 11 at ¶48. On January 15,

recent pleading indicates that there were depositions,[8] which also were not disclosed.  Cohen Dec. ¶39.  The motive is apparent.  Any of these documents would have alerted Best Brands to the existence of GennComm and the Agreement, so they were intentionally buried.  In fact, as of this writing we have no way of knowing the extent of all the materials that were concealed.

### C.    Beverly Hills Also Possessed Highly Probative Sales Records

The withheld documents also demonstrate that Beverly Hills was misleading in its prior motion papers in this action.  As the Court will recall, Best Brands' referral motion maintained that Beverly Hills submitted false information to the U.S. Copyright Office.  For example, Best Brands contended that Beverly Hills knowingly provided inaccurate information regarding the Squeezamals' date of first publication.  Dkt. 54 at 12-22.  The Copyright Office has stated that an inaccurate date of first publication is grounds to refuse registration.  Ex. 26 at p. 8 ¶1.  An offer of a work to a party for further distribution (as in the order with Target), constitutes publication. *See e.g.,* Ex. 27 at p.6; 17 U.S.C. §101.

GennComm's Verified Complaint, filed under penalty of perjury, has information on this. Beverly Hills' President spoke with GennComm on November 27, 2017 (Exhibit 11 at ¶49) and advised that "Target had reduced their order by eighty percent (80%)" (*id.*).  Beverly Hills admitted, in its responsive pleading, that Target reduced its order.  Exhibit 19 at ¶49.

Thus, a Target order demonstrates a date of first publication before Nov. 27, 2017.  That is inconsistent with the Dec. 21, 2017 date in the copyright registrations (*see e.g.,* Dkt. 54-1 at 1,

---

2018, GennComm sent "[Beverly Hills] an email congratulating all of them on the early success of the Squishamals (aka Squeezamals) product line that launched at Target stores."  Ex. 11 at ¶53. David Socha sent GennComm an email on February 28, 2018 proposing that GennComm "do the PR … on Squeezamals."  Ex. 11 at ¶57.

[8]  Exhibit 33 at 27 ¶134 (re: deposition of Frome), ¶138 (re: deposition of D. Rosenberg (GennComm COO Daniel Rosenberg, *see,* ¶78)) (redacted copy obtained from PACER).

and Dkt. 54-5), so it was relevant to the referral motion.  Furthermore, Target reduced its order

by 80% before Best Brands was ever in the picture, which is relevant to a lack of causation by

Best Brands of Beverly Hills' alleged "lost profits."  Yet, Beverly Hills does not appear to have

ever produced the initial order, or the 80% reduction, in discovery.  Cohen Dec. ¶40.

## II.   BEVERLY HILLS CONCEALED THAT INFORMATION IN VIOLATION OF THE FEDERAL RULES

Best Brands issued discovery requests in July 2019 covering the information in question

(*infra,* Sections II.B-C), and then repeatedly followed up.  For example, counsel requested any

further agreements (Exhibit 6), and receiving no response, followed up two more times (Exhibits

7 and 8).  Subsequently, Plaintiff stated that "no additional documents are forthcoming." Exhibit

9.  Beverly Hills withheld all the relevant materials, as discussed below.

### A.     Beverly Hills Omitted the Information from its Initial Disclosures

Beverly Hills issued its Initial Disclosures on July 15, 2019.  Exhibit 2.  By then, the

GennComm state court suit had been going on for nine months, and the Agreement had been in

effect for over two years.  *See,* Exhibit 11 at 1 (referencing October 15, 2018 filing date).  The

suit concerned the Squeezamals/Squishamals (*see e.g.,* Exhibit 11 at ¶5, 41-42, 46).  Yet, Section

I of the Initial Disclosures ("Individuals likely to have discoverable information"), provided no

mention of GennComm, its CEO Genna Rosenberg, attorney Perry Goldberg,[9] or any of the

individuals having knowledge.  *Id.*  Beverly Hills did not even disclose Cristy Collins, a Beverly

Hill officer that wrote the highly probative email mentioned above.  Similarly, Section II

("Documents"), provided no mention of the Agreement regarding copyright ownership.  Nor was

there any mention of the email communications with GennComm, or related documents.

---

[9] Though they share a common last name, GennComm's attorney Perry Goldberg is not related to
Best Brands' attorney Lee Goldberg.  To avoid ambiguity, first names may be used herein.

**B.      Beverly Hills Withheld It From Its Document Production**

Best Brands issued well over a dozen relevant document requests for the information at issue.  *See,* Exhibit 3, Request Nos. 8, 11, 12, 13, 14, 15, 16, 20, 22, 34, 35, 36, 40, 41, and 42. Beverly Hills did not provide the critical discovery in response to any of those requests.

For example, Request No. 41 sought "licenses, contracts, agreements, assignments, or disputes between Plaintiff and third parties relating to the Squeezamals Products."  Exhibit 3 at 12 ¶41.  The GennComm Agreement was a license, contract, agreement, <u>and</u> assignment relating to the Squeezamals.  Exhibit 1.  It licensed rights to Beverly Hills in the slow-rise products at issue in this lawsuit (Exhibit 1 at 1, 22); agreed that GennComm would own all copyrights therein (Exhibit 1 at 6); and assigned those rights to GennComm (*id.* at 6-7).  The Agreement was also relevant to Request Nos. 42, 14, and 35.  *See,* Exhibit 3.  But Beverly Hills withheld it. It also withheld all the documents regarding the ongoing dispute with GennComm, despite the explicit terms of Request No. 41 regarding disputes (Exhibit 3 at 12 ¶41), and Request 36.

Beverly Hills now takes the meritless position that the Agreement provided it with the rights, not GennComm.  Dkt. 77 at 5.  Even under that wrongful position, it should **still** have produced the Agreement, under Requests 22 and 8 covering its alleged rights.  *See,* Exhibit 3.

Beverly Hills also takes the position that the Agreement is "primarily" a patent license. Exhibit 30, Tx. at 17:1-10.  That is misleading, as it tries to evade the fact that the Agreement plainly includes copyright provisions as well.  *See*, Exhibit 1 at p.6 §IV.  Moreover, <u>all</u> licenses relating to the Squeezamal Products were sought.  *See*, Exhibit 3, Request No. 34.  Furthermore, the Squeezamals were created using GennComm's slow-rise foam.  At least two requests sought that type of information.  *Id.,* Requests 15 and 16.  But Beverly Hills did not disclose GennComm's design of the slow-rise materials, or the Agreement on the rights regarding the

same.  *Id.,* Request Nos. 11-13.

As part of the Agreement, Beverly Hills took a license to the pending patent application filed by GennComm (which later issued as two patents, *see* Exhibits 17-18).  That explains the "patent-pending" designation that Beverly Hills placed on the Squeezamal products.  Beverly Hills should have produced those patents and application.  *Id.,* Request Nos. 20 and 40.  It did not.  Cohen Dec. ¶41.  Moreover, it filed legal proceedings in federal court in California over the patent applications and patents licensed from GennComm and relating to the Squeezamals.  It disregarded discovery requests on that as well.  *See e.g.*, Exhibit 3, Requests 40 and 41.

It further withheld every email and reference to any of the documents above**.**

### C.      Beverly Hills Concealed it When it Responded to Interrogatories

Beverly Hills also concealed the information from its sworn responses to interrogatories.

Best Brands requested identification of "all of the individuals and entities involved in the creation, design, development, manufacturing … of the Squeezamals Products, including their role."  Exhibit 4, Interrogatory 4.  Though GennComm provided the slow-rise technology used to create, design, develop and manufacture the Squeezamals, Beverly Hills did not identify GennComm.  *Id.,* Response 4.  Best Brands requested identification of "all agreements relating to the Squeezamals Products and the alleged rights of the Beverly Hills Teddy Bear Company therein."  Ex. 4, Interrogatory No. 6.  Yet, Beverly Hills did not identify the GennComm Agreement.  *Id.,* Response 6.  Best Brands requested identification of "all individuals and entities having information relating to Plaintiff's contentions."  Ex. 4 at Interrogatory 7.  Beverly Hills understood that the interrogatory covered "ownership of the Squeezamal Works" (Ex. 4, Response 7), which "Squeezamal Works" it defined as the copyrights (Ex. 4 at Definition 5).  Yet, it did not disclose GennComm, or its attorney, officers, and employees.  Ex. 4, Response 7.

David Socha aided in the responses to those Interrogatories 4, 6, and 7 (*see,* Exhibit 4, Response No. 10) and verified his responses under penalty of perjury (*id.* p.12).  He knew of the GennComm Agreement that he had signed (Exhibit 1 at 21), the slow-rise technology licensed in that Agreement, and the ongoing litigation in state court over the Agreement and technology. Yet, he did not disclose GennComm's involvement in the Squeezamals, or the Agreement.

Interrogatory No. 14 sought the source of each feature of the Squeezamals.  Exhibit 5 at Interrogatory 14.  The GennComm source of the slow-rise feature should have been disclosed, but was not.  *Id.,* Response 14.  That interrogatory also sought all prior art.  In its federal lawsuit, Beverly Hills has identified numerous references that it insists are prior art.  Exhibit 13 at ¶54. But it did not disclose any of them in its response.  Exhibit 5, Response 14.

David Socha also aided in the response to Interrogatory 14.  *See,* Exhibit 5, Response 15. He knew that GennComm was the source of the slow-rise feature.  He also knew of the federal lawsuit that his company later filed, and the allegations of prior art made therein.  Exhibit 13 ¶54. But he did not provide any of that information in his response, or in any later supplemention.

Beverly Hills concealed all this information in its sworn interrogatory responses.

### D.    Beverly Hills Then Committed Perjury to Cover Up its Misconduct

On February 25, 2020, Beverly Hills CEO David Socha testified as the 30(b)(6) representative for Beverly Hills.  Under oath, he proffered false testimony that he had no agreements relating to the Squeezamals:

> Question:  "So, do you have any other agreements with any parties relating to Squeezamals?  Have you entered into any agreements?"
>
> Answer:  "No."

Ex. 10, Socha Tx. 154:19-22.  In gross, indisputable, perjury, he never disclosed the GennComm Agreement.  Nor did he ever produce documents relating thereto.  *Id.*, 154:23-156:12.

Similarly, when asked about licenses, he failed to identify the key license here, *viz.*, the GennComm license to the slow-rise technology (Exhibit 1 at 3, §I.1.a.).  He knew about the GennComm license that he signed and was litigating, but concealed that information.

Mr. Socha perjured himself repeatedly, to advance his cover-up.  For example, he had acknowledged in the GennComm Agreement that he would mark the Squeezamals with a patent-pending designation (*see,* Exhibit 1 at 5, §III.6), since GennComm was pursuing patent protection to the slow-rise foam in the Squeezamals.[10]  But when asked at his deposition why there were patent-pending designations on the Squeezamals, Mr. Socha perjured himself to conceal the basis for the designations.  He claimed there were no patents or patent applications. Exhibit 10 at 25:23-26:7.  He alleged that Beverly Hills thought about patenting it, but never did (*id.*, at 30:4-17, 32:7-8).  When examined on this odd fact (that there were patent-pending designations on a product he just testified was not patent-pending), he concocted a false story that "we would just put patent pending on everything just to deter people."  *Id.* at 30:9-17, 32:10-33:8.  He lied under oath to conceal the fact that Beverly Hills was marking patent-pending on the Squeezamals per its Agreement – so as to conceal the existence of that Agreement.

Mr. Socha was also asked to identify all his intellectual property attorneys.  Exhibit 10 at 22:22 – 23:12.  We now know that he had IP attorneys at Ferguson Case Orr Patterson LLP in California, who were working on the Squeezamals suit since October 2018.[11]  To hide the existence of the GennComm suit, he concealed the identity of the IP attorneys working on it.  *Id.* In fact, shortly thereafter, Beverly Hills filed an IP suit against GennComm, continuing to use the

---

[10]  *See,* Ex. 16 (provisional patent application), and Exs. 17 and 18 (later-issued patents)

[11]  As shown in Exhibit 19, Beverly Hills' Answer, his IP attorneys Bret G. Anderson and Tyler R. Train were working on the case.  As shown in Exhibit 20, Bret Anderson is a partner in the Intellectual Property Group.  As shown in Exhibit 21, Tyler Train is also an IP attorney, who was an associate at Ferguson Case at the time, and is now at Womble Bond.

IP attorneys at Ferguson Case, including Bret Anderson.[12]  Exs. 13 and 20.  He used those attorneys for a year and a half, and then used them to prepare a new suit against GennComm.  But he concealed them to keep Best Brands from learning about the suits and associated facts.

His perjury is repeated and undeniable.

## III.    BEVERLY HILLS INTENTIONALLY CONCEALED THE INFORMATION TO HIDE THE FATAL FLAWS IN ITS MERITLESS CASE

Beverly Hills had an affirmative obligation to establish its ownership over the copyrights-in-suit.  *Pannonia Farms, Inc. v USA Cable*, 2004 U.S. Dist LEXIS 23015, at *18, n 14 (S.D.N.Y. 2004).  In fact, such ownership is the threshold issue in a copyright case.  *Silberman v Innovation Luggage, Inc.,* 2003 U.S. Dist. LEXIS 5420, at *18 (S.D.N.Y. Mar. 31, 2003).  Moreover, standing must exist at the very inception of a lawsuit.  *Hirsch v Qingdao Orien Commer. Equip. Co., Ltd.,* 2015 U.S. Dist. LEXIS 28112, at *19 (E.D.N.Y. Mar. 6, 2015).

**Ownership was mandatory to file a complaint, but Beverly Hills lacked ownership**.  Its Agreement assigned the copyrights in the ITEM to GennComm.  *Supra,* Section I.A.  Moreover, the Agreement provided Beverly Hills with only <u>non-exclusive</u> rights, not the exclusive rights required by the Copyright Act.[13]  Exhibit 1 at 1.  Also, the Agreement <u>waived all right to sue over the slow-rise products here</u>, unless Beverly Hills first obtained GennComm's express prior written consent (*supra*, Section, XIV.2), which it never did.  All of this was reason why it had no standing to sue.  So, it intentionally buried that information, and its CEO lied under oath to avoid it.  It also withheld discovery showing false statements in its submissions to

---

[12]  Beverly Hills filed a federal lawsuit against GennComm on March 26, 2020 in the Central District of California, to contest the validity of GennComm's patents that issued from the provisional patent application licensed in the Agreement.

[13]  Only the "*legal or beneficial owner of an exclusive right under a copyright* is entitled … to institute an action for any infringement."  17 U.S.C. §501(b) (emphasis added).

the Copyright Office,[14] along with who knows what else.  Under false pretenses of owning valid

copyrights, Beverly Hills secured settlement payments from parties before.  Exhibits 22-24.  It

figured it would do it again, and nobody would ever find out.  It was dead wrong.

## IV.    BEVERLY HILLS HAS COMMITTED A FRAUD ON THE COURT

"A fraud upon the court occurs where it is established by clear and convincing evidence

'that [a party] has sentiently set in motion some unconscionable scheme calculated to interfere

with the judicial system's ability impartially to adjudicate the action.'"  *Abbott Labs. v. Adelphia*

*Supply USA*, 2020 U.S. Dist. LEXIS 50928, *18-19 (E.D.N.Y. Mar. 24, 2020), quoting, *New*

*York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 Fed. App'x 25 (2d Cir. 2011)

(summary order) (internal quotation marks omitted).  "The essence of a fraud upon the court is

when a party lies to the court and his adversary intentionally, repeatedly, and about issues that

are central to the truth-finding process.  An isolated instance of perjury, standing alone, will not

constitute a fraud upon the court.  Rather, fraud upon the court occurs where a party has acted

knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his

adversary's defense of the action."  *Id.* at *19-20 (citations and quotations omitted).

That very-fittingly describes Beverly Hills.  It filed three complaints here, asserting

copyrights it did not own, having assigned them to GennComm.  It then "willfully withheld

every single document sent by, received by, or referencing [GennComm's employees, officers,

and attorneys and] ... intentionally withheld every document concerning [GennComm]."  *Id.* at

*14.  All in all, it flouted over a dozen document requests.  It then provided false or misleading

responses, under penalty of perjury, to four interrogatories.  Its CEO then committed repeated

---

[14]  It had a Target order (*supra,* Section I.C) probative of false statements regarding the date of first
publication (Dkt. 54 at 12-22), i.e., to copyright invalidity, so it was also not produced.

perjury during his 30(b)(6) deposition.  It then falsely asserted ownership in its motion response.

Dkt. 60 at 11, n. 6.  In short, it continually misled this Court and Best Brands about central facts,

concealed critical evidence, and committed repeated perjury.

"If it is shown by clear and convincing evidence that a party perpetrated a fraud upon the

court, courts consider the following five factors to determine the appropriate sanction: (i)

"whether the misconduct was the product of intentional bad faith;" (ii) "whether and to what

extent the misconduct prejudiced the injured party;" (iii) "whether there is a pattern of

misbehavior rather than an isolated instance;" (iv) "whether and when the misconduct was

corrected;" and (v) "whether further misconduct is likely to occur in the future." *Id.* at *20-21.

As to (i), Beverly Hills' own counsel has admitted that the misconduct was intentional.  Exhibit

30, Tx. at 11:4-15.  As to (ii), the misconduct could not have prejudiced Best Brands more – all

the evidence undermining Beverly Hills' meritless claims of ownership and standing were

concealed throughout the entire discovery period, allowing prosecution of a suit without merit.

As to (iii), there was a pattern of misbehavior, rather than an isolated instance, starting with the

Complaint, moving on to two amended Complaints, responses to requests for documents,

searching of emails, responses to two sets of interrogatories, perjury in depositions, and a

misleading response to the referral motion.  As to (iv), the misconduct was never corrected by

Beverly Hills – rather, a third party supplied notice.  As to (v), Beverly Hills has engaged in this

conduct multiple times, asserting false claims of copyright ownership, and extracting settlement

payments based thereon, from multiple parties.  *See e.g.*, Exhibits 22-24.

"When faced with a fraud upon the court, [t]he available sanctions at a court's disposal

…  range from the issuance of a jury charge on falsehoods under oath, to the imposition of

attorney's fees occasioned by the conduct in question, and finally to the entry of judgment

against the offending party." *Abbott*, at *21 (citation and quotation omitted).  As in *Abbott*,

Beverly Hills "calculatedly attempted to manipulate the judicial process." *Id.* at *15.  "[T]he

misconduct involved in this case "was not an isolated instance of perjury or one withheld

document" – rather, "it was a calculated pattern of pervasive misconduct that started early on and

continued." *Id.*  In such a situation, nothing less than dismissal is appropriate. *Id.* at *23-25.

## V.    THIS COURT HAS THE POWER TO SANCTION BEVERLY HILLS FOR ITS ABUSIVE MISCONDUCT

The *post hoc* excuses that Beverly Hills has fabricated (Ex. 30 at 14:9-11) to try to

downplay its violations do not even matter at this point.  Best Brands was entitled to all the

information during the discovery phase, to defend against this meritless suit.  Instead, Beverly

Hills **intentionally** concealed discovery **and** repeatedly lied under oath.

### A.    The Court Has Inherent Power to Protect the Administration of Justice

"A federal district court possesses broad inherent power to protect the administration of

justice by levying sanctions in response to abusive litigation practices." *Penthouse Int'l, Ltd. v.

Playboy Enters., Inc.*, 663 F.2d 371, 386 (2d Cir. 1981) (citations omitted).  "As the [Supreme]

Court recently observed … Rule 37 sanctions must be applied diligently both to penalize those

whose conduct may be deemed to warrant such a sanction, (and) to deter those who might be

tempted to such conduct in the absence of such a deterrent." *Id.* (citations and quotations

omitted).  In addition, "courts are permitted to analyze such failures under their broader inherent

power – a power that "extends to a full range of litigation abuses," including, most importantly,

to fraud upon the court." *Abbott*, 2020 U.S. Dist. LEXIS 50928, at *17-18 (citations omitted).

The Second Circuit's comments in the context of violation of a discovery order are

appropriate.  Namely, "it would be excessively formalistic to view [a discovery violation] in

isolation rather than against the background of [plaintiff's] prolonged and vexatious obstruction

of discovery . . . through perjurious testimony of its top officials and false representations to the court by its counsel." *Penthouse*, 663 F.2d at 388.  Here, "[t]here is ample evidence in the record … [Plaintiff's] executives were familiar with these important documents … and … deliberately gave false trial testimony to the effect that such [documents] did not exist." *Id.*

Nor is a prior order needed before sanctioning discovery abuses, since parties have a duty to respond to lawful discovery requests.  "The functioning of the federal discovery rules depends upon each party's fulfilling this duty unless it asserts a non-frivolous objection or moves for a protective order." *Id.* at 390.  Beverly Hills' conduct undermines those rules.

### B.      The Court Also Has Power to Sanction Under Rule 37(c)

"The discovery provisions of the Federal Rules of Civil Procedure are designed to achieve disclosure of all the evidence relevant to the merits of a controversy.… When a party seeks to frustrate this design … thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate." *Daval Steel Prods., Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991) (citations omitted).

Accordingly, this Court also has authority under Rule 37(c) to sanction Beverly Hills for its discovery abuses, such as imposition of any of the sanctions listed in Rule 37(b)(2)(A)(i)–(vi).[15]  *See,* Fed. R. Civ. P. 37(c)(1)(c).  "Any sanction imposed under this rule should serve the purposes of the rule.  Those purposes are threefold: first, the sanctions should ensure that a party does not benefit from its own failure to comply with discovery requests; second, they should serve as a specific deterrent to obtain compliance with the discovery rules; and, finally, they

---

[15]  Those include:  (i) "directing that … designated facts be taken as established … (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses … (iii) striking pleadings in whole or in part… (v) dismissing the action or proceeding … (vi) rendering a default judgment against the disobedient party …".  Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi).

should serve as a general deterrent to dissuade others from disregarding discovery obligations."

*Rammal v. Timberland Co.*, 1995 U.S. Dist. LEXIS 13605, at *6-7 (S.D.N.Y. Sep. 20, 1995)

citing *Update Art, Inc. v. Modiin Publishing, Ltd.,* 843 F.2d 67, 71 (2d Cir. 1988).

## VI.    BEVERLY HILLS SHOULD BE SEVERELY SANCTIONED

In *AVT,* this Court condemned this type of conduct in a similar context, lack of patent

ownership.  "To be perfectly frank … Bluffing is what [Plaintiff] did:  it bluffed by confidently

asserting that it owned the patent, knowing that no one was likely to call its bluff and force it to

prove what it knew it could not really prove."  *Advanced Video Techs. LLC v. HTC Corp.*, 2015

U.S. Dist. LEXIS 122423, at *29 (S.D.N.Y. Aug. 28, 2015).  Beverly Hills did the same.  It "had

no right to bring the case in the first place" (id at *31), as "it was aware of the … defect in title

from the very beginning" (id. at *32).  As a result, its "conduct makes this case exceptional and

merits sanctions" (*id*.).  Sanctions are needed to "serve as a deterrent to other [plaintiffs] who

might prefer to ignore doubts about their title, warning them to make sure they own the

[intellectual property] before initiating suit."  *Id.* at *31.

The circumstances here are the same as *AVT*:  "I have never before had a case … in

which the purported owner of the [intellectual property] did not in fact own [it] – that alone

makes this case 'exceptional,' for I have no basis on which to believe that suing on [intellectual

property] one does not own falls within the bounds of normal litigation behavior."  *Id.* at *21.

### A.    Beverly Hills Should be Sanctioned For Its Fraud on the Court

When there is intentional fraud on the court, *Abbott* concluded that nothing less than

dismissal of the case is appropriate.  *Abbott* is directly on-point here.

"Given (1) the bad-faith, repeated, and egregious nature of [Beverly Hills'] discovery

misconduct, (2) their repeated misrepresentations … [in filing multiple false pleadings, and in

committing perjury] in an attempt to cover up this misconduct, (3) the fact that their misconduct may never have come to light if not for their having being caught, (4) their continued evasion even after having been caught [having still withheld all the concealed discovery identified in the GennComm litigation] (5) the prejudice suffered by [Best Brands] as a result of the foregoing [having been deprived of critical discovery to its defense through the course of the entire discovery period, which is now closed, and having spent hundreds of thousands of dollars defending a frivolous action], and (6) the particular stage of the proceedings [with all discovery closed, and it being unfair to reopen discovery, which would give Beverly Hills a "do-over" despite their egregious violations], lesser sanctions – such as merely awarding attorneys' fees or providing an adverse inference instruction at a potential trial – would not sufficiently punish [Beverly Hills] nor deter those who might be tempted to similar conduct." *Abbott,* 2020 U.S. Dist. LEXIS 50928, at \*25-26.

The Second Circuit has similarly held that, where prejudice is manifest, dismissal is the appropriate sanction. "The prejudice to [Defendant] and to the court from [Plaintiff's] unjustifiable obstruction of discovery in this case is readily apparent. … [Plaintiff] deprived [Defendant] of the opportunity to cross-examine key [Plaintiff] witnesses fully with respect to the most important element in the case" (*Penthouse*, 663 F.2d at 390) – namely, the question of whether Plaintiff ever had standing to bring its claims to begin with. Moreover, "[Plaintiff's] obstructive tactics led to enormous waste and delay in the trial and disposition of the case." *Id*. Accordingly, in *Penthouse*, the Second Circuit affirmed a dismissal for abusive conduct involving perjury by executives and burying of documents. Here, Best Brands was prejudiced by being deprived of the opportunity to fully explore the facts and cross-examine the witnesses in discovery. It would also be prejudiced by having to conduct discovery all over again.

**B.      Beverly Hills Should Likewise be Sanctioned For Its Perjury**

"Perjurious testimony is of course sanctionable, under Rule 11 if the rule applies … or under the Court's inherent power.  Indeed, perjury and subornation of perjury are felonies, *see* 18 U.S.C. §§ 1621 and 1622."  *R.B. Ventures, Ltd. v. Shane*, 91 Civ. 5678 (CSH), 2000 U.S. Dist. LEXIS 10170, at *14 (S.D.N.Y. July 19, 2000) (citation omitted).

As noted above, the Second Circuit in *Penthouse* has expressly approved of dismissals where perjury is involved.  Courts in the Ninth Circuit, Beverly Hills' home jurisdiction, have held the same.  "Dismissal is an appropriate sanction for falsifying a deposition.  Fed. R. Civ. P. 11, as well as the court's inherent powers, can be called upon to redress such mendacity." *Combs v. Rockwell Inter. Corp.*, 927 F.2d 486, 488 (9th Cir. 1991).  "Dismissal is appropriate where a 'pattern of deception and discovery abuse made it impossible' for the district court to conduct a trial 'with any reasonable assurance that the truth would be available.'"  *Valley Eng'rs v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057-58 (9th Cir. 1998), quoting, *Anheuser-Busch, Inc. v. Natural Beverage Distributors,* 69 F.3d 337, 352 (9th Cir. 1995).

Indeed, "[t]here need be no look at the merits of a lawsuit if material, substantial perjury is found."  *Arnold v. Cnty. of El Dorado*, 2012 U.S. Dist. LEXIS 112398, at *13 (E.D. Cal. Aug. 8, 2012) (citation omitted).  "[W]hen a party falsely testifies to a fact material to the substance of a litigation, such is anathema to the function of the courts.  Perjury is much more than simply a 'gotcha,' harmful in effect only for the reason that one got caught.  Litigation is not a game in which perjury warrants a five yard penalty for a minor untruth, fifteen yards if the perjury was really serious.  Rather, perjury on any material fact strikes at the core of the judicial function and warrants a dismissal of one's right to participate at all in the truth-seeking process.  If one can be punished for perjury with up to five years imprisonment, 18 U.S.C. § 1621, it should not seem

out of place that a civil action might be dismissed for the same conduct." *Id.* at \*13-14.

The same applies here. "[P]laintiff's actions during discovery have thwarted the truth seeking process." *Id.* at \*39. "[O]ne cannot reach the true merits of a case if false or evasive testimony is given and other discovery obligations are ignored." *Id.* at \*45. "The complete lack of cooperation evidences affirmative bad faith, and has been solely within the control of plaintiff. … When the entire course of discovery is viewed along with perjury on a material fact, there is ample justification for recommending dismissal." *Id.* at \*42-43. "In summary, plaintiff's willful disregard of the Federal Rules … and most especially her false statements under oath, undermine the judicial process plaintiff herself has invoked." *Id.* at \*46-47 (E.D. Cal. Aug. 8, 2012). As a result, there is no effective alternative short of dismissal. *Id.* at \*47.

The Ninth Circuit has aptly summarized the approach to suits like Beverly Hills' here. "***There is no point to a lawsuit, if it merely applies law to lies***." *Valley Eng'rs*, 158 F.3d at 1058.

### C.     No Lesser Sanction Than Dismissal is Appropriate

There are several factors for the Court to consider in exercising its discretion to impose sanctions under Rule 37, including: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010). These are not exclusive, and need not each be resolved against the sanctioned party. *Id.*

Here, (1) Beverly Hills' actions were willful, as its counsel has admitted (Ex., Tx. at 11:4-15); (2) lesser sanctions would not be appropriate, as discussed above and below; and (3) the non-compliance has lasted throughout this case, from the filing of three complaints until the period for summary judgment motions.

21

As to (4), a warning, Beverly Hills was warned from the outset that the Court "wanted to establish a series of deadlines that the parties can comply with because I expect to enforce these deadlines" (Ex. 28, Tx at 12:18-19), and would have to "live with [its] decisions" about the resources "to invest in this case" (*id.* at 16:13-16).  Beverly Hills did not just ignore the warning, it used it – running out the deadline without providing the information it was obligated to.  Moreover, it was warned at least three times that its responses were under penalty of perjury:  in its responses to two sets of interrogatories (Ex. 4 at p. 12, Ex. 5 at p. 10), and in the oath administered in the deposition (Ex. 10 at 11:2-10, 13:3-5).  Furthermore, sanctions for its violations were "entirely foreseeable" – aside from the fact that "Parties and counsel have no absolute right 'to be warned that they disobey court orders at their peril.'"  *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 270 (2d Cir. 1999), quoting *Daval,* 951 F.2d at 1366.

As to (2), the level of sanctions, "[t]he discovery provisions of the Federal Rules of Civil Procedure are designed to achieve disclosure of all the evidence relevant to the merits of a controversy."  *Daval*, 951 F.2d at 1365 (citation and quotations omitted).  "When a party seeks to frustrate this design … thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate."  *Id.*  As noted, many cases, such as *Penthouse, Abbott, Rammal, Arnold*, *Valley Engineers,* and *Anheuser-Busch,* among others, have concluded that, in situations like this, no lesser sanction than dismissal is appropriate.

Nor would lesser sanctions be warranted.  For example, re-opening discovery would give Beverly Hills a "do-over" – excusing its intentional non-compliance.  It would give Plaintiff an undeserved pass after wrongful conduct.  In exchange for its bad faith, it would allow it to undermine the Court's warning that discovery deadlines would be enforced.  Ex. 28, Tx at 12:18-19.  "Furthermore, '(if) parties are allowed to flout their obligations, choosing to wait to make a

response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules.'"  *Penthouse*, 663 F.2d at 388 (citation and quotations omitted).

Nor would other sanctions be relevant or effective.  For example, "[e]vidence preclusion would also be to no avail as plaintiff either testified falsely or provided no evidence …"  *Arnold*, 2012 U.S. Dist. LEXIS 112398, at *45.  As the Advisory Committee recognized, "preclusion of evidence is not an effective incentive to compel disclosure of information that, being supportive of the position of the opposing party, might advantageously be concealed by the disclosing party."  *Communispond, Inc. v. Kelley*, 96 Civ. 1487 (DC), 1998 U.S. Dist. LEXIS 12336, at *14-15 (S.D.N.Y. Aug. 10, 1998) (entering a default judgment due to discovery violations).

Moreover, Best Brands has been prejudiced by these intentional abuses and perjury, all orchestrated to obfuscate key facts.  Counsel has been forced to spend hundreds of hours pursuing a defense, including, Beverly Hill's fraud on the Copyright Office, based on an incomplete record.  All the while, the facts underlying more basic and speedier defenses (dismissal for lack of standing, and failure to join a necessary and indispensable party) were being deliberately concealed.  "[Beverly Hills'] actions not only prejudiced [Best Brands], which has no doubt expended significant resources in defending this litigation, but also the Court, which has now been forced to spend significant time presiding over this absurd series of events.  Having considered lesser sanctions … dismissal is the only appropriate sanction here.  [Beverly Hills] has acted willfully and in bad faith, and deprived [Best Brands] of a meaningful opportunity to defend this lawsuit."  *ComLab, Corp. v. Kal Tire & Kal Tire Mining Tire Grp.*, 2018 U.S. Dist. LEXIS 154983, at *24-25 (S.D.N.Y. Sep. 11, 2018).

In general, dismissal or default is justified if there is willfulness, bad faith, or any fault on

the part of the sanctioned party.  *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d

Cir. 2010).  Here, Beverly Hills' own counsel has admitted that his client acted intentionally.

Indeed, the overall record shows that there can be no doubt of willfulness, bad faith, and fault on

Plaintiff's part.  With all the relevant evidence having been buried until after the close of

discovery, Best Brands has been deprived of all meaningful opportunity to defend.  Beverly Hills

should be held culpable for that conduct.  *See e.g., Communispond,* 1998 U.S. Dist. LEXIS

12336, at *17-18 ("entry of a default judgment is warranted in light of … Kelley's blatant

misrepresentations concerning the existence of discovery responsive to Communispond's

requests, [and] his deliberate and deceitful obfuscation of relevant discovery material …").

Furthermore, "the pattern of deception and discovery abuse made it impossible … to conduct [a]

trial with any reasonable assurance that the truth would be available.  It is appropriate to reject

lesser sanctions where the court anticipates continued deceptive misconduct."  *Anheuser-Busch,*

*Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 352 (9th Cir. 1995)

　　　　"The motion here involves, in part, plaintiff's needless obstreperousness in discovery, but

more importantly, additionally involves an allegation that plaintiff committed perjury during her

deposition pertinent to a material fact in this litigation .… there is no doubt that plaintiff did

perjure herself; the issue becomes what to do about it.  Courts have struggled with the issue, but

the better reasoned opinions permit a dismissal of the case of the party committing perjury."

*Arnold*, 2012 U.S. Dist. LEXIS 112398, at *1-2.

### D.　　　Beverly Hills Should be Ordered to Pay Best Brands' Attorneys' Fees

　　　　The payment of Best Brands attorneys' fees is also warranted and entirely appropriate.

Best Brands has spent hundreds of thousands of dollars defending a case that should never have

been brought.  It was also forced to spend more than necessary due to an incomplete record,

considering that the facts underlying a far less expensive, and threshold, defense of lack of

standing, were being concealed by Beverly Hills.  The law allows an award of attorneys' fees

and costs in situations like this one.  *See,* Fed. R. Civ. P. 37(c)(1)(A) (providing for "payment of

the reasonable expenses, including attorney's fees, caused by the failure [to provide information

in discovery]."  The Supreme Court has fully approved of the same.[16]  However, to be sure,

merely awarding fees in a case like this would not sufficiently punish Beverly Hills, nor deter

those who might be tempted to similar conduct.  *Abbott*, 2020 U.S. Dist. LEXIS 50928, at *25.

In short, Best Brands respectfully requests its attorneys' fees and costs it has been

needlessly forced to incur for all (*infra,* n.16), or at least part, of this case.  Best Brands

respectfully requests leave to submit documentation of the applicable fees and costs, once the

Court rules on the extent of sanctions it wishes to impose in the interests of justice.

## CONCLUSION

Until now, Beverly Hills has executed its scheme with impunity – defrauding this Court,

Best Brands, and numerous other defendants.  It has committed multiple acts of perjury, and

innumerable discovery violations whose full extent is not even known.  It has plotted, for the

<u>fourth</u> time, to extract money on copyrights it has never owned.

In view of the seriousness, frequency, and intentional nature of its illegal acts, Beverly

Hills should be severely sanctioned.  Its brand of misconduct undermines the integrity of this

Court, and the entire judicial process.

Its abuses warrant nothing less than dismissal of this action.

---

[16]  "No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost of the proceedings could justly be assessed against the guilty parties.  Such is precisely a situation where 'for dominating reasons of justice' a court may assess counsel fees as part of the taxable costs."  *Universal Oil Prods. Co. v. Root Ref. Co.*, 328 U.S. 575, 580, 66 S. Ct. 1176, 1179 (1946) (citation omitted).

Dated: August 28, 2020    Respectfully submitted,

               */s/ Morris E. Cohen*

               _____

               Morris E. Cohen
               Lee A. Goldberg
               Limor Wigder
               GOLDBERG COHEN LLP
               1350 Avenue of the Americas, 3rd Floor
               New York, New York 10019
               (646) 380-2087 (phone – main)
               (646) 380-2084 (phone – direct)
               (646) 514-2123 (fax)
               LGoldberg@GoldbergCohen.com
               MCohen@GoldbergCohen.com
               LWigder@GoldbergCohen.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2020, a true and correct copy of the foregoing was served on counsel of record via the Court's ECF system.

Dated: August 28, 2020                    */s/ Morris E. Cohen*

_____

Morris E. Cohen

27