# EXHIBIT F

*BEVERLY HILLS TEDDY BEAR COMPANY VS.*
*BEST BRANDS CONSUMER PRODUCTS, INC.*

*DAVID SOCHA*
*February 25, 2020*
*HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY*



*Original File 301478.txt*
*Min-U-Script® with Word Index*

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     ----------------------------------------x
 3   BEVERLY HILLS TEDDY BEAR COMPANY,

 4                  Plaintiff,
          vs.
 5
     BEST BRANDS CONSUMER PRODUCTS, INC.,
 6   and BEST BRANDS SALES COMPANY, LLC,

 7                  Defendants.
     ----------------------------------------x
 8
        *** HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY ***
 9

10                  60 East 42nd Street
                    New York, New York
11
                    February 25, 2020
12                  8:30 a.m.

13

14

15   Reported by:

16   Eileen Mulvenna, CSR/RMR/CRR

17   Job No. 301478

18

19

20

21

22
            ELLEN GRAUER COURT REPORTING CO. LLC
23              A U.S. LEGAL SUPPORT COMPANY
            126 East 56th Street, Fifth Floor
24               New York, New York 10022
                      212-750-6434
25                  REF:   301478
```

```
 1            DEPOSITION of DAVID SOCHA,
 2   held at the offices of Epstein Drangel LLP, One
 3   Grand Central Place, 60 East 42nd Street, New
 4   York, New York, before Eileen Mulvenna,
 5   CSR/RMR/CRR,  Certified Shorthand Reporter,
 6   Registered Merit Reporter, Certified Realtime
 7   Reporter and Notary Public within and for the
 8   State of New York
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  Are you familiar with your products?
 2          A.      Yes.
 3          Q.      Okay, good.
 4                  So I'd like to show you as an
 5   example Plaintiff's Exhibit 25.  Could you
 6   identify that for the record.
 7                  (Exhibit 25, Previously marked.)
 8          A.      It's a Squeezamal 3.5-inch monkey.
 9          Q.      Is that a Series 1 product?
10          A.      I'm assuming because it doesn't have a
11   series number on it, so I'm assuming yes.
12          Q.      You're asserting copyright
13   protection for this product; correct?
14          A.      Correct.
15          Q.      So what's your title in the company?
16          A.      CEO.
17          Q.      And how long have you been CEO?
18          A.      26 years.
19          Q.      Who in the company has the final say
20   on matters?  Would that be you as the CEO?
21          A.      I have a good team below me; but at
22   the end of the day, everything stops with me, yes.
23   But I don't see everything.
24          Q.      As the CEO, what are your work
25   responsibilities, if you could summarize them?
```

```
 1         A.     Yeah, I think making sure we have the
 2   right teams in place and the right goals.
 3         Q.     Okay.  And be more specific, though.
 4   In other words, what areas of the company are you
 5   involved in or do you supervise?
 6         A.     Mostly marketing.  I co-supervise
 7   product development.  I oversee loosely financials.
 8         Q.     Anything else?
 9         A.     I mean, I'm involved in sales, but I
10   don't oversee it.
11         Q.     What else are you involved in?
12         A.     Trash collection.  You name it, I do
13   everything.  We're a small company, so yeah.
14         Q.     By "small," how many members do you
15   have in the company?
16         A.     We have about 30 now.
17         Q.     And you said some degree financials.
18   Who would you say is primarily involved in
19   financials?
20         A.     We have a CPA firm.
21         Q.     What's the name of the firm?
22         A.     Hedman & Associates, H-E-D-M-A-N.
23         Q.     Do you have a CFO?
24         A.     We have a controller.
25         Q.     Who's the controller?
```

Case 1:19-cv-03766-AS   Document 270-6   Filed 09/11/23   Page 7 of 12

**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**            38

```
 1  your title or responsibility?
 2       A.    I did forecasting.  I did sales.  I
 3  did -- forecasting and sales.  Oh, and licensing.
 4       Q.    What about at Applause; what was
 5  your title or responsibility there?
 6       A.    I was an intern.  Worked in almost all
 7  the departments.
 8       Q.    After Dakin, what did you do next?
 9       A.    Started the company.
10       Q.    You started Beverly Hills?
11       A.    Beverly Hills Teddy Bears, yes.
12       Q.    What year was that?
13       A.    '93, '94.  I think officially '94.
14       Q.    And you've been the CEO since then?
15       A.    Yes.  Owner, yeah.
16       Q.    How many other owners are there?
17       A.    None.
18       Q.    You're the sole owner?
19       A.    Yes.
20       Q.    Are there any related companies to
21  Beverly Hills?
22       A.    They're all under Beverly Hills'
23  d/b/a's, so --
24       Q.    What are those d/b/a's?
25       A.    Custom Plush.  Frankie's Play is
```

```
 1   separate, but it's going to be folded in.  So it's
 2   essentially going to be the same.
 3        Q.    Frankie's Play?
 4        A.    Frankie's Play, just how it sounds.
 5        Q.    Any others?
 6        A.    No.
 7        Q.    Any other companies that you have an
 8   ownership stake in other than the stock market?
 9        A.    No.
10        Q.    So there are no private companies in
11   which you're an owner or investor?
12        A.    No.
13        Q.    Are there any other investors in
14   your company?
15        A.    Just my parents.
16        Q.    Do they own stock in the company?
17        A.    No.
18        Q.    Who owns the stock of Beverly Hills?
19        A.    I do.
20        Q.    How much of the stock do you own?
21        A.    A hundred percent.
22        Q.    When you started the company, how
23   many employees did you have?
24        A.    None.
25        Q.    Okay.
```

```
 1         A.      I don't know.  I don't know.
 2         Q.      Did you have any discussions via
 3  e-mail after this meeting confirming what was
 4  discussed in the e-mail -- in the meeting?
 5         A.      I'm sure.
 6                 MR. COHEN:  If there are any such
 7         e-mails that you haven't produced, we would
 8         ask for them.
 9  DOCUMENT/DATA REQUESTED:
10         Q.      So what happened after this?  After
11  this meeting, what was the next step that members
12  of your team or you took?
13         A.      I think what we just said; they
14  probably decided on a shape and then they went out
15  hired 99 Designs.
16         Q.      Who's "they"?
17         A.      I think Luke worked with Kana doing
18  it, I believe.
19         Q.      Were you involved in that at all?
20         A.      Just looking at them when they came
21  in.
22         Q.      Looking at what?
23         A.      The designs when they come in.
24         Q.      Did you have an account with 99
25  Designs?
```

```
 1        A.     I believe we did, yes.
 2        Q.     Did you access that account or were
 3   you not involved in accessing that account?
 4        A.     I don't know if I did on this project.
 5   I was on there a couple of times, but then I think I
 6   gave the log-in to Luke.
 7        Q.     So Luke mainly was involved in
 8   logging into 99 Designs?
 9        A.     I think so.
10        Q.     And who was Luke reporting to?
11        A.     He was like an assistant.  So he did a
12   Jack-of-all-trades.  He did everything.
13        Q.     Do you have any recollection of any
14   log-ins that you ever did with 99 Design?
15        A.     No, no -- I mean, I know I did.  I
16   just don't recall what I did.
17        Q.     Okay.  You said that you decided on
18   a ball design.  What did you mean by that?
19        A.     The round balls that you see in the
20   exhibit there.
21        Q.     Why did you want that type of a
22   round ball?
23        A.     We felt it was the best shape for the
24   use of it to get the most bang for your buck.  When
25   you squeeze it, it would expand on all sides.
```

```
 1   as far as you know?
 2        A.    Possibly Kana.
 3        Q.    Did Kana communicate with Mr. Tijo
 4   or Ibba via the website?
 5        A.    I don't know.  I don't know.
 6        Q.    Okay.  So at some point you chose to
 7   pursue copyright applications on these; is that
 8   correct?
 9        A.    Correct.
10        Q.    Who interfaced with the attorneys?
11        A.    I'm sure -- well, I did.  I started
12   the relationship with Jason, I think.
13        Q.    Okay.
14        A.    But the details would have gone
15   through Randy or Kana is my guess.
16        Q.    Okay.  Who provided -- who provided
17   the attorneys with information for copyright
18   applications?
19        A.    I would assume Kana.  Maybe someone
20   from her team, but I'm assuming her.
21        Q.    Okay.  Anyone else?
22        A.    Not that I know of.
23        Q.    Did you give the attorneys any
24   information for the applications?
25        A.    I think Dwana and I had a conversation
```

```
 1  and talked for a little bit about it.
 2         Q.    And this is before the applications
 3  were prepared?
 4         A.    I believe so.
 5         Q.    Did you give her images?  Did you
 6  give her information?
 7         A.    I don't think I did.  I think we
 8  got -- I think the samples were sent from our
 9  office, if I recall correctly.
10         Q.    So you sent samples to your
11  attorneys?
12         A.    Sent samples of something.  I don't
13  know if it was product line for photos.  So -- I
14  don't know if it was this product line or another --
15         Q.    That's what I'm asking you.
16         A.    I don't recall specifically if we took
17  these pictures or if they did.
18         Q.    So you said Kana you think -- you're
19  assuming worked on the copyright applications --
20         A.    Or someone on her team.
21         Q.    Or someone on her team.
22               You might have talked to the
23  attorneys; right?
24         A.    I did talk to the attorneys.
25         Q.    But you don't know --
```