# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 03/11/2019 04:25 PM Sherri R. Carter, Executive Officer/Clerk of Court, by L. Marquez, Deputy Clerk

Case 1:19-cv-03766-AS    Document 293-1    Filed 12/18/23    Page 2 of 52

1  Vahe Hovanessian, Esq. (Bar No. 237068)
**LAW OFFICE OF VAHE HOVANESSIAN**
2  100 N. Brand Boulevard, Suite 536
Glendale, CA 91203-2642
3  Tel: (818) 240-1333 / Fax: (818) 240-1369
E-mail: vahe@vhlaw.com
4
Attorney for Plaintiffs
5  **GENNCOMM, LLC**

6

7

8  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9  **FOR THE COUNTY OF LOS ANGELES –NORTHWEST DISTRICT**

| | |
|---|---|
| 10  GENNCOMM, LLC., a California limited liability corporation, | Case No.: 18VECV00045 |
| 11 | Dept.    NW-T |
| | Plaintiff, | |
| 12 | Hon. Shirley K. Watkins |
| | v. | |
| 13 | **VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:** |
| 14  BEVERLY HILLS TEDDY BEAR COMPANY, a California corporation; DAVID SOCHA, an individual; DOES 1 to 100 inclusive, | |
| 15 | **1. BREACH OF CONTRACT (LICENSING AGREEMENT);** |
| 16 | **2. ACCOUNTING;** |
| | Defendants. | |
| 17 | Complaint filed: October 15, 2018 |
| | | CMC:         May 14, 2019 |
| 18  / / / | |

19    Plaintiff **GENNCOMM, LLC., a California Limited Liability Corporation**

20  ("Plaintiff") hereby files this Verified Complaint against Defendant **BEVERLY HILLS**

21  **TEDDY BEAR COMPANY, a California corporation**; and **DOES 1 to 100 inclusive**

22  ("Defendants"). Per stipulation between the parties, Plaintiff dismisses its claims against

23  Defendant **DAVID SOCHA, an individual.**  Plaintiff is informed and believes, and on the basis

24  of that information and belief, alleges as follows:

25

26
**I.
INTRODUCTION**                Ex. 45

27    1.    This case arises out of a toy company's breach of a licensing agreement for

28  royalties in order to market and sell plush toys without paying or reporting any royalties for a

LAW OFFICE OF VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL: (818) 240-1333
FAX: (818) 240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

licensed plush innovation; completely ignoring a worldwide executed license agreement.

2.      On September 20, 2017, Defendant entered into a Non-Exclusive License Agreement ("license agreement") with Plaintiff with an effective date of June 16, 2017.  A true and correct copy of the Non-Exclusive License Agreement is incorporated herein and attached hereto as **Exhibit 1**.

3.      Under the agreement, Defendant became a licensee of "Pop Up Plush" described as a "[p]lush figure comprising of slow rising, kid safe, latex, polyurethane or other memory foam filler that has been cut or molded (e.g., machine, injection, additive printed), into the shape of a plush toy or other character that grows when squeezed down or compressed. The exterior will be covered with a general plush material synthetic or natural that is sewn or wrapped around the sculpted memory foam." *See* Exhibit 1, at p. 23, Exhibit A.

4.      Under the agreement, Plaintiff was to receive a royalty rate of 4% of Net Wholesale Selling Price on Items without royalty bearing, third party brand or character applied for the first 50,000 units shipped; and 2% of Net Wholesale Selling Price on Items without royalty bearing, third party brand or character applied at 50,001 and thereafter." See Exhibit 1, p. 1 of 23, and p. 3 of 23.

5.      Beginning on or about April 19, 2017 through the present, Defendant has used the Pop Up Plush concept subject of the license agreement to obtain contracts and commitments for items sold under multiple brand names including but not limited:  Squeezamals; Squishamals; Squooshamals; Surprizamals; Unboxamals; Shimeez; and others at merchants including but not limited to:  Walmart;  Target; Walgreens; Amazon; Claire's; and multiple other retail customers and distributors globally. Defendant has also used Plaintiff's innovation under multiple licensed brands including Disney and Hello Kitty without first obtaining the required license authorization or agreement. Defendants also sub-licensed to third parties including but not limited to Big G Creative for the Freeze-N-Squeeze Game without first obtaining the required license authorization or agreement.  Defendants use continues without providing any accounting or royalty in breach of the license agreement. Moreover, Defendant's use of Plaintiff's innovation has resulted in Defendant's product line receiving industry-wide acclaim including

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL.: (818) 240-1333
FAX: (818) 240-1369

- 2 -

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

the 2018 Toy-of-the-Year Award in Plush by Learning Express.

## II.
## PARTIES

6.      At all times material to this Complaint, Plaintiff **GENNCOMM, LLC**, is and was a California limited liability corporation, duly organized and existing under and by virtue of the laws of the State of California, and/or authorized to do business and doing business in the County of Los Angeles, State of California, at 5955 De Soto Avenue, #230, Woodland Hills, CA 91367.

7.      Plaintiff is informed and believes and thereby alleges that Defendant **BEVERLY HILLS TEDDY BEAR COMPANY** is a California corporation with its principal place of business located at 24625 Railroad Ave., Santa Clarita, CA 91321.

8.      Per stipulation between the parties, Plaintiff agrees to dismiss Defendant **DAVID SOCHA, an individual.**  Plaintiff is informed and believes and thereby alleges that **DAVID SOCHA** is and at all times relevant to this Complaint was the CEO, a managing member, owner, officer, director and shareholder of all other named Defendants herein; and a resident of Los Angeles County.

9.      Defendants **DOES 1 to 100** are sued herein under fictitious names pursuant to Code of Civil Procedure Section 474. Plaintiff is informed and believes, and on that basis alleges, that each Defendant sued under such fictitious name is in some manner responsible for the wrongs and damages as alleged below, and in so acting was functioning as the agent, servant, partner and employee of the defendants, and in doing the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner and employee with the permission and consent of the defendants.

10.      Defendants, and each of them, are now, and/or at all times mentioned in this Complaint were in some manner legally responsible for the events, happenings and circumstances alleged in this Complaint.

11.      Defendants proximately caused Plaintiffs to be subjected to the unlawful practices, wrongs, complaints, injuries and/or damages alleged in this Complaint.

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL: (818) 240-1333
FAX: (818) 240-1369

- 3 -

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

12.    Defendants, and each of them, are now, and/or at all times mentioned in this Complaint were members of, and/or engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of said joint venture, partnership and common enterprise.

13.    Defendants, and each of them, at all times mentioned in this Complaint concurred and contributed to the various acts and omissions of each and every one of the other Defendants in proximately causing the complaints, injuries and/or damages alleged in this Complaint.

14.    Defendants, and each of them, at all times mentioned in this Complaint approved of, condoned and/or otherwise ratified each and every one of the acts and/or omissions alleged in this Complaint.

15.    Defendants, and each of them, at all times mentioned in this Complaint aided and abetted the acts and omissions of each and every one of the other Defendants thereby proximately causing the damages alleged in this Complaint.

## III.
## JURISDICTION AND VENUE

16.    The California Superior Court has jurisdiction in this matter because both the individual monetary damages sought herein exceed the minimal jurisdictional limits of the Superior Court.

17.    Venue is proper in Los Angeles County pursuant to CCP §395(a) and §395.5 because liability arose there as at least some of the transactions that are the subject matter of this Complaint occurred therein and/or each Defendants either are found, maintain offices, transact business, and/or have an agent therein.

18.    Plaintiff and Defendants have contractually agreed that California law shall govern interpretation and enforcement of the underlying Agreement, with disputes resolved in Los Angeles County.

/ / /

/ / /

/ / /

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL.: (818) 240-1333
FAX: (818) 240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

# IV.
## GENERAL ALLEGATIONS
## COMMON TO ALL CAUSES OF ACTION

19. On or about April 19, 2017, the parties held a meeting to discuss the Pop-Up Plush concept, which included a video demonstration and physical product samples demonstrating the slow rise foam technology. Plaintiff was represented at the meeting by Genna Rosenberg, Jeremy Medwed and Allyson Frome; Defendant was represented by DAVID SOCHA, Cristy Collins and Randy Clark. Plaintiff's representative conveyed that squishy toys would be a hot category in 2018 with no other company likely doing slow-rise foam inside plush. DAVID SOCHA on behalf of Defendant advised Plaintiff's representatives that Defendant had tried to incorporate slow rise foam into the research and development of their plush products and could not get it to work in a proper way.  DAVID SOCHA further advised Plaintiff's representatives that Defendant also tried vacuum sealing, shredded foam, foam chunks and other attempts; and none of the attempts went back to their original state as intended and did not reshape properly and did not have the desired squishy feel. DAVID SOCHA advised that the Defendant was very interested in Plaintiff's concept since Defendant's years of prior attempts had not worked and Plaintiff had figured out how to successfully achieve the feature.

20. On or about April 19, 2017 at the meeting, there was a discussion as to whether or not Plaintiff's Pop-Up Plush concept was potentially patentable.  Plaintiff's representatives advised Defendant's representatives that there was no guarantee regarding patentability. Plaintiff's representatives fully disclosed that they had actively sought-out advice from patent counsel, that they had received mixed opinions on if use of the innovation was potentially patentable, and that they were advised by counsel not to promise patentability, and that being quick to market would be key to success.

21. On or about April 19, 2017 at the meeting, Defendants expressed their desire to move quickly and requested to keep the samples. Plaintiff's representatives left samples with Defendant's representatives. Plaintiff's samples included a "Nemo" plush about seven (7") inches tall featuring the Plaintiff's innovation; along with an unshaped sample of memory foam; and a mini-Suprizamal plush with the Plaintiff's innovation inside a container so that Defendant

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. Brand Blvd.
Suite 536
Glendale, CA
91203-2642
Tel.: (818)240-1333
Fax: (818)240-1369

could review and also obtain cost estimates, as Defendant's President Randy Clark was leaving for Hong Kong that week.

22.    On or about April 19, 2017 at the meeting, DAVID SOCHA advised Plaintiff's representatives that Defendant also would like to use the samples to show at an upcoming meeting with Disney and other customers, and that the "Nemo" plush sample would be perfect for Defendant's meeting with Disney. In good faith, Plaintiff's representatives agreed to allow the use of the samples.

23.    On or about April 19, 2017, Plaintiff's representative Allyson Frome sent the Defendants an email with the presentation and an NDA.

24.    On or about April 19, 2017 after the meeting, Plaintiff replied to an email from CRISTY COLLINS, an employee of Defendant requesting a two week period for Defendant to conduct a cost analysis and requesting permission to preview the concept with a Walmart buyer on May 4, 2017 in Bentonville, Arkansas. Plaintiff agreed in good faith to allow use of the sample and without requiring that Defendant pay an industry-standard and formal option fee.

25.    On or about April 24, 2017, Plaintiff received another email from CRISTY COLLINS requesting another Pop Up Plush sample of a Disney Emoji character to be mocked up for the Walmart meeting.

26.    On or about April 25, 2017, Plaintiff and Defendant entered into a Mutual Non-Disclosure Agreement regarding confidential information relating to Plaintiff's innovation called "Pop Up Plush – Sculpted Foam Plush Collectible." A true and correct copy of the April 25, 2017 Mutual Non-Disclosure Agreement is incorporated herein and attached hereto as **Exhibit 2**.

27.    On or about May 1, 2017, in good faith Plaintiff delivered to Defendant two (2) Disney Emoji samples developed by Plaintiff per Defendant's request on April 24, 2017, including a Mickey Mouse and a Disney Cheshire Cat plush featuring Plaintiff's innovation.

28.    On or about May 9, 2017, Defendant advised Plaintiff regarding initial cost estimates.

29.    On or about June 2, 2017, GENNA ROSENBERG on behalf of Plaintiff and DAVID SOCHA on behalf of Defendant discussed the concept and deal terms.

LAW OFFICE OF
VAKÉ HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL.: (818) 240-1333
FAX: (818) 240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

30.     On or about June 6, 2017, ALLYSON FROME on behalf of Plaintiff and CRISTY COLLINS on behalf of Defendant further discussed deal terms for licensing the Pop-Up Plush concept.

31.     During the period from about June 6, 2017 through June 13, 2017, multiple emails and telephone calls were exchanged in negotiating the deal terms for Pop-Up Plush concept.

32.     On or about June 15, 2017, CRISTY COLLINS on behalf of Defendant sent an email to GENNA ROSENBERG on behalf of Plaintiff confirming that the parties have an agreement on deal terms and they wish to move forward. CRISTY COLLINS stated in her June 15, 2017 email: " I'm pleased to say we have agreement on the deal terms for your foam application for plush. As discussed we agree to 4% for the first 50k units and 2% thereafter on non-licensed plush using your die-cut foam application. We will discuss potential licensed applications at a later date as needed."

33.     On or about June 16, 2017, ALLYSON FROME on behalf of Plaintiff emailed a deal proposal to CRISTY COLLINS on behalf of Defendant named "License Deal Terms".

34.     On or about July 7, 2017, DAVID SOCHA on behalf of Defendant and DANIEL ROSENBERG on behalf of Plaintiff executed the "License Deal Terms." A true and correct copy of the License Deal Terms in incorporated herein and attached hereto as Exhibit 1.

35.     On or about July 17, 2017, ALLYSON FROME on behalf of Plaintiff sent a long form contract agreement entitled "Non-Exclusive License Agreement" to CRISTY COLLINS on behalf of Defendant with an effective date of June 16, 2017. *See* Exhibit 1.

36.     During the week of July 17, 2017, Defendant presented the Pop Up Plush concept to the Toys R Us buyer.

37.     On or about September 20, 2017, Plaintiff received Defendant's executed "Non-Exclusive License Agreement" effective as of June 16, 2017.  A true and correct copy of the September 20, 2017 (dated June 16, 2017) Non-Exclusive License Agreement is incorporated herein and attached hereto as **Exhibit 1**.

38.     On or about September 26, 2017, CRISTY COLLINS on behalf of Defendant sent an email to GENNA ROSENBERG on behalf of Plaintiff advising that Defendant planned to do

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL.: (818)240-1333
FAX: (818)240-1369

a Disney Emoji licensed line for Latin America and would like to add third party licensing to the grant of rights. CRISTY COLLINS stated in her September 26, 2017 email: " I hope all is well. I am happy to report that we would like to use the pop-up plush in one of our Disney Emoji skus for LATAM. This will be a $9.99 Emoji plush, launching in spring 18 and going through to fall 18 and beyond. Given that, we need to talk about a 3rd party royalty rate and get that added into the contract, assuming you are ok with this. Let know your thoughts. Looking forward to seeing you in Dallas next week!"

39.    On or about October 4, 2017, representatives of Plaintiff and Defendant met in Dallas at the Fall Mass Market Preview. Defendant's representatives discussed the strong interest in Plaintiff's innovation from Defendant's global customers. Plaintiff advised Defendants while in Dallas that, although they had been advised by patent counsel that the innovation is likely not protectable with a patent; that the Plaintiffs had indeed filed a provisional patent application in an effort to possibly make certain uses more protectable.

40.    On or about October 5, 2017, ALLYSON FROME on behalf of Plaintiff sent to CRISTY COLLINS on behalf of Defendant an addendum to add the Disney Emoji license to the grant of rights.

41.    On or about October 17, 2017, CRISTY COLLINS on behalf of Defendant sent an email to ALLYSON FROME on behalf of Plaintiff advising that Defendant will be calling the line "Squishamals" and that she would be presenting the line to Target the week of October 23rd.

42.    On or about October 23, 2017, CRISTY COLLINS on behalf of Defendant requested information regarding the details of what the provisional patent application had covered, for the first time, that the Plaintiff had filed in an effort to make their innovation more protectable, with a subject Squishamals, saying, "We are showing to Target on Wed am. They will be the first in the US to see the line. For this meeting we want to be able to talk about this being a patent protected item. Can you send me detail on the what the patent covers so that I don't mis-represent that in the meeting?"

43.    On or about October 23, 2017, Allyson Frome for Plaintiff replied with, "We have a provisional patent pending with the USPTO that covers a plush character stuffed with sculpted

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL: (818) 240-1333
FAX: (818) 240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

or molded slow rising foam.  The plush can be compressed into various types of packages and will increase to 3 times it's size once released from the package."

44.    During the period of October 23, 2017 through October 31, 2017, multiple emails were exchanged negotiating the deal terms for the Disney licensed royalty rates. The emails confirmed product plans, retail interest, and feedback from Target meeting. In an email during the period of October 23, 2017 through October 31, 2017, CRISTY COLLINS on behalf of Defendant advised:  "Generic. 3 sizes/ price points. This will be sold into international as well with very strong interest from our partners. TV supported as well in US at minimum." CRISTY COLLINS further advised: "The meeting was good. We are working with them toward an early launch in June but we still have some work to do to get that sealed. We are showing Wal-mart on Nov 15th as well. International response has been huge and orders are already coming to be on shelf late spring. I will discuss the terms below with Dave and get back to you".

45.    On or about November 3, 2017, DAVID SOCHA requested a telephone meeting with GENNA ROSENBERG. During the telephone call DAVID SOCHA stated that things had not worked out as planned from a costing perspective, and that key retailers had reduced their orders. During the same conversation, DAVID SOCHA attempted to renegotiate the licensing agreement stating that if the Plaintiff did not sell him the concept outright, then Defendant would not be able to use Plaintiff's innovation. Additionally, DAVID SOCHA advised GENNA ROSENBERG multiple times that he had been trying to figure out a way to go around the license agreement to save on paying royalties in an effort to reduce costs. During the same conversation, GENNA ROSENBERG reminded DAVID SOCHA that prior to the parties signing the Non-Exclusive Agreement, Plaintiff had given the team at Beverly Hills Teddy Bear the ability to do initial costing, six months earlier prior to signing the initial deal memorandum and without the industry-wide customary option agreement. In addition to establishing initial costing, prior to committing to a long-term license and without signing a customary Option Agreement and Deal Memo, Defendants used the Plaintiff's samples featuring the innovation to secure interest from licensors, retailers and distributors globally, which resulted in significant early commitments for the Defendants, according to Defendant's representatives who provided to Plaintiff ongoing

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL: (818) 240-1333
FAX: (818) 240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

feedback. Plaintiff desired to keep the current license agreement and no subsequent renegotiated agreement arose.

46.    Notwithstanding DAVID SOCHA'S misrepresentations to GENNA ROSENBERG  on November 3, 2017, regarding Defendant's use of Plaintiff's innovation; prior to November 3, 2017, Defendants had already sold their plush line in multiple sizes and iterations featuring the Plaintiff's innovation to retailers and distributors globally, under their own brands and under the Disney brands, and it is believed that they shipped the already-manufactured product branded Squishamals (aka Squeezamals) to Target stores nationwide.

47.    During the November 3, 2017 telephone call, Defendant DAVID SOCHA admittedly refused to honor the license agreement and advised that he was trying to "go around" the license agreement in order for Plaintiff to not receive any royalties; despite the fact that Defendant had already sold the concept globally featuring Plaintiff's innovation during the prior months and the product was already in route for sales at Target.

48.    On November 27, 2017, RANDY CLARK, President of Defendant requested a call with Plaintiffs and sent to Plaintiff an email with a pdf showing the Squishamals and retail display, to show use of Plaintiff's innovation.

49.    On November 27, 2017, RANDY CLARK spoke with GENNA ROSENBERG and JEREMY MEDWED by telephone and advised that Target had reduced their order by eighty percent (80%), and reiterated their costing challenges notwithstanding the significant sales already conducted pursuant to the underlying agreement herein.

50.    On November 27, 2017, during the conversation RANDY CLARK requested a copy of the filed provisional patent application from the Plaintiff, for the first time.

51.    On November 27, 2017, Plaintiff's representative sent to RANDY CLARK a copy of the provisional patent application per Defendant's request.

52.    On or about December 15, 2018, RANDY CLARK on behalf of Defendant sent an email to GENNA ROSENBERG and JEREMY MEDWED on behalf of Plaintiff stating:  "So sorry for delay in following up. Surprizamals is really humming and we are trying to squeeze everything we have with retailers to be able to position the line for next year. We are thankful

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL: (818)240-1333
FAX: (818)240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

that it is selling really well and buyers are thrilled. Circling back on Pop-Up Plush, we seem to have more clarity with the help of reviewing the provisional patent. It makes sense why we are hearing that others are doing product similar to Squishamals because plush memory foam by itself isn't patentable or able to be protected.  With the "squish" craze, it is a no-brainer line extension for companies to do.  That being said, and since our last call, we have honed in on Unboxamals in order to utilize the provisional patent and agreement with you for Pop-Up Plush. We are working super hard on development. We pitched it to our Target guy earlier this week and his mouth dropped. Understanding that we have to act fast, we are putting this as a top priority for BHTB. Let's try to set up a time to jump on a conference call next week to review and go over details. Also, will either of you be in Hong Kong in January?"

53.     On or about January 15, 2018, Plaintiff sent Defendant an email congratulating all of them on the early success of the Squishamals, (aka Squeezamals) product line that launched at Target stores and was selling out at Target. Plaintiff requested items owed to the Plaintiff under their agreement, including the certificate of liability and contractual product samples.

54.     On or about January 31, 2018, a royalty report and royalty payment under the license agreement was due and missed by Defendants.

55.     On or about February 14, 2018, GENNA ROSENBERG on behalf of Plaintiff asked for the missed report via email to DAVID SOCHA on behalf of Defendant.

56.     Between February 14, 2018 and April 12, 2018 the parties engaged in multiple emails and an in-person meeting requested by the Defendant. At these meetings and through emails, DAVID SOCHA continued to misrepresent that Defendants were not using the Plaintiff's innovation, despite the fact that they used the multiple sets of samples provided at the Defendant's request for meetings with Disney, Walmart, their global retail customers and distributors. Plaintiff GENNA ROSENBERG reminded DAVID SOCHA of their obligations under the executed licensing agreement, which had not been predicated on any patent, and that despite the Defendants pretending that they had simply not used the innovation, indeed Squeezamals and the Disney Emoji line featured the innovation Beverly Hills Teddy Bear had licensed from the Plaintiffs. Further, that the Company had still not signed the third-party

Law Office of
Vahe Hovanessian
100 N. Brand Blvd.
Suite 536
Glendale, CA
91203-2642
Tel: (818) 240-1333
Fax: (818) 240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

amendment it was obligated to execute for the Disney Emoji lines per their agreement.

57.     In an email on February 28, 2018, DAVID SOCHA wrote "…OUR PROPOSAL IS FOR YOU TO DO THE PR (AS YOU HAVE MENTIONED) ON SQUEEZAMALS - - AS A PARTNER - - NO CHARGE. I WOULD BE OPEN TO DISCUSSING YOUR SERVICES ON OUR OTHER BRANDS FOR SURE, AND THOSE WE WOULD OBVSIOULSY [SIC] PAY FOR."

58.     In an email on March 15, 2018, DAVID SOCHA wrote, "your idea isn't even really being used. We are being very kind in this---and frankly, i feel like the wool was pulled over our eyes when we signed the agreement…i didn't even read it before i signed it… i relied on an outside contractor for the details…[… at the end of the day, i do believe we are better allies than enemies… the damage we could cause each other is not something i want to think about….]""

59.     As of the date of this Complaint, no royalty report or otherwise any royalty has been provided by Defendant pursuant to the license agreement.

## V.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
(Against Defendant BEVERLY HILLS TEDDY BEAR COMPANY and DOES 1 to 100)

60.     Plaintiff incorporates by reference and realleges each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

61.     Defendant entered into a Non-Exclusive License Agreement ("license agreement") with Plaintiff with an effective date of June 16, 2017.  A true and correct copy of the Non-Exclusive License Agreement is incorporated herein and attached hereto as **Exhibit 1**. Plaintiff herein incorporates and makes reference to the entirety of the Non-Exclusive License Agreement as if fully set forth herein.

62.     Under the agreement, Defendant became a licensee of "Pop Up Plush" described as a "[p]lush figure comprising of slow rising, kid safe, latex, polyurethane or other memory

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. Brand Blvd.
Suite 536
Glendale, CA
91203-2642
Tel.: (818) 240-1333
Fax: (818) 240-1369

foam filler that has been cut or molded (e.g., machine, injection, additive printed), into the shape of a plush toy or other character that grows when squeezed down or compressed. The exterior will be covered with a general plush material synthetic or natural that is sewn or wrapped around the sculpted memory foam." *See* Exhibit 1, at p. 23 Exhibit A.

63.    Under the agreement, Plaintiff was to receive a royalty rate of 4% of Net Wholesale Selling Price on Items without royalty bearing, third party brand or character applied for the first 50,000 units shipped; and 2% of Net Wholesale Selling Price on Items without royalty bearing, third party brand or character applied at 50,001 and thereafter." See Exhibit 1, p. 1 of 23, and p. 3 of 23.

64.    Under the agreement, the parties were "required to enter an amendment should Licensee desire to sell ITEMS bearing third party, royalty-bearing licensed property, which amendment shall address among other things, the royalty rate payable on such third party, royalty-bearing ITEMS." See Exhibit 1, p. 3 of 23, II. COMPENSATION, paragraph 1, subsection (c).

65.    Beginning on or about April 19, 2017 through the present, Defendant has used the Pop Up Plush concept subject of the license agreement to obtain contracts and commitments for items sold under multiple brand names including:  Squeezamals; Squishamals; Squooshamals; Surprizamals; Unboxamals; Shimeez; and others at merchants including but not limited to: Walmart;  Target; Walgreens; Amazon; Claire's; and multiple other retail customers and distributors globally. Defendant has also used Plaintiff's innovation under multiple licensed brands including Disney and Hello Kitty, without first obtaining the required license authorization or agreement. Defendants also sub-licensed to third parties including but not limited to Big G Creative for the Freeze-N-Squeeze Game without first obtaining the required license authorization or agreement. Defendant's use continues without providing any accounting or royalty in breach of the license agreement. Moreover, Defendant's use of Plaintiff's innovation has resulted in Defendant's product line receiving industry-wide acclaim including the 2018 Toy-of-the-Year Award in Plush by Learning Express.

/ / /

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL.: (818) 240-1333
FAX: (818) 240-1369

- 13 -

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*
VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

66.   Since June 16, 2017 to the date of this Complaint, no royalty report or any royalty or other owed deliverable have been provided by Defendant pursuant to the license agreement.

67.   Since June 16, 2017 to the date of this Complaint, no amendment involving third parties has been entered, yet Defendant has been selling Disney products with Plaintiff's innovation in Latin America, as well as Disney and Hello Kitty products in the U.S. and other worldwide territories.

68.   Plaintiff performed all conditions, covenants and promises required on its part to be performed under the contract.

69.   Defendants have failed and refuse to perform obligations under the contract, including but not limited to:

      a.     paying royalties;

      b.     providing royalty reports;

      c.     obtaining an amendment for third parties;

      d.     providing contractual production samples;

      e.     providing product liability insurance required under the agreement.

      f.     sublicensing the use of the innovation with permission;

      g.     paying revenues earned from the innovation;

      h.     registering trademarks in the licensor's name;

      i.     fighting infringers of their brand using Plaintiff's innovation.

70.   Plaintiff has made numerous demands for performance. Defendants have refused all of Plaintiffs demands for payment as well as the provision of insurance.

71.   As a proximate result of Defendants' breach of the Agreements, Plaintiffs suffered damage in that they incurred out-of-pocket expenses in the development of the molded concept, samples provided to Defendant all the while profits were realized by Defendants alone.

72.   As a further proximate result of Defendants' breach of the Agreements, Plaintiffs have lost profits that would have been earned under the license agreement, but for Defendants' breach, in an unknown amount at the time of this Complaint.

/ / /

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. Brand Blvd.
Suite 536
Glendale, CA
91203-2642
Tel.: (818) 240-1333
Fax: (818) 240-1369

73.      As a result of the Defendants' breach of the contract, Plaintiff has been damaged in the amount unknown as of the time of this Complaint and subject to proof at trial, plus interest at the legal rate, attorneys fees, costs and other consequential damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## ACCOUNTING
### (Against Defendant BEVERLY HILLS TEDDY BEAR COMPANY and DOES 1 to 100)

74.      Plaintiffs incorporate by reference and reallege each and every one of the allegations contained in the preceding and foregoing paragraphs of this Complaint as if fully set forth herein.

75.      On or after June 16, 2017, Plaintiffs and Defendants entered into a license agreement regarding the sales of a Pop-Up Plush concept toys. *See* Exhibit 1.

76.      Defendants obligations under the agreement included the duty of care for the protection of the licensor's financial interests and property in connection with the license agreement.

77.      Defendants duties also included periodic statements of accounts of all moneys and property from the sales, and to pay over to Plaintiffs their portion of proceeds from the sales of the Pop-Up Plush concept under the license agreement.

78.      Defendants failed to provide statements of account and/or royalty reports and failed to distribute any payment from the sales to Plaintiff under the License Agreement.

79.      The amount of money due from Defendants to Plaintiffs is unknown and cannot be ascertained without an accounting of the aforementioned sale.

80.      Beginning on or about February 14, 2018, Plaintiffs demanded that Defendants account for the aforementioned business operations and pay the amount found due to Plaintiffs, but Defendants have failed and refuse and continue to fail and refuse, to render the accounting and pay Plaintiffs.

/ / /

/ / /

/ / /

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. Brand Blvd.
SUITE 536
GLENDALE, CA
91203-2642
TEL: (818) 240-1333
FAX: (818) 240-1369

- 15 -

# VI.
# PRAYER

WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as follows:

## FIRST CAUSE OF ACTION - BREACH OF CONTRACT

1.      General damages in a sum according to proof;

2.      Special damages including loss of income and benefits;

3.      For attorney's fees in an amount to be shown according to proof;

4.      For interest per agreement and provided by law including, but not limited to, Civil Code §3291;

5.      Costs of suit and for each other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION – ACCOUNTING:

1.      For an accounting between Plaintiff and Defendant;

2.      For payment over to Plaintiffs' of the amount due from Defendant as a result of the account and interests on that amount from and after June 16, 2017;

3.      For interest provided by law including, but not limited to, Civil Code §3291;

4.      For attorney's fees in an amount to be shown according to proof; and

5.      For such other and further relief as the court may deem proper.

## AS TO ALL CAUSES OF ACTION:

1.    For such other and further relief as this Court may deem just and proper.

# VII.
# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

Dated: March 11, 2019          LAW OFFICE OF VAHE HOVANESSIAN

_____
Vahe Hovanessian, Esq.
Attorney for Plaintiff GENNCOMM, LLC.

/ / /

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. Brand Blvd.
Suite 536
Glendale, CA
91203-2642
Tel.: (818) 240-1333
Fax: (818) 240-1369

- 16 -

1

## **VERIFICATION**

2        I, GENNA ROSENBERG am the Managing Member of Plaintiff GENNCOMM, LLC.,

3  in this action. I have read the foregoing First Amended Complaint. The matters stated in the

4  Complaint are true of my own knowledge except those matters stated on information and belief,

5  and as to those matters I believe them to be true.

6        I declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct. Executed at Woodland Hills, California.

8  DATED: March 11, 2019

9

10        GENNA ROSENBERG
          for GENNCOMM, LLC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICE OF
VAHE HOVANESIAN
100 N. Brand Blvd.
Suite 556
Glendale, CA
91203-2632
Tel.: (818) 240-1333
Fax: (818) 240-1369

- 17 -

# EXHIBIT 1

# NON-EXCLUSIVE LICENSE AGREEMENT

**DATE OF AGREEMENT:**   June 16, 2017

**LICENSOR:**      GennComm, LLC
           19528 Ventura Blvd
           Suite 707
           Tarzana, CA 91356

**LICENSEE:**      Beverly Hills Teddy Bear Co.
           24625 Railroad Avenue
           Newhall, CA 91321

**ITEM:**        Pop Up Plush™ - Die Cut Slow Rising
           Foam Concept

**LICENSED TERRITORY:**  WORLDWIDE

**NON-REFUNDABLE MINIMUM
ROYALTY PAYMENTS:**   None

**ROYALTY RATE:**    4% of Net Wholesale Selling Price on Items
           without royalty bearing, third party brand or
           character applied for the first 50,000 units
           shipped; and

           2% of Net Wholesale Selling Price on Items
           without royalty bearing, third party brand or
           character applied at 50,001 and thereafter.

GENNCOMM 001

This licensing agreement (the "Agreement") is entered with an effective date of the Sixteenth day of June, 2017 by and among:

1. GennComm, LLC of 19528 Ventura Blvd., Suite 707, Tarzana, California 91356 (hereinafter "LICENSOR"), and

2. Beverly Hills Teddy Bear Co. of 24625 Railroad Avenue, Newhall, California 91321, United States of America (hereinafter "LICENSEE").

WITNESSETH

WHEREAS, LICENSOR is the exclusive owner of all rights to a certain item referred to as "POP UP PLUSH™" and as more particularly described in Exhibit A (hereinafter referred to as the "ITEM"); and

WHEREAS, LICENSOR hereby warrants that as the exclusive owner of the ITEM it has the right to grant the licenses herein, and that it has granted no other licenses on the aforementioned "ITEM" that conflict with or violate the license granted herein; and

WHEREAS, LICENSEE is in the business of manufacturing, marketing and selling toys, plush, and novelties and represents that it has the ability, willingness and intent to manufacture, market and distribute the "ITEM"; and

WHEREAS, LICENSEE is desirous to obtain from LICENSOR a non-exclusive license to use, manufacture and sell the "ITEM" in the geographic territories briefly identified below and in detail in Exhibit "B" (the "LICENSED TERRITORY").

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the performance of the mutual covenants and agreements hereinafter to be performed, the parties, each intending to be legally bound, hereby do agree as follows:

Page 2 of 23

GENNCOMM 002

## I.    **GRANT OF LICENSE**

1.  LICENSOR hereby grants to LICENSEE  the non-exclusive right:

    a)  to make, use and sell the subject matter of all patents and patent applications whether existing, pending, or subsequently filed on the ITEM pursuant to paragraph IV hereof, as more fully detailed in Exhibit A, attached hereto and incorporated by reference.

2.  It is understood and agreed that this grant of rights includes the right to use the ITEM on all future issues and/or series provided the LICENSEE does nothing to demean, disparage or otherwise cast a negative light on, or diminish the value of, the ITEM.

## II.    **COMPENSATION**

1.  LICENSEE shall pay a royalty at the following rates:
    a)  Four Percent (4%) of the "Net Wholesale Selling Price" on the first 50,000 units in sales of the ITEM by LICENSEE, its subsidiaries or affiliates issued without royalty bearing third party brand or character applied.
    b)  Two (2%) of the "Net Wholesale Selling Price" on all sales thereafter 50,000 units of the ITEM by LICENSEE, its subsidiaries or affiliates issued without royalty bearing third party brand or character applied.
    c)  The parties shall be required to enter an amendment should Licensee desire to sell ITEMS bearing third party, royalty-bearing licensed property, which amendment shall address among other things, the royalty rate payable on such third party, royalty-bearing ITEMS.

2.  As used herein, "Net Wholesale Selling Price" means the gross wholesale selling price on all sales after deductions, bona fide rejection or return of defective merchandise which are accepted and credited by LICENSEE, customary trade quantity or cash discounts and cash discounts actually shown on the invoice itself.

GENNCOMM 003

a)  Such deductions shall not in the aggregate exceed ten percent (10%) annually of the gross wholesale selling price for the licensed ITEM.

b)  No deductions shall be taken for bad debts, markdowns, markdown allowance and/or advertising.

c)  Immediately upon billing of the "Net Wholesale Selling Price" on all sales of the ITEM, as defined below, the applicable Royalty Rate, shall be deemed to be held by the LICENSEE in trust for the LICENSOR, subject only to credits for bona fide rejections or returns as provided above.

3.  All payments due hereunder shall be made by the Thirtieth (30th) day following the end of each calendar quarter.  All payments shall be accompanied by the corresponding royalty report for that period.  The royalty report shall include customer, invoice number, invoice date, gross sales amount with applicable deductions and territory of sale.

## III.  **LICENSEE'S OBLIGATIONS**

1.  LICENSEE shall show, display, market and offer the ITEM for sale (collectively "Sell the Item" or "Offer the Item for Sale") in each of the countries constituting the LICENSED TERRITORY.  Selling the ITEM shall mean that LICENSEE shall use its best commercial marketing efforts,  including appropriate physical exhibition and the inclusion of the ITEM in LICENSEE'S sell sheets, catalogs, and price lists.

2.  If LICENSEE has not offered the Item for Sale at the 2017 Dallas Toy Fair and commenced production of the ITEM within Twelve (12) months from the date of this Agreement, LICENSOR shall have the right to terminate this Agreement as provided in paragraph VIII.

a)  Such termination shall not affect LICENSOR'S right to retain all monies paid and/or due.

3.  Notwithstanding any other provision herein to the contrary, at any time after Eighteen (18) months from the effective date of this Agreement, LICENSOR, at its sole discretion, may

GENNCOMM 004

terminate or amend the scope of the LICENSED TERRITORY entirely or on a country-by-country basis if, in the LICENSOR'S sole opinion, the LICENSEE:

a) has failed to Offer the ITEM for sale in any country / countries in the LICENSED TERRITORY; or

b) has failed to generate any Royalties in the LICENSED TERRITORY, directly or through a sublicense, or

c) is not engaged in development, manufacturing, marketing or sublicensing activity appropriate to achieving its obligations as set out in paragraph III.1.

4. LICENSEE agrees that the ITEM as manufactured and sold shall meet or exceed all applicable quality and safety standards, now or hereinafter in force, including any voluntary toy, game and novelty industry standards, and shall be manufactured, sold and distributed in accordance with all applicable laws of each territory in which the ITEM is sold. LICENSEE shall indemnify, defend, and hold LICENSOR harmless from all claims arising from the manufacture, sale or use of the ITEM.  LICENSEE shall provide to LICENSOR at least Twelve (12) production samples of the ITEM (or each part thereof) at no cost to the LICENSOR for each year that this Agreement is effective or at such other times as the LICENSOR may reasonably require.

5. LICENSEE agrees to use its best efforts in the manufacture, sale, distribution, marketing and promotion of the ITEM in the LICENSED TERRITORY.

6. LICENSEE agrees to mark the ITEM(S), containers and packaging therefore with the words "U.S. Patent Pending" or with specific patent number should a patent be filed and/or issued with/by the USPTO.

 At least once during each calendar year, when requested by the LICENSOR, LICENSEE shall provide six (6) production samples of each ITEM(S).

GENNCOMM 005

## IV. <u>PATENT AND OR OTHER INTELLECTUAL PROPERTY RIGHT PROTECTION</u>

1.  All right, title and interest in and to all copyrights, trademarks and patents embodying the ITEM, and all copyright, trademark and patent registrations based thereon, shall be in LICENSOR's name and shall be owned exclusively by LICENSOR, and LICENSEE covenants and agrees that this Agreement shall be deemed a license, not a transfer, of LICENSOR's rights in the ITEM, and that LICENSEE shall have no interest in or claim to the ITEM or to any of the copyrights and trademarks associated therewith, except to the limited extent of the license to use same pursuant to this Agreement, and subject to its terms and conditions. LICENSEE agrees not to utilize the ITEM or any other intellectual property of LICENSOR except as expressly permitted by this Agreement or pursuant to a separate license agreement. LICENSEE further agrees to provide LICENSOR with the date of the first use of the ITEMS in interstate and in intrastate commerce and to execute, and provide LICENSOR with, all necessary documents, assignments and signatures which LICENSOR may reasonably request for the purpose of perfecting LICENSOR's title to all such copyright and trademark registrations.  LICENSEE agrees to secure assignments of all rights which any third party designers of the products or related materials may otherwise claim.  All uses of the trademarks by LICENSEE hereunder shall inure to LICENSOR's benefit. Without limiting the foregoing, LICENSEE hereby assigns to LICENSOR all copyrights and trademarks in ITEM, together with the good will attaching to that part of the business in connection with which the trademarks are used. LICENSEE agrees that, upon request of LICENSOR, it shall provide LICENSOR with copies, in such format as LICENSOR may reasonably request (including but not limited to digitized copies downloaded onto disc), of all artwork utilizing the ITEM. LICENSEE shall follow LICENSOR's instructions for proper use of the ITEM in order that protection and/or registrations for the trademarks may be obtained or maintained.

2.  LICENSEE agrees to cooperate fully and in good faith with LICENSOR for the purpose of securing and preserving the rights of LICENSOR (or any grantor of LICENSOR) to the

GENNCOMM 006

ITEM.  LICENSEE shall, at LICENSOR's request and expense, register or cooperate with LICENSOR to register in all states and countries, any copyright, trademark, patent, and/or service mark for the ITEM in the appropriate class(es), all in the name of LICENSOR or LICENSOR's designee.  However it is agreed that nothing contained in this Agreement shall be construed as an assignment or grant to LICENSEE of any right, title, or interest in or to the ITEM, or any registration or application therefore referred to above, it being understood that all rights relating thereto are reserved by LICENSOR, except for LICENSEE's right to use the ITEM as expressly provided in this Agreement.  LICENSEE agrees that it will, at any time upon request of LICENSOR, assign, transfer, and convey to LICENSOR all rights to any ITEM including by way of example all trademarks, service marks, or copyright and goodwill, title, and other rights in and to the ITEM which may be obtained by LICENSEE or which are contemplated hereby.  LICENSEE shall execute any instruments presented to it by LICENSOR to accomplish or confirm the foregoing.  Any such assignment, transfer, or conveyance shall be without further consideration, other than the mutual covenants set forth in this Agreement.  LICENSEE hereby agrees that it shall not at any time acquire any rights in the ITEM by virtue of any use it may make of the ITEM.  In furtherance of the foregoing, LICENSEE hereby grants to LICENSOR an irrevocable power of attorney to sign, on behalf of LICENSEE, any and all applications and other documents relating to copyright and/or trademark protection and registration in order to insure ownership thereof in LICENSOR.

3.  The cost of filing, prosecution and maintaining patent applications and patents, or other rights, issuing thereon shall be paid by LICENSEE so long as this Agreement may be in force, but shall be owned by LICENSOR subject to paragraph XI below.

4.  LICENSEE shall not permit any such patent application or patent, or other property right, to become abandoned.

5.  LICENSEE may apply to the ITEM any trademarks that it creates and shall apply appropriate patent, trademark and/or copyright notices noting LICENSOR's ownership.  LICENSEE's trademarks may not violate any provision of this Agreement.  LICENSEE shall hold

Page 7 of 23

GENNCOMM 007

harmless, indemnify, and defend LICENSOR from all claims arising from LICENSEE's use of any property right not licensed herein by LICENSOR.

## V.  RETENTION OF RIGHTS

1. All trademarks, service marks, trade names, slogans, logos, copyrights and methods (except as expressly owned or protected by LICENSOR'S provisional patent or other rights) used in connection with the manufacture, sale or advertisement of the ITEM, shall be and remain the sole property of LICENSEE.

2. Upon termination or expiration of this Agreement, LICENSEE shall, without any additional consideration, assign to LICENSOR such rights as LICENSOR owns or controls to permit LICENSOR to continue to market and sell the ITEM or to license such rights to a third party.

3. Except as expressly granted to LICENSEE herein, LICENSOR retains all rights to the ITEM, including the rights to grant other licenses with respect to geographic areas not specifically identified as being within the LICENSED TERRITORY and including any improvements as described in paragraph XI.

## VI.  ROYALTY REPORTS AND PAYMENTS

1. LICENSEE shall, on the Thirtieth (30th) day of the month following the end of each calendar quarter, starting with the quarter in which sales for the ITEM commence, submit to LICENSOR a Royalty Report covering the sales of the ITEM during the preceding quarter by LICENSEE and its affiliates.  Royalty reports for foreign sublicenses shall be due Sixty (60) days following the end of the calendar quarter.

2. Simultaneously with the submission of the Royalty Report, LICENSEE shall transmit to LICENSOR payment of the amount due under paragraph II hereof in U.S. dollars, in accordance with the provisions of paragraph VI.7.

GENNCOMM 008

3.  Except as required by law, no deductions shall be made by LICENSEE for withholding or similar taxes.  LICENSOR shall provide LICENSEE with an appropriate tax exemption certificate or similar documentation as to render LICENSEE in compliance with governmental laws, rules and regulations.

4.  Royalty Reports provided by LICENSEE shall provide, on a country-by-country basis, information pertaining to the number of units shipped by SKU# (Stock Keeping Unit #), the sales price and all deductions taken into account in calculating such royalty payment.

5.  Late payments shall bear interest at a rate of One-Half Percent (0.5%) (or the maximum legal interest rate, whichever is less) per month or fraction thereof.

6.  Royalties based on sales in currencies other than United States Dollars shall be converted to United States Dollars based upon the exchange rate effective on the last day of the quarter for which payment is being made as published in the Wall Street Journal; provided, however, that if such conversion and transfer of dollars cannot be made by LICENSEE, it shall pay such amounts in the currency, of such country, deposited in LICENSOR'S name in a bank in such country designated by LICENSOR.

7.  All royalty payments shall accompany a Royalty Report as described in paragraph VI.

## VII.    **BOOKS AND AUDIT**

1.  LICENSEE agrees to keep full and accurate books of account, records, data and memoranda, including sublicense agreements (and any distributorship/dealership agreements), respecting the manufacture and sales of the ITEM in sufficient detail to enable the payments hereunder to LICENSOR to be determined.

2.  LICENSEE further gives LICENSOR the right to examine or audit said books and records

GENNCOMM 009

insofar as they concern the ITEM and not more often than once in any calendar year and upon at least Twenty One (21) prior days written notice, for the purpose of verifying the reports provided for in this Agreement.

3. In the event that such examination reveals a discrepancy in the amount due the LICENSOR from what was actually paid, the LICENSEE shall immediately pay such discrepancy to the LICENSOR with interest calculated at One-Half Percent (0.5%) per month or fraction thereof.

4. In the event that such discrepancy is in excess of Five Percent (5.0%) of the amount actually paid, the LICENSEE, in addition to making immediate payment of such discrepancy with interest calculated from the date originally due, shall also reimburse the LICENSOR for the costs and expenses of such examination or audit in connection therewith, including the costs of attorneys' fees incurred by LICENSOR to collect any Royalties due.

5. The receipt and acceptance of any Royalty Report and payment hereunder shall not prevent the LICENSOR from subsequently challenging the validity of such Royalty Report or payment.

6. In the event that LICENSOR shall examine the records, documents and materials in the possession or under the control of the LICENSEE with respect to the subject matter, such examination shall be conducted in such manner as not to unduly interfere with the business of the LICENSEE.

   a) LICENSOR and its representatives shall not disclose to any other person, firm, corporation (or other such entity) any information acquired as a result of any such examination, provided, however, that nothing herein shall be construed to prevent LICENSOR from conducting such examination or audit.

   b) All books and records relative to LICENSEE'S obligations hereunder shall be maintained

GENNCOMM 010

and kept accessible and available to the LICENSOR for inspection for at least Three (3) years after termination of this Agreement.

## VIII.  **TERMINATION**

1.  If LICENSEE shall at any time:
    a)  fail to deliver any notice or report (including Royalty Reports) or
    b)  fail to make any payment required hereunder, or
    c)  be in default with respect to any other material provision of this Agreement; and
    d)   LICENSEE shall fail to remedy such default within Thirty (30) days after written notice thereof by LICENSOR, then LICENSOR may, at its sole option, terminate this Agreement and the license granted herein by notice to that effect, but such act shall not relieve LICENSEE of its liabilities or obligations accruing up to the time of termination; provided however, that in the event LICENSEE'S fraud or intentional misconduct is the basis of the default under this Agreement, LICENSOR shall have the right to immediately terminate this Agreement, effective upon the giving of such notice.

## IX.  **CESSATION OF MANUFACTURE, MARKETING, AND SALE**

1.  If LICENSEE ceases to Offer the Item for Sale or to manufacture the ITEM for a period of Two (2) consecutive calendar quarters, except as provided in paragraph XII hereof, LICENSOR may terminate the Agreement  upon giving LICENSEE Thirty (30) days written notice of its intent to terminate

2.  If LICENSEE does not, within Thirty (30) days, Offer the Item for Sale or resume the manufacture of the ITEM this Agreement (and the license granted herein) shall terminate as of the end of such Thirty (30) day period.  As used herein, "Manufacture" shall mean the actual production of the Item.

## X.  **TERM**

GENNCOMM 011

1. This Agreement shall commence upon signing, and shall continue for three (3) years expiring December 31, 2020 with a one (1) year auto-renewal so long as Licensee is actively marketing the Licensed Product.  The term is subject to earlier termination in accordance with the provisions of this Agreement.

## XI.    EFFECT OF EXPIRATION / TERMINATION

1.  Within ten (10) calendar days after such expiration (or, in the event of termination of this license, ten (10) calendar days after receipt of notice of termination or the happening of the event which terminates this Agreement where no notice is required), LICENSEE shall furnish to LICENSOR a statement showing the number and description of articles covered by this Agreement on hand or in process.  LICENSOR shall have the right to take a physical inventory to ascertain or verify such inventory and statement, and refusal by LICENSEE to submit to such physical inventory by LICENSOR shall forfeit LICENSEE's right to dispose of such inventory as provided below, LICENSOR retaining all other legal and equitable rights LICENSOR may have in the circumstances.

2. LICENSEE agrees that all of the following hereunder shall be the sole property of the LICENSOR, free and clear of any and all liens and encumbrances upon expiration or termination of this Agreement:

a)  the ITEM.
b)  any patent applications filed with respect to the ITEM.
c)  any improvements, all designs, drawings, sketches, prototypes, written specifications and market surveys with respect to the ITEM.

3. LICENSEE agrees upon termination of this Agreement to immediately provide LICENSOR with a true and accurate accounting in writing of:
a)  all inventory of the ITEM on hand, in transit, and/or in manufacture.

GENNCOMM 012

b) accounts receivable on sales of the ITEM.

c) all unfilled or pending orders including the customer name and location, the number of units of the ITEM ordered, and sales terms.

d) the type, number, and location of any and all molds, tools, and dies used by LICENSEE, its subsidiaries, affiliates, or sub-contractors in manufacturing the ITEM.

e) any and all prototypes, pre-production samples, design studies, drawings, renderings, blueprints or any other materials related to the use by LICENSEE of the ITEM.

4. After expiration of this Agreement, LICENSEE, except as otherwise provided in this Agreement, may dispose of Licensed Products which are completed and on hand at the time of expiration for a period of six (6) months after expiration (hereinafter, the "Sell-Off Period"), provided that (i) Royalties with respect to sales during the Sell-Off Period are paid and statements are furnished for that period as provided herein, (ii) the ITEMS had been offered for sale and shipped prior to the expiration of the Term, and (iii) such sales are restricted to the Territory and Channels of Distribution. No such inventory sell off shall be permitted in the event that LICENSEE is in default of its obligations under this Agreement resulting in termination of the Agreement.

5. Upon and after the expiration or termination of this license, all rights granted to LICENSEE hereunder shall forthwith revert to LICENSOR, and LICENSEE will refrain from further use of the ITEM or any further reference to it, direct or indirect, or anything deemed by Licensor to be similar to the ITEM in connection with the manufacture, sale or distribution of Licensee's products, except as provided above. Disposition of any plates, moulds, forms, lithographs, advertising, promotional and/or other material relating to the ITEM then remaining on hand or in LICENSEE's possession shall be subject to written instructions from LICENSOR to LICENSEE either to destroy or to deliver same to LICENSOR or its designee.

6. No expiration or termination of this Agreement shall relieve the LICENSEE of its obligations

GENNCOMM 013

hereunder arising prior to the effective date of the expiration or termination, nor of those specific covenants extending beyond the date of expiration or termination.

## XII.   **FORCE MAJEURE**

1.  It is understood and agreed that in the event an act of government, war, fire, flood, or an Act of God prevents the performance by LICENSEE of the provision of this Agreement, then such non-performance by LICENSEE shall not be considered a breach of this Agreement and such non-performance shall be excused while, but no longer than, the conditions described herein prevail.

2.  Should the LICENSEE claim that its performance of the provisions of this Agreement has been or is being prevented by any force majeure as aforesaid, the LICENSEE must give notice in writing within Five (5) days of the event taking place and submit proper evidence thereof to the LICENSOR.

## XIII.   **INDEMNITY**

1.  LICENSOR hereby expressly warrants that to the best of its knowledge it is the sole owner of the ITEM and all rights pertaining thereto and has the power and authority to enter into this Agreement, and no other person has given LICENSOR notice of any claim of ownership or commenced an action challenging LICENSOR'S claim of ownership.

2.  In the event of a court of law of competent jurisdiction from which no appeal of right exists makes a final judgment that the LICENSOR knowingly and intentionally breached its representation or ownership of the ITEM that LICENSOR will defend, indemnify and hold LICENSEE and all other parties to this Agreement harmless with respect to any suit at law or in equity brought by LICENSEE or against LICENSEE, in which said lawsuit concerns the ownership of title of the ITEM or for infringement of the rights of a third party.

GENNCOMM 014

3. Notwithstanding the foregoing, it is agreed that any such indemnification shall be limited to the greater of the royalties:

   a) paid to LICENSOR within One (1) year prior to the earlier to occur of the receipt of any claim or commencement of litigation against LICENSEE,
   b) payable at the time of such notice of claim, or
   c) payable thereafter hereunder.  Such an indemnification to include LICENSEE'S costs, expenses and losses (including reasonable attorney's fees).

4. LICENSOR represents that it has not received any claim or notice of claim which, if true, would make the representation in paragraph XIII. false or misleading

5. LICENSOR further agrees, upon LICENSEE'S request, to execute any and all documents and do all acts reasonably necessary to carry out the terms of this Agreement.

6. LICENSEE agrees to indemnify and hold harmless LICENSOR as to all damages, costs and attorneys' fees resulting from all claims for injury or property damage based on the use of the ITEM as produced and sold by LICENSEE, its subsidiaries, affiliates, successors and sublicenses.

7. LICENSEE agrees that it will, at its own expense, obtain product liability insurance from a recognized insurance company having an AM Best rating of A, that is qualified to do business within the Licensed Territory and provide protection at least in the amount of Two Million United States Dollars (US$2,000,000 U.S. Dollars) for LICENSOR against any claims, suits, loss or damage arising out of any alleged defects in the ITEM, with such policy naming LICENSOR as "additional insureds."

8. Such insurance shall provide that it cannot be cancelled without at least Thirty (30) days prior written notice to LICENSOR.

GENNCOMM 015

9.  As proof of such insurance, a certificate of insurance naming LICENSOR as insured parties shall, upon LICENSOR'S written request, be submitted to LICENSOR by LICENSEE before the ITEM is distributed or sold hereunder.

10. In the event any claim is made which gives rise to indemnification as provided herein, the party receiving notice of the claim shall immediately notify the indemnifying party of its, her, or his obligation to indemnify.  All parties agree to cooperate with each other in the defense of any claim or action.

11. NEITHER PARTY MAKES ANY REPRESENTATIONS, WARRANTIES, OR GUARANTEES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WHICH ARE NOT EXPRESSLY MADE IN THIS AGREEMENT.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES SPECIFICALLY AGREE THAT LICENSOR MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTEES REGARDING THE SUCCESS OF LICENSOR'S ITEM AND/OR LICENSED PRODUCTS OR THE GROSS LICENSING REVENUE OR ROYALTIES EARNED PURSUANT TO THIS AGREEMENT. EXCEPT AS OTHERWISE PROVIDED IN THE SECTION ENTITLED "INDEMNIFICATION", IN NO EVENT SHALL EITHER PARTY HEREUNDER BE LIABLE TO THE OTHER, OR TO ANY PARTY CLAIMING THROUGH SUCH OTHER PARTY, FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR INDIRECT DAMAGES, OR FOR ANY LOSS OF PROFITS OR SALES, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSS.

12. All warranties, indemnification and any other applicable obligations of LICENSEE shall survive the expiration or termination of this Agreement.

## XIV.  <u>INFRINGEMENT</u>

1.  With respect to any patent or intellectual property right that is exclusively licensed to

GENNCOMM 016

LICENSEE under the terms of this Agreement (a "Property Right") each of the parties agree to notify the others of an infringement of which they become aware within Thirty (30) days of such knowledge.

2. LICENSOR shall have the sole right to determine what, if any, action shall be taken to address such unauthorized uses.  LICENSEE shall have no rights against LICENSOR for damages or other remedy by reason of LICENSOR's decision not to prosecute any alleged unauthorized use of the Property Right.  The LICENSEE agrees not to make any demands or claims, bring suit, effect any settlements, or take any other action against such party without the express prior written consent of LICENSOR and to cooperate with LICENSOR, at no out-of-pocket expense to the LICENSEE, in connection with any action taken by LICENSOR to terminate infringements.  LICENSOR shall retain 100% of all net amounts recovered from infringers.

3. Subject to LICENSOR's prior written consent, should LICENSEE wish to co-prosecute the action with LICENSOR, then, the parties shall agree among themselves the share that each will bear of all costs, expenses and attorney's fees of the action, and shall share in any recovery in the same percentage.  Any recoveries from the litigation shall be applied first to reimburse the parties, pro rata, for the costs and expenses contributed by them, and then as provided in paragraph XIV.2. The LICENSEE shall control the litigation if it has brought or is participating with others in bringing the action.  If the LICENSEE is not participating in the litigation as a co-prosecutor, the LICENSOR shall control the litigation  and retain all recovery as applicable.

4. The LICENSEE shall be permitted to deduct from the royalty payments due LICENSOR the amounts which the parties have agreed that LICENSEE committed to contribute to the prosecution of the claim, and shall make a proper account to the LICENSOR in the Royalty Report(s) of such deductions as set out in paragraph VI.

## XV.    ASSIGNABILITY

GENNCOMM 017

1. The license granted hereunder is personal to the LICENSEE and this Agreement and the rights, benefits and obligations of the LICENSEE under this Agreement shall not be assignable by LICENSEE or by operation of law without express prior written consent of LICENSOR.

## XVI.  **BANKRUPTCY**

1. In the event LICENSEE files a voluntary petition in bankruptcy or receivership or similar relief, or an involuntary petition is filed and not dismissed within Thirty (30) days of the filing date, or if a receiver or trustee is appointed and the appointment is not vacated within Thirty (30) days of appointment, or if the LICENSEE shall be adjudged insolvent, or if an assignment shall be made by LICENSEE for the benefit of creditors, this Agreement shall be terminated and all right, title and interest in and to the ITEM shall revert to LICENSOR.

## XVII.  **NOTICES**

1. All notices wherever required in this Agreement shall be in writing and sent either by United States mail, certified mail with return receipt requested, national or international overnight courier, or by hand delivery to the address of the party as set forth above, unless either party shall at any time in writing designate a different address.

## XVIII. **ROYALTY CLASSIFICATION**

1. This Agreement is and is intended to be construed as a license by LICENSOR of any and all rights to the ITEM and any patents that may be granted thereon, within the meaning of Section 1235(a) of the Internal Revenue Code of 1954, as amended.

## XIX.  **SEVERABILITY**

GENNCOMM 018

1. If any provision of this Agreement is for any reason declared to be invalid, the validity of the remaining provisions shall be not affected thereby.

## XX.    BINDING UPON SUCCESSION

1. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, successors, administrators and assigns as herein provided.

## XXI.    PRIOR AGREEMENTS

1. This Agreement supersedes any and all agreements heretofore entered into by and between LICENSOR and LICENSEE on this ITEM.

## XXII.    WAIVER

1. No waiver by either party, whether express or implied of any provision of this Agreement, or any default by either party shall constitute a continuing waiver or waivers of any other provision, and no waiver shall prevent the other party from enforcing any and all provisions of this Agreement upon any subsequent breach or default.

## XXIII.    LEGAL RELATIONSHIP

1. No provisions shall be deemed to place the parties in the relationship of partners or joint ventures, or constitute one party the agent of the other.

## XXIV.    SEVERABILITY OF AGREEMENTS

1. All parties hereto agree and understand that the terms, conditions and payments agreed to under this Agreement stand alone and will not be linked or held against any other disputes, claims, suits or agreement(s) between one or more of the parties hereto whether executed or

GENNCOMM 019

that may be pending or occur in the future with regard to any and all other subject matter not the subject of this Agreement.

## XXV.  ENTIRE AGREEMENT

1.  This Agreement represents the entire agreement of the parties and may not be modified except by an agreement in writing signed by the parties.

## XXVI. AUTHORSHIP

1.  It is understood and agreed that both sides shall be deemed to have created this Agreement in order to avoid any negative inference by any tribunal as against the preparer of the Agreement.

## XXVII. GOVERNING LAW

1.  This Agreement shall be governed and construed in accordance with the laws of the State of California and parties hereto hereby submit to the exclusive jurisdiction of the courts of the State of California, County of Los Angeles, and any federal courts located therein, and agree to waive any defense based on jurisdiction and/or venue, and agree to accept service of process by mail. If either party contests the validity of this forum selection clause as set forth in this paragraph, and the court finds jurisdiction and venue in Los Angeles County, California, the non-prevailing party shall pay the prevailing party's costs and attorney's fees incurred in enforcing this paragraph XXVII .

## XXVIII. SURVIVAL OF RIGHTS

1.  Notwithstanding anything to the contrary contained herein, such obligations which remain executory after expiration of the term of this Agreement shall remain in full force and effect until discharged by performance and such rights as pertain thereto shall remain in force until

Page 20 of 23

GENNCOMM 020

their expiration.

## XXIX. <u>ATTORNEY FEES</u>

1. LICENSEE agrees to pay all expenses incurred by LICENSOR in any actions against LICENSEE to enforce the terms of this Agreement including but not limited to postage, telephone, messenger services, and reasonable attorney's fees, should the LICENSOR prevail.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement on the date first written above.


LICENSOR

GennComm, LLC

Print Name: Daniel Rosenberg

Signature: *Daniel Rosenberg*
SignNow e-signature ID: 4b486a105b...
08/17/2017 20:26:00 UTC


LICENSEE

Beverly Hills Teddy Bear, Co.

Print Name: david socha

Signature: DAVID SOCHA
SignNow e-signature ID: cab52f77ad...
09/20/2017 17:28:34 UTC

GENNCOMM 021

EXHIBIT A

The ITEM is generally described as follows:


Pop Up Plush:   Plush figure comprising of slow rising, kid safe, latex, polyurethane or other memory foam filler that has been cut or molded (e.g., machine, injection, additive printed), into the shape of a plush toy or other character. The exterior will be covered with a general plush material synthetic or natural that is sewn or wrapped around the sculpted memory foam.


Provisional Patent Application No. 62508800 - Filed May 19, 2017.

GENNCOMM 022

EXHIBIT B

LICENSED TERRITORY

WORLD-WIDE

GENNCOMM 023



SignNow E-Signature Audit Log
Document name: GennComm_BHTB_PopUp_Plush_License_Agreement-FINAL 8_1_17
Document ID: 390b7fac411a221b349ffeecbfe0fbb38668ec79
Document page count: 23

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded Document | daniel@genncomm.com | 2017-08-02 12:01:59 am UTC | 2017-08-02 12:01:54 am UTC | 75.82.109.242 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-08-02 12:02:47 am UTC | 2017-08-02 12:02:49 am UTC | 75.82.109.242 |
| SignNow Web Application | Document Saved | daniel@genncomm.com | 2017-08-02 12:07:43 am UTC | 2017-08-02 12:07:43 am UTC | 75.82.109.242 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-08-02 12:08:10 am UTC | 2017-08-02 12:08:11 am UTC | 75.82.109.242 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-08-02 12:13:49 am UTC | 2017-08-02 12:13:51 am UTC | 75.82.109.242 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-08-02 12:16:07 am UTC | 2017-08-02 12:16:08 am UTC | 75.82.109.242 |
| SignNow Web Application | Document Saved | daniel@genncomm.com | 2017-08-02 12:18:16 am UTC | 2017-08-02 12:18:12 am UTC | 75.82.109.242 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-08-02 12:20:15 am UTC | 2017-08-02 12:20:17 am UTC | 75.82.109.242 |
| iPhone Application 2 | Document Downloaded | daniel@genncomm.com | 2017-08-04 05:57:30 pm UTC | | 188.9.53.51 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-08-17 08:13:36 pm UTC | 2017-08-17 08:13:37 pm UTC | 69.75.121.205 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-08-17 08:25:22 pm UTC | 2017-08-17 08:25:23 pm UTC | 69.75.121.205 |
| SignNow Web Application | Added a Text | daniel@genncomm.com | 2017-08-17 08:26:00 pm UTC | 2017-08-17 08:25:43 pm UTC | 69.75.121.205 |
| SignNow Web Application | Signed the Document, Signature ID: 4b486a105ba4b7bf9e85 | daniel@genncomm.com | 2017-08-17 08:26:00 pm UTC | 2017-08-17 08:25:58 pm UTC | 69.75.121.205 |
| SignNow Web Application | Document Saved | daniel@genncomm.com | 2017-08-17 08:26:00 pm UTC | 2017-08-17 08:26:00 pm UTC | 69.75.121.205 |
| iPhone Application 2 | Document Downloaded | daniel@genncomm.com | 2017-08-18 11:35:33 pm UTC | | 12.130.117.84 |
| SignNow Web Application | Document Downloaded | daniel@genncomm.com | 2017-08-28 05:51:14 pm UTC | 2017-08-28 05:51:10 pm UTC | 69.75.121.205 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-09-20 05:24:12 pm UTC | 2017-09-20 05:24:14 pm UTC | 76.81.63.220 |
| SignNow Web Application | Viewed the Document | david@plush.com | 2017-09-20 05:28:08 pm UTC | 2017-09-20 05:28:12 pm UTC | 76.90.167.134 |
| SignNow Web Application | Added a Text | david@plush.com | 2017-09-20 05:28:34 pm UTC | 2017-09-20 05:28:27 pm UTC | 76.90.167.134 |
| SignNow Web Application | Signed the Document, Signature ID: cab52f77ad342ca19b6b | david@plush.com | 2017-09-20 05:28:34 pm UTC | 2017-09-20 05:28:32 pm UTC | 76.90.167.134 |
| SignNow Web Application | Document Saved | david@plush.com | 2017-09-20 05:28:47 pm UTC | 2017-09-20 05:28:37 pm UTC | 76.90.167.134 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-09-27 06:33:20 pm UTC | 2017-09-27 06:33:21 pm UTC | 76.81.63.220 |
| iPhone Application 2 | Document Downloaded | daniel@genncomm.com | 2017-11-02 05:22:25 pm UTC | | 107.77.230.63 |
| iPhone Application 2 | Document Downloaded | daniel@genncomm.com | 2018-05-23 02:33:37 am UTC | | 107.77.228.6 |

GENNCOMM 024



## Licensee Deal Terms

| | |
|---|---|
| DATE: | 6-16-17 |
| PROPERTY: | Pop Up Plush™ |
| LICENSEE: | Beverly Hills Teddy Bear |
| STREET ADDRESS: | 24625 Railroad Avenue |
| CITY, STATE, ZIP CODE | Newhall, Ca 91321 |
| OFFICE TELEPHONE # | (661) 257-0750 |
| FAX # | 6612573424 |
| EMAIL ADDRESS: | cristy@plush.com |
| BUSINESS CONTACT & PHONE: | david@plush.com |
| PRODUCT DEVL CONTACT & PHONE: | CRISTY |
| LEGAL CONTACT & PHONE: | JEANETTE SOCHA |
| FINANCE/ROYALTY CONTACT & PHONE: | KIMBERLY OLSEN |
| PROPOSED LICENSED PRODUCTS: | Pop Up Plush - Plush figure comprising of slow rising, kid safe, latex, polyurethane or other memory foam filler that has been cut or molded by any means (e.g., machine, injection, additive printed), into the shape of a plush toy or other character. The exterior will be covered with a general plush material synthetic or natural that is sewn or wrapped around the sculpted memory foam. |
| PROPOSED TERM: | June 1, 2017 to December 31, 2020 |
| PROPOSED ROYALTY RATES: | **4%** to be paid on the first 50,000 units shipped.<br>Royalty reduced to **2%** on all units shipped thereafter. |

1

GENNCOMM 025

| PROPOSED ADVANCE: | N/A |
|---|---|
| TYPE OF LICENSE:<br><br>PROPOSED CHANNELS OF DISTRIBUTION: | Non-Exclusive<br><br>All Channels of Distribution |
| PROPOSED TERRITORY: | **Worldwide** |
| PROPOSED SELL-OFF: | **6 Months** |
| SALES PROJECTION: | YEAR 1 –   0<br>YEAR 2 -<br>YEAR 3 - |
| TOP RETAIL TARGETS: | 1._____<br>2._____<br>3. 9.99_____<br>4._____ |
| PROPOSED MARKETING DATE: | May 2018 |
| PROPOSED FIRST SALE DATE: | Spring 2018 |
| MARKETING STRATEGY: | |
| MEDIA BUDGET: | N/A |
| PUBLIC OR PRIVATE | Private |
| SPECIAL PROVISIONS: | This agreement covers non-licensed brand applications. Opportunities to license will be discussed and reviewed at a later date and will be amended to the long form license agreement. |

EFFECTIVE DATE:
   Upon signature of the Deal Memo, both parties undertake to negotiate in good faith and agree upon a long form license agreement the ("License Agreement") incorporating the terms set forth in this

2

Deal Memo.  Neither this Deal Memo nor any agreements otherwise reached between the parties relating to this proposed transaction shall be binding on either party unless and until a formal Licensing Agreement is executed by both parties.

LICENSOR

By: _____ _Daniel Rosenberg_ _____

SignNow e-signature ID: a17823c24a...

Title: ____ CEO ____ 07/05/2017 18:45:19 UTC ____

Date: _____ July 5, 2017 _____

LICENSEE

By: _____ _DAVID SCott_ _____

SignNow e-signature ID: de33c12fb8...
07/05/2017 18:26:24 UTC

Title: _____ OFFICER _____

Date: _____ 07/05/17 _____

3



SignNow E-Signature Audit Log
Document name: GennCommBHTBPopUpPlushProposal
Document ID: d419647c903abb10b92d4f192136f228dfb9520d
Document page count: 3

| Client | Event | By | Server Time | Client Time | IP Address |
|--------|-------|-----|-------------|-------------|------------|
| SignNow Web Application | Uploaded Document | daniel@genncomm.com | 2017-06-26 08:03:26 pm UTC | 2017-06-26 08:03:24 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-06-26 08:03:32 pm UTC | 2017-06-26 08:03:34 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-06-26 08:05:01 pm UTC | 2017-06-26 08:05:03 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-06-26 08:10:42 pm UTC | 2017-06-26 08:10:44 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-06-26 08:10:54 pm UTC | 2017-06-26 08:10:56 pm UTC | 66.186.0.34 |
| SignNow Web Application | Document Saved | daniel@genncomm.com | 2017-06-26 08:11:56 pm UTC | 2017-06-26 08:11:57 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-06-26 08:12:16 pm UTC | 2017-06-26 08:12:18 pm UTC | 66.186.0.34 |
| SignNow Web Application | Document Saved | daniel@genncomm.com | 2017-06-26 08:42:21 pm UTC | 2017-06-26 08:42:22 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-06-26 08:42:42 pm UTC | 2017-06-26 08:42:45 pm UTC | 66.186.0.34 |
| SignNow Web Application | Document Saved | daniel@genncomm.com | 2017-06-26 08:43:54 pm UTC | 2017-06-26 08:43:55 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2017-06-26 08:52:33 pm UTC | 2017-06-26 08:52:35 pm UTC | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | david@plush.com | 2017-07-05 06:33:27 pm UTC | 2017-07-05 06:33:31 pm UTC | 172.91.195.35 |
| SignNow Web Application | Signed the Document, Signature ID: de33c12fb88468a59834 | david@plush.com | 2017-07-05 06:35:42 pm UTC | 2017-07-05 06:34:59 pm UTC | 172.91.195.35 |
| SignNow Web Application | Added a Text | david@plush.com | 2017-07-05 06:35:42 pm UTC | 2017-07-05 06:35:10 pm UTC | 172.91.195.35 |
| SignNow Web Application | document_added_text | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:34:28 pm UTC | 172.91.195.35 |
| SignNow Web Application | document_added_text | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:34:35 pm UTC | 172.91.195.35 |
| SignNow Web Application | document_added_text | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:34:39 pm UTC | 172.91.195.35 |
| SignNow Web Application | document_added_text | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:34:44 pm UTC | 172.91.195.35 |
| SignNow Web Application | document_added_text | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:34:51 pm UTC | 172.91.195.35 |
| SignNow Web Application | document_added_text | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:35:28 pm UTC | 172.91.195.35 |
| SignNow Web Application | document_added_text | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:35:32 pm UTC | 172.91.195.35 |
| SignNow Web Application | Document Saved | david@plush.com | 2017-07-05 06:35:43 pm UTC | 2017-07-05 06:35:44 pm UTC | 172.91.195.35 |
| iPhone Application 2 | Document Downloaded | daniel@genncomm.com | 2017-07-05 06:44:16 pm UTC | | 66.186.0.34 |
| iPhone Application 2 | Viewed the Document | daniel@genncomm.com | 2017-07-05 06:44:26 pm UTC | 2017-07-05 06:44:26 pm UTC | 66.186.0.34 |
| iPhone Application 2 | Signed the Document, Signature ID: a17823c24a8e7b0d6407 | daniel@genncomm.com | 2017-07-05 06:45:19 pm UTC | 2017-07-05 06:45:05 pm UTC | 66.186.0.34 |
| iPhone Application 2 | Added a Text | daniel@genncomm.com | 2017-07-05 06:45:19 pm UTC | 2017-07-05 06:45:16 pm UTC | 66.186.0.34 |
| iPhone Application 2 | document_added_text | daniel@genncomm.com | 2017-07-05 06:45:33 pm UTC | 2017-07-05 06:45:13 pm UTC | 66.186.0.34 |
| iPhone Application 2 | Document Saved | daniel@genncomm.com | 2017-07-05 06:45:33 pm UTC | 2017-07-05 06:45:18 pm UTC | 66.186.0.34 |
| iPhone Application 2 | Document Downloaded | daniel@genncomm.com | 2017-07-05 06:45:36 pm UTC | | 66.186.0.34 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2018-01-12 09:22:58 pm UTC | 2018-01-12 09:23:00 pm UTC | 75.82.109.242 |
| SignNow Web Application | Viewed the Document | daniel@genncomm.com | 2018-01-25 05:28:30 pm UTC | 2018-01-25 05:28:33 pm UTC | 76.81.63.220 |
| SignNow Web Application | Document Downloaded | daniel@genncomm.com | 2018-02-10 02:04:07 am UTC | 2018-02-10 02:04:06 am UTC | 75.82.109.242 |
| iPhone Application 2 | Document Downloaded | daniel@genncomm.com | 2018-05-23 02:33:40 am UTC | | 107.77.228.6 |

GENNCOMM 028

# EXHIBIT 2



## MUTUAL NON-DISCLOSURE AGREEMENT

This Agreement is effective when signed by and between **Beverly Hills Teddy Bear** and **GennComm, LLC.**, collectively referred to as the "Parties."

The Parties desire to disclose, on a confidential basis, certain information, process, clients, business acquisitions or contacts and documents considered confidential and/or proprietary by the Parties concerning their respective businesses. The Parties wish to maintain the confidentiality and/or the proprietary nature of the confidential information disclosed relating to "Pop Up Plush - Sculpted Foam Plush Collectible". In consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereto agree as follows:

1.    Confidential Information: The Parties agree that information disclosed orally or in writing or made available by any Party ("Disclosing Party") to another Party ("Recipient"), including, but not limited to, information acquired from employees; trade secrets; strategic plans; invention plans and disclosures; customer information; suppliers; software; distribution channels; marketing studies; intellectual property; information relating to process and products, designs, business plans, business opportunities, marketing plans, finances, research, development, know-how or personnel; confidential information originally received from third parties; information relating to any type of technology, and all other material whether written or oral, tangible or intangible, shall be deemed "Confidential Information." In addition, the existence and terms of this Agreement shall also be treated as Confidential Information. The parties agree that any Confidential Information disclosed prior to the execution of this Agreement was intended to be and shall be subject to the terms and conditions of this Agreement.

2.    Restrictions and Exceptions: The Parties agree to maintain the confidentiality of the Confidential Information and to prevent its unauthorized dissemination or use for a period of three (3) years from the date of last disclosure by the Disclosing Party, subject to the exceptions enumerated in Section 4 of this Agreement.

3.    Recipient's Obligations: The parties expressly agree that the Recipient shall not use Confidential Information in the development of any products or services for its own account or for the account of a third party unless expressly agreed to by the Disclosing Party in writing. Further, the Parties agree not to use the Confidential Information for purposes other than that necessary to consider the possibility of entering into a business relationship or transaction between the Parties. The Recipient shall protect the Confidential Information by using the same degree of care, but no less than reasonable care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Recipient uses to protect its own Confidential Information. The Recipient shall limit its internal disclosure of the Confidential Information to only those employees and agents who have a need to know the information for the limited purpose of the proposed business relationship between the Parties. The Parties agree that they will each direct their respective employees and agents to maintain the confidentiality of the Confidential Information.

The obligation not to disclose shall not be affected by bankruptcy, receivership, assignment, attachment or seizure procedures, whether initiated by or against Recipient, nor by the rejection of any agreement between the Disclosing Party and Recipient, by a trustee of Recipient in bankruptcy, or by the Recipient as a debtor-in-possession or the equivalent of any of the foregoing under local law.

4.    Exceptions: This Agreement shall impose no obligations with respect to Confidential Information which:

a)    is now, or hereafter becomes, through no act or failure to act on the part of the receiving party, generally known or available to the public;
b)    was acquired by the receiving party before receiving such information from the disclosing party and without restriction as to use or disclosure;
c)    is hereafter rightfully furnished to the receiving party by a third party, without restriction as to use or disclosure;

GENNCOMM 029

d)   is information which the receiving party can document was independently developed by the receiving party;

e)   is required to be disclosed pursuant to law, provided the receiving party uses reasonable efforts to give the disclosing party reasonable notice of such required disclosure; or

f)   is disclosed with the prior written consent of the disclosing party.

Additionally, in the event of a disclosure required pursuant to a requirement of a governmental agency or law, the Party seeking to disclose Confidential Information will provide to the Disclosing Party notice prior to such disclosure in order to afford the Disclosing Party a reasonable opportunity to file objections to the disclosure with the appropriate agency or entity.

6.    Ownership of Confidential Information: All Confidential Information, and all material items delivered by the Disclosing Party to the Recipient, remains the property of the Disclosing Party or their agent and no license or other rights in the Confidential Information are granted to the Recipient by this Agreement or by the act of disclosure. No rights, obligations, representations or terms other than those expressly set forth herein are to be implied from this Agreement. In particular, without limitation, no license is hereby granted directly or indirectly to any Party or their respective employees: (a) under any patent, trademark, trade secrets or copyright; or (b) to use the other Party's name, trade names, trademarks, service marks, logos or designs for any purpose; without the other Party's prior written permission.

7.    Return of materials and documents: Upon the written request of the Disclosing Party, the Recipient shall return to it (or, at the request of the Disclosing Party, erase or destroy) all materials that contain or embody any Confidential Information of the Disclosing Party, including but not limited to all computer programs, documentation, notes, plans, drawings, and copies thereof. Return or destruction of such material shall not relieve the Recipient of its obligations of confidentiality. Upon the request of the Disclosing Party, the Recipient will certify that it has complied with the provisions of this paragraph.

8.    Non-Circumvention: In addition the Parties agree to not circumvent each other and work with business associates, clients, and other third party vendors introduced by each party. The parties may introduce each other to companies that are interested in acquiring companies or being acquired. It is understood that the introducing party retains ownership of such a referral and that the other party cannot deal directly with such referred company without the written consent of the referring party. This non-circumvention provision shall expire at the end of three (3) years from the termination of this Agreement.

9.    Non-Solicitation: For a period of two (2) years after the termination of this Agreement, all parties agree that they will not solicit for hire, or hire or advice or assist others with the opportunity to do the same, any employee of any other party, without the prior written consent of such other party.

10.    Remedy: The Parties hereby acknowledge that unauthorized disclosure or use of Confidential Information or a breach of this Agreement could cause significant and irreparable harm, which may be difficult to ascertain, and that money damages would be inadequate compensation. Accordingly, the Parties agree that the Disclosing Party shall have the right to seek and obtain injunctive relief from breaches of this Agreement in addition to any other rights and remedies it may have from a court of competent jurisdiction.

11.    Termination: This Agreement shall survive and remain in effect until expressly terminated in writing and signed by all Parties, or until three (3) years from the date of execution, whichever is earlier.

12.    General: This Agreement contains the entire agreement between the parties, and supersedes any prior written or oral agreements between them concerning the subject matter contained herein. The provisions of this Agreement may be waived, altered, amended or repealed, in whole or in part, only upon the written consent of all parties. The waiver of any party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof. This Agreement constitutes the product of negotiations of the parties hereto and any enforcement hereof will be interpreted in a neutral manner and not more strongly for against any party based upon the source of the draftsmanship of this Agreement. If any provision of this Agreement shall be held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions hereof shall continue to be fully effective. This Agreement shall be deemed to have been executed and delivered within the State of California, and the rights and obligations of the parties shall be construed and enforced in accordance with, and governed by, the laws of the State of California.

GENNCOMM 030

GennComm, LLC

*Daniel Rosenberg*

By: _____    Date: _____

Name: <u>Daniel Rosenberg, for  GennComm, LLC.</u>

Title: <u>Managing Director</u>
(818)839-1461
www.GennComm.com


Beverly Hills Teddy Bear

By: _____    Date: _____

Name:_____

Title:_____

GENNCOMM 031

1

## **PROOF OF SERVICE**

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3
4

     I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 100 North Brand Boulevard, Suite 536, Glendale, California 91203.

5

     On March 11, 2019, I served the foregoing document described as:

6

- **FIRST AMENDED COMPLAINT**

7
8

on the interested parties in said action, by placing said documents in a sealed envelope with postage and delivery charges thereon fully prepaid, in the United States mail at Glendale, California, addressed as follows:

9

Bret G. Anderson, Esq.
Ferguson Case Orr Paterson LLP

10

4550 E. Thousand Oaks Blvd., Suite 250
Westlake Village, CA 91361

11

Tel: (805) 659-6800
Fax: (805) 659-6818

12

Email: banderson@fcoplaw.com

13

   __X__ **VIA U.S. MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S.

14

Postal Service on that same day with postage thereon fully prepaid at Glendale, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed

15

invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

16

17

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on March 11, 2019, at Glendale, California.

18

19



20

_____
          Vahe Hovanessian, Esq.

21

22

23

24

25

26

27

28

LAW OFFICE OF
VAHE HOVANESSIAN
100 N. BRAND BLVD.
SUITE 536
GLENDALE, CA
91203-2642
TEL.: (818) 240-1333
FAX: (818) 240-1369

*GennComm, LLC v. Beverly Hills Teddy Bear Company, et al.*             18VECV00045
PROOF OF SERVICE