# EXHIBIT 7

*BEVERLY HILLS TEDDY BEAR COMPANY VS.*
*BEST BRANDS CONSUMER PRODUCTS, INC.*

*RANDY W. CLARK 30(b)(6)*
*February 21, 2020*
*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*



*Original File 301474.txt*
Min-U-Script® *with Word Index*

Exhibit 14

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
     ---------------------------------------X
 3   BEVERLY HILLS TEDDY BEAR COMPANY,
 4              Plaintiff
 5        - against -
 6   BEST BRANDS CONSUMER PRODUCTS, INC.,
     and BEST BRANDS SALES COMPANY, LLC,
 7
                Defendants.
 8   ---------------------------------------X
 9
10           *** HIGHLY CONFIDENTIAL ***
11              ATTORNEYS' EYES ONLY
12
13               60 East 42nd Street
                 New York, New York
14
                 February 21, 2020
15                  12:32 p.m.
16
17           30(b)(6) DEPOSITION of BEVERLY
18   HILLS TEDDY BEAR COMPANY, by RANDY W. CLARK,
19   pursuant to Notice, before Elizabeth
20   Santamaria, a Certified Court Reporter and
21   Notary Public of the State of New York.
22
           ELLEN GRAUER COURT REPORTING CO., LLC
23            A U.S. LEGAL SUPPORT COMPANY
          126 East 56th Street, Fifth Floor
24            New York, New York 10022
                   212-750-6434
25                REF:   301474
```

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   EPSTEIN DRANGEL, LLP
 4   Attorneys for Plaintiff
 5       One Grand Central Place
 6       60 East 42nd Street - Suite 2520
 7       New York, New York 10165
 8   BY:  JASON DRANGEL, ESQ.
 9        KERRY BROWNLEE, ESQ.
10        jdrangel@IPCounsellors.com
11
12   GOLDBERG COHEN, LLP
13   Attorneys for Defendants
14       1350 Avenue of the Americas, 3rd Floor
15       New York, New York 10019
16   BY:  MORRIS E. COHEN, ESQ.
17        LEE A. GOLDBERG, ESQ.
18        Mcohen@goldbergcohen.com
```

Page 3

```
 1   ------------------ I N D E X ------------------
 2   WITNESS                  EXAMINATION BY      PAGE
 3   RANDY W. CLARK 30(b)(6) MR. GOLDBERG          6
 4
 5
 6   --------------- DOCUMENT REQUESTS ---------------
 7   PAGE    87  Art boards
 8           99  All iterations of all artwork with
 9               dates saved
10          100  Documents from Wilko
11
12
13   ---------------- E X H I B I T S ----------------
14   CLARK       DESCRIPTION                    FOR I.D.
15   Exhibit 1   Document entitled "Topics of       8
16               Examination For Rule 30(b)(6)
17               Depositions"
18   Exhibit 2   One page Bates stamped            26
19               BHTBC000918
20   Exhibit 3   Pages Bates stamped BHTBC00168,   35
21               -1639 and -1665
22   Exhibit 4   Pages Bates stamped BHTBC001581   73
23               to BHTBC001587
24   Exhibit 5   Pages Bates stamped BHTBC001543   82
25               to BHTBC001545
```

Page 4

```
 1   ----------- E X H I B I T S (Cont'd) -----------
 2   CLARK       DESCRIPTION                    FOR I.D.
 3   Exhibit 6   One pages Bates stamped           87
 4               BHTBC000917
 5   Exhibit 7   One-page document Bates stamped   90
 6               BHTBC001521
 7   Exhibit 8   One-page document Bates stamped   93
 8               BHTBC001539
 9   Exhibit 9   Second Amended Complaint         102
10
11
12           (EXHIBITS TO BE PRODUCED)
```

Exhibit 14

BEVERLY HILLS TEDDY BEAR COMPANY, INC. vs.  
BEST BRANDS CONSUMER PRODUCTS, INC.  
HIGHLY CONFIDENTIAL  
ATTORNEYS' EYES ONLY  
RANDY W. CLARK 30(b)(6)  
February 21, 2020

**Page 13**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Okay.
A. We're not a big company, we really wear a lot of different hats. So my title is President but I do some sales, I do some product development. So I have a hand in a few areas within the company, not just managerial presidential stuff.
Q. How many people are in the company today?
A. Roughly 25, 30.
Q. And has that changed since 2009? 2010?
A. Within the last couple of years we've grown. I think it's grown from -- we had 15 to 20 to 20 to 30.
Q. Mr. Clark, I'm going to show you what we have designated as Solomon number 1, which is the --
     I know, I'm sorry it's small but that's the way it was produced to us.
A. That's fine.
     (Reporter requested clarification.)
Q. Which is the Solomon number -- I'm sorry. Which is the BHTB organization chart.

**Page 14**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

     And just so you know, those are my handwritings on the top. In fact, let me give this back to you because I think I have the original. This is better.
     Looking at Solomon number 1, does that accurately depict the organizational chart today?
A. So this is a different version than the one that I've -- the one that I recall in my head. This is a little bit different one. But the people are --
     You mean in terms of active people on here? Is that what you're asking?
Q. Yes.
A. So there's a couple of people that -- that -- like Marianne Berry is no longer with us. So there's changes on here.
Q. Can you tell me the changes, if you recall.
A. I'm starting from here. So Hope White is no longer with the company, Marianne is no longer with the company.
Q. Just say her last name, if you would.

**Page 15**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. Marianne Berry.
Q. Okay.
A. Glenn Jackson is no longer with the company. And then we've made some hires to fill some gaps where people have left.
Q. How many people have you hired?
A. Two or three.
Q. In what areas?
A. We hired a gentleman to handle e-commerce for us, e-commerce sales. We hired a woman to handle and assist on operational sides of things, to take over for Glenn Jackson who is not with us, and then on the --
     I guess that would be it. That's all I recall.
Q. Okay. Have you hired anybody in the design area? I think it's over here (indicating).
A. Thank you. Those.
     Are our four key designers.
Q. Okay.
A. They're all there.
Q. They are all still there?
A. Yes.

**Page 16**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. Thank you.
A. Yup.
Q. Mr. Clark, as you know, this case revolves around the Squeezamals. Did you play any role in the development of those products?
A. Not in the initial stages. My role in -- it is more product development as opposed to product design. Taking the finished design and handling the manufacturing side is where I handle most of it.
Q. Can you be more specific as to exactly what your role is in product development regarding this particular product?
     And the reason I say products is because my understanding is there are different series to the products.
A. Correct.
Q. And so maybe we should start there and say, did you play the same role for all the series of the products?
A. No, I did not.
Q. Okay. And so tell me how it differed.
A. So when we started with Series 1, I

Exhibit 14

Case 1:19-cv-03766-AS   Document 293-7   Filed 12/18/23   Page 5 of 10

BEVERLY HILLS TEDDY BEAR COMPANY v.  HIGHLY CONFIDENTIAL                    RANDY W. CLARK 30(b)(6)
BEST BRANDS CONSUMER PRODUCTS, INC.  ATTORNEYS' EYES ONLY                   February 21, 2020

Page 17

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2  handled the factory communication and initial
3  manufacturing of the product. And as it went
4  on to Series 2, Series 3 or even seasonal
5  assortments, whatever it might be, we had a
6  woman on our staff handle the product
7  development from that point on in terms of
8  sampling with the factories, and then our
9  Hong Kong staff would handle the shipment end
10 and all the elements that go with it; cart
11 markings, packaging, you name it.
12     So I handled the first series and
13 then I don't know where, at what point, but it
14 was in between Series 1 and Series 2 that I
15 handed off the actual product development.
16  Q.  Okay. How would I tell as a
17 layperson the difference between Series 1 and
18 Series 2?
19  A.  Well, it's noted on the hang tag
20 and packaging. We have different scents,
21 smells that are in it. I believe Series 1 was
22 watermelon, Series 2 I believe was grape, and
23 then the different animals and designs are
24 different from Series 1 to Series 2.
25  Q.  Do you recall how many animals

Page 18

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2  there were in Series 1?
3  A.  I'm going to guess that it was 14,
4  12 to 14 different.
5  Q.  And we will get to some pictures to
6  take a look at that.
7  A.  Sure.
8  Q.  Okay. You said that you were in
9  charge of product development in Series 1.
10 A.  Correct.
11 Q.  And you mentioned a woman on your
12 staff that took over that between Series 1 and
13 Series 2. Can you tell us her name?
14 A.  Mimi Angeles. She is titled
15 Manager, Product Development.
16 Q.  You talked about product
17 development in terms of a finished product, so
18 is it fair to characterize your testimony that
19 you were not involved in the design of the
20 product?
21 A.  The art design?
22 Q.  Well, any part of the design.
23 A.  I was involved in the designing of
24 the product once I had artwork.
25 Q.  Okay.

Page 19

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2  A.  So, you know, you start with
3  conceptual art and once that was at a point
4  where we're confident to sample, then that's
5  where I took it and sampled with China, at the
6  factory.
7  Q.  Can you explain for us the process
8  that went into the initial design of the
9  Squeezamals Series 1 to when you received it?
10 A.  I can't. I was not intimately
11 involved in the artwork. I was not intimately
12 involved in choosing colors or anything that
13 went along with that. Where I really jumped
14 in full-force was in the manufacturing and
15 sampling. We had to get it going so that was
16 my role, to get it shipped.
17 Q.  So is it fair to say that once the
18 artwork and the colors and the animals were
19 chosen, they gave it to you to sample?
20 A.  Correct.
21 Q.  And walk me through, if you will,
22 what you do in terms of sampling. Can you be
23 more specific in that regard?
24 A.  Once I have the artwork from the
25 design team, I'll take the artwork and give it

Page 20

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2  to our factory. And our factory has sample
3  makers. I'll work with the sample makers to
4  create a pattern. Artwork can be taken a lot
5  of different ways. So when you take the
6  approved art, we have to make sure the pattern
7  is something that can be produced effectively
8  through, you know, manufacturing processes.
9      A toy stuffed animal is not just --
10 you know, a lot goes into creating that
11 pattern to make sure it looks as close as
12 possible to the art. And then we'll get, you
13 know, first samples back from the factory. So
14 I'll work with them on materials, picking out
15 materials that includes fabric swatches, books
16 of fabrics with all different feels, looking
17 at that and looking at pricing for the fabric.
18 So I want to be careful with the pricing.
19     And then we go through counter
20 samples. So we get first samples back, they
21 provide the samples, then we review them,
22 counter sample and counter sample, as many
23 times as we get something that we like and
24 then we approve it.
25 Q.  Can you design for us what "counter

Exhibit 14

Page 21

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2  sample" means?
3     A.  Just a sample that is revising the
4  previous instruction, so if I'm sitting down
5  with a sample maker and instructed him to
6  change from yellow to blue or changing the
7  location of an embroidery, the counter sample
8  would be the sample that they give to me after
9  that comment.
10    Q.  And do you make the final decision?
11    A.  Not myself alone.
12    Q.  And can you describe for the
13 process how that decision is made?
14    A.  Honestly, it varies from line to
15 line.  In regards to Squeezamals it was --
16       What I recall is that it was mostly
17 David and myself in partnership with the
18 creative team and when we liked it, we
19 approved it and started manufacturing.
20    Q.  Who is on the creative team or was
21 at the time of the Series 1?
22    A.  Still the same people.  It's Kana
23 Claussen, Charlie Boyle, Justin Kinder.
24       Actually, I'll correct that.  Those
25 three and Yuting Lin was not on with us at the

Page 22

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2  time of Squeezamals.  Yuting.
3     Q.  Can you spell it for our court
4  reporter.
5     A.  Y-U-T-I-N-G, last name Lin, L-I-N.
6     Q.  And then it's ultimately finalized
7  for marketing?  Or let me ask you a different
8  question.  What is the next step?
9     A.  After it's approved?
10    Q.  Yes.
11    A.  We manufacture.  It's a dual
12 process between manufacturing, at the same
13 time getting our plan from marketing and how
14 we're going to market it, rush samples for a
15 commercial.  You know, our -- with our sales
16 effort, our commitment on Squeezamals was to
17 provide commercials and so we had to rush
18 samples for that.
19       So it's producing and at the same
20 time getting our marketing so we can be up and
21 running even prior to it being in the store.
22    Q.  When you say commercials, you mean
23 actual TV commercials?
24    A.  TV commercials, yes.
25    Q.  So you were doing that at the same

Page 23

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2  time you were developing the Squeezamals?
3     A.  Not me but the company, correct.
4     Q.  And do you recall the time period
5  that this was all going on?
6     A.  So --
7     Q.  Just to be clear, we're talking
8  about Series 1.
9     A.  Correct.  It would have been
10 November of 2017.
11    Q.  What does that date mean?  Is that
12 the date you developed it?  Is that the date
13 you got the commercials going?
14    A.  That was the date that we
15 started --
16       I went to China and that's -- after
17 I had the artwork I went to China.  We were
18 onto our very rushed schedule in order to ship
19 the product and have it in the store for our
20 initial launch with our customer, so that
21 would have been -- I believe I went to China
22 in November and we had the product in-store in
23 January of 2018.  So between that time there's
24 manufacturing and it was marketing, TV
25 commercial, prepping it.

Page 24

1  CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
2     Q.  And you mentioned the initial
3  launch with your customer.  Which customer
4  were you talking about?
5     A.  Target.
6     Q.  When did you launch it with Target?
7     A.  January of 2018.
8     Q.  And can you define what you mean by
9  "launch"?
10    A.  On-shelf in-store.
11    Q.  On-shelf in-store, Series 1?
12    A.  Correct.
13    Q.  January 2018; is that correct?
14    A.  That's what I recall, yeah.
15    Q.  Do you -- and I know this brings
16 you back, but do you recall the date?
17    A.  I don't.
18    Q.  Was the entire series in the store
19 on that date?
20    A.  Every style like the 14 that I
21 mentioned, possibly.  I don't recall.
22       I know that we had worked on adding
23 styles to Series 1.  There is a possibility
24 that not all Series 1 were on-shelf on that
25 January date.

Exhibit 14

BEVERLY HILLS TEDDY BEAR COMPANY vs.  
BEST BRANDS CONSUMER PRODUCTS, INC.  
HIGHLY CONFIDENTIAL  
ATTORNEYS' EYES ONLY  
RANDY W. CLARK 30(b)(6)  
February 21, 2020

Page 29

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

We launched with a 3.5 inch size, so there is more to Series 1 than what is on this list.

Q. Okay. But it's fair to say that the 3.5 was Series 1; if I see 3.5, I know it's Series 1?

A. Except for the top four there that are exclusives.

Q. So just to be clear, if it says 3.5-inch and it doesn't say "exclusive" then it's Series 1?

A. Correct.

Q. And then can you look at the rest of that column and tell us if you know what series that appears in.

A. For like the 8-inch?

Q. Yes.

A. So what we did is we launched with 3.5-inch, and then after that initial launch we focused on two other sizes that we felt were important. It was a clip-on size, which looks like from this list all of them would be Series 1, and then we also did 8-inch size. So we had three sizes for Series 1, 3.5-inch,

Page 30

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

clip-on size and 8-inch.

Q. Okay. What does a clip-on size mean?

A. Roughly, in this situation it was two and a half inches.

MR. GOLDBERG: Off the record for a second.

(Discussion off the record.)

Q. Mr. Clark, previously marked in a container that has been marked as Plaintiff's Exhibit 31 there are a number of -- intermixed is the accused products, Fuzzy Squishies, along with your company's products, the Squeezamals. Do you see that?

A. Uh-huh. Yes.

Q. Feel free to rummage through them, but can you identify --

And I'm looking particularly at Plaintiff's Exhibit 21. Can you describe that. Is that a three and a half inch product?

A. Yes.

Q. And would that be a Series 1 product?

Page 31

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. I believe it is, but I don't see it on the original. For this one in particular, this unicorn, I don't see it on our hang tag.

Q. I have put the rest of your company's products in front of you. Can you tell me just going through them if they are Series 1 or Series 2. And then what we'll do is we will identify --

You know what? Better yet, if when you go through them you see the numbers on the front, if you can identify whether that's Series 1, Series 2 or something different.

A. So all these are Series 1.

Q. Okay.

A. Every single one of these right here in front of us.

This is a duplicate, the rabbit or bunny. Yeah, one of them --

This is marked so one must not be marked. You want me to go through these?

Q. You already said they are all Series 1?

A. All of them are Series 1.

MR. GOLDBERG: I'm just going to

Page 32

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

tell the court reporter, I tell you what, we'll do that on a break. This way we don't waste your time.

Q. Going back to the initial launch --

And you said that was in January 2018, correct?

A. Yes.

Q. Prior to that time had you made an offer to Target to sell them the Squeezamals?

A. Prior to January?

Q. Yes, prior to January 2018.

A. Yes.

Q. When was that?

A. I don't know the exact date but it had to be in November or December of '17, 2017.

Q. Can you walk me through the process of how that offer for sale occurred with Target?

A. I was not intimately involved in that.

We have a rep, a representative, that handles sales for us at Target and they will handle the day-to-day communication with

Exhibit 14

BEVERLY HILLS TEDDY BEAR COMPANY v. HIGHLY CONFIDENTIAL  
BEST BRANDS CONSUMER PRODUCTS, INC. ATTORNEYS' EYES ONLY  
RANDY W. CLARK 30(b)(6)  
February 21, 2020

Page 33

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

our direction from Beverly Hills Teddy Bear Company to the rep and then the rep will communicate. Sometimes we're involved in e-mail correspondence or conference call.

So in regards to Series 1, sometime between November and December -- I would actually say it was November because December would be too late, so I believe it would be in November time frame. We, our rep group and our rep, communicated with the buyer and went back and forth and liked what they saw and moved forward.

Q. How do you know it was in November of 2017?

A. So it could have been in October. I know it would be --

We have a show in Dallas early October, it's called the Dallas Toy Preview, and at that time I'm confident that we didn't have an agreement with Target at that time but there could have been early discussions. They could have been seeing artwork from us.

A lot of times with relationships we have with other buyers sometimes they

Page 34

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

will -- we'll show them early conceptual art without seeing samples. So there's a chance, but it would be October would be a lot of the communication with the culmination of an order and confirmation.

Now, when I say "order," it might not be an actual physical purchase order. It might be a commitment, "Yes, we're going to order X amount," you need it by X date.

I don't know all that transpired with that. All I know is in Dallas in October, which is early October, we did not have a commitment. But by November I was in Hong Kong -- I'm sorry -- China getting this produced to rush to shipment. So between November in Dallas and November me being in China, that's when it happened.

Q. Do you recall what part of November you were in China?

A. I don't. I don't recall.

Q. Is it fair to say you weren't in China over Thanksgiving?

A. Correct.

Q. So it would be at the earlier part

Page 35

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

of the month?

A. I would assume yes.

Q. Okay. And when you say you had a commitment from Target, would that have been in writing?

A. Possibly. Sometimes it's verbal, sometimes it's on a call. So I don't know if it was in writing or not but we had -- it was enough for us to move forward with ordering, producing, yeah.

MR. GOLDBERG: I would like to mark as Clark Exhibit 3 a document bearing Bates numbers 1638 through 1639. There is a last page that has a number of figures on it that doesn't have a number on it, so that's the whole exhibit.

The last page does in fact have a number. It's 1665.

(Clark Exhibit 3, pages Bates stamped BHTBC00168, -1639 and -1665, marked for identification, as of this date.)

Q. Mr. Clark, if you would, take a look through that exhibit and if you would, it talks about an attachment on it. Can you

Page 36

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

confirm for me that those figures are, in fact, the attachment that should be attached to this particular e-mail string?

(Witness reviewed exhibit.)

A. Yes. These would be more of the original. We made modifications from this but yes, this is from Series 1.

Q. What modifications did you make?

A. So the chick on the top is yellow. We revised the art from white to yellow. The bear on the top, the brown bear became a moose in production. The owl became a different color. The owl became pink like that one right there.

But, yes, this would be Series 1.

Q. And but for those changes that you just testified about, those were the animals that appeared in the launch with Target?

A. That I recall, yeah.

Q. So if you look at the first page, it says "We have a huge meeting with the VP of Toys at Target to try to get them to buy huge on Squishamals." And in fact the Squishamals are the products on the last page, correct?

Exhibit 14

BEVERLY HILLS TEDDY BEAR COMPANY v.  
BEST BRANDS CONSUMER PRODUCTS, INC.  
HIGHLY CONFIDENTIAL  
ATTORNEYS' EYES ONLY  
RANDY W. CLARK 30(b)(6)  
February 21, 2020

**Page 37**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2  A.  Correct, and the name changed.
3  Q.  To Squeezamals?
4  A.  Correct.
5  Q.  So that's the Series 1 that we've
6  been talking about that appeared in the launch
7  on January 2018, correct?
8  A.  That is correct.
9  Q.  Okay.  And was this the first
10 meeting that you had regarding the Squishamals
11 the Thursday after October 27th with Target,
12 which would have been November 2, 2017?
13 A.  I don't think this would have been
14 the first, no.
15 Q.  You think it would have been
16 sooner, before October 27th?
17 A.  I would think, knowing normal
18 processes, we're not going to get a --
19     I assume there is discussion -- I
20 don't know if there is a meeting, but a
21 discussion with the buyer in some capacity
22 about, at this time, Squishamals.
23 Q.  So is it fair to say that prior to
24 October 27, 2017, that Beverly Hills offered
25 Series 1 Squishamals or Squeezamals to Target?

**Page 38**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2  A.  I don't know for certain, but that
3  would be my -- my guess is that it would.
4  Before a meeting there would be previous
5  discussions about this brand to get the
6  meeting, if we're going to have a meeting with
7  the high-up at Target.
8  Q.  And do you have any understanding
9  as you sit here today as to how much before
10 that time period it would have been?
11 A.  Not -- I don't think it would be
12 before the Dallas toy fair, which would have
13 been the first week of October, so sometime
14 between then and this date.
15 Q.  So between October 1st, 2017 and
16 October 27th, 2017, is it fair to say that
17 there was some discussion with Target
18 regarding the sale of the Squeezamals
19 Series 1?
20 A.  I would assume so, yes.
21 Q.  And at that meeting would you or
22 somebody from Beverly Hills have shown them,
23 Target, the artwork that appears on the third
24 page of this exhibit?
25 A.  I wasn't in the meeting but I would

**Page 39**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2  think that the buyer would have seen artwork.
3  Q.  At that meeting?
4  A.  Potentially, or samples.  Early
5  samples could have -- you know, if I'm working
6  with the factory, it could have been a mixture
7  of artwork and samples.
8      Obviously by this time I wouldn't
9  have had all these styles because that was in
10 November when I was working on it.  But there
11 could have been a very first -- like we talked
12 about the original sample.  Could have been at
13 this meeting, I don't know.  But there's a
14 possibility that the artwork was shown at this
15 meeting as well.
16 Q.  Do you recall when you had the
17 original samples from the Squeezamals?
18 A.  I don't.  I don't recall.
19 Q.  Do you recall whether it was before
20 or after -- before or after you went to China?
21 A.  It would have been -- the original
22 original probably would have been before I
23 went to China, yeah.
24 Q.  How was the original samples made?
25 Were they --

**Page 40**

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2      Not how were they made in the sense
3  of somebody knitting them together or putting
4  them together, but who designed them?
5  A.  The original, our design team.
6  Q.  Okay.
7  A.  Yeah.
8  Q.  And so they would have given you
9  samples.  You would not have gotten that from
10 China, correct?
11 A.  No, they don't handle anything with
12 the samples.
13 Q.  "They" being?
14 A.  The design team.
15 Q.  Okay.
16 A.  The design team doesn't handle
17 actual samples.  The sample would have come
18 through me.
19 Q.  From where?
20 A.  From the factory.
21 Q.  In China?
22 A.  Correct.
23 Q.  Can you tell me the name of the
24 factory?
25 A.  So we used a -- a -- we call it a

Exhibit 14

Page 85

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

actual samples. January I would have shown actual samples in Hong Kong.

Q. Would know the answer to the question definitively whether they were offered for sale in October of 2017? Because that would have preceded the January 2018 show.

A. So there wouldn't -- no offer to -- no offers for sale. Like we wouldn't have sold anything in October. We would have shown art boards in October. We could have shown art boards, like conceptual stuff. Kind of like the private room we have, a lot of times it's just art boards, it's not actual product.

So in October of '17 we didn't have samples, we didn't have pricing, we didn't have anything. We couldn't have sold it then. We could have shown them artwork.

Q. And I took the prerogative of saying offered for sale, but I meant shown art boards. Do you know whether they were shown in Hong Kong in 2000 -- let me rephrase it -- that the art boards of the Squeezamals were shown in 2017 in Hong Kong, in October?

Page 86

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

A. Yes. They would have had art boards. I'm pretty sure that they did, yeah.

Q. And would that have included all the animals from Series 1?

A. No.

Q. What would the art boards have shown?

A. We went through so much different -- I went through so many different tweaks and stuff to get the look right so it could have been --

You know, there's different stages of design and artwork. So I don't recall. It wouldn't have been all that right there.

Q. Okay. So I'm looking at Clark 3 and I'm looking at the last page. Okay?

A. Yeah.

Q. You said it wouldn't have been all of those. Can you tell me which ones it would have been?

A. I can't tell you, but I know that from the October show to the January show it was -- basically we were done because in January we were -- actually had shipped the

Page 87

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

product.

Q. Right.

A. So, you know, in January I don't think it would be hardly any --

I mean, I'm sorry, in October it wouldn't be hardly any of these, I wouldn't think. I don't -- I think it could have been some iterations of some of the animals but they were not finalized.

Q. Do you keep any records of the art boards?

A. Our design team does.

Q. And are they dated?

A. Yeah. I think they should save it with the date.

RQ    MR. GOLDBERG: We would like those art boards.

That's for your counsel, not for you.

Let me mark as Exhibit 6 a document bearing Bates numbers BHTBC000917.

(Clark Exhibit 6, one pages Bates stamped BHTBC000917, marked for identification, as of this date.)

Q. Mr. Clark, can you identify what

Page 88

CLARK - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

number 6 is?

A. Looks like a chargeback to Wal-Mart for product.

Q. What does that mean, a chargeback?

A. So -- let me see the date here.

Chargeback means that, you know, there's an agreement made between us and Wal-Mart that if they have a carryover or if they want to move on to a new series -- or there's a variety of reasons why there would be a chargeback. But basically we're agreeing to pay Wal-Mart a certain amount of money for something, whether it's --

It could be a rollback like we talked about, it could be in advertising, you know, partnering in advertising, you know, in-store advertising or something like that.

What is the date? I don't see the date.

Q. It's in the upper right-hand corner. It says invoice date 4/28/2019.

A. Okay.

Q. Do you know whether this had to do with the Squeezamals?

Exhibit 14